## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SPRINT NEXTEL CORPORATION<br>6200 Sprint Parkway<br>Overland Park, Kansas 66251 | ) ) ) ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) ) | |
| AT&T, INC.<br>208 S. Akard Street<br>Dallas, Texas 75202-2233, | ) ) ) ) | Case No. |
| | ) | Filed: |
| AT&T MOBILITY LLC<br>Glenridge Highlands Two,<br>5565 Glenridge Connector<br>Atlanta, Georgia 30342, | ) ) ) ) ) | |
| T-MOBILE USA, INC.<br>12920 SE 38th Street<br>Bellevue, Washington 98006, | ) ) ) ) | |
| and | ) ) | |
| DEUTSCHE TELEKOM AG<br>Friedrich-Ebert Allee 140<br>53113 Bonn, Germany | ) ) ) ) | |
| *Defendants.* | ) ) | |

## <u>COMPLAINT</u>

Plaintiff Sprint Nextel Corporation ("Sprint") brings this action for injunctive relief under the antitrust laws of the United States to enjoin the acquisition by AT&T, Inc., and its wholly owned subsidiary AT&T Mobility LLC (together, "AT&T") of T-Mobile USA., Inc. ("T-Mobile"), a subsidiary of Deutsche Telekom AG ("Deutsche Telekom").  Plaintiff Sprint

alleges on knowledge as to itself and its own acts and on information and belief as to all other matters as follows:

## I.     NATURE OF THE ACTION

1.      AT&T's proposed takeover of T-Mobile is brazenly anticompetitive.  In one fell swoop, AT&T's proposed purchase would eliminate one of four national competitors and marginalize a second (Sprint), pushing the market back toward a 1980s-style cell phone duopoly that would force consumers to endure higher prices and be denied the fruits of vigorous innovation.  If allowed to be consummated, the merger also would adversely affect businesses that rely on wireless services and the Internet and many other key sectors of the economy.

2.      On its face, the horizontal combination of AT&T and T-Mobile is a classic violation of antitrust merger law, resulting in market concentration far in excess of the thresholds established both by a long and uninterrupted line of Supreme Court precedent and by the U.S. Department of Justice ("DOJ") and Federal Trade Commission ("FTC") 2010 Horizontal Merger Guidelines.  No matter how market shares are measured – all wireless services for consumers, postpaid wireless services for consumers, wireless services for business and governmental accounts – the proposed transaction would leave AT&T controlling in excess of 40 percent of the national markets, and would give it the ability to exercise market power both unilaterally and in coordination with Verizon, as these Twin Bells together would control more than three quarters of all wireless services.

3.      The effects of AT&T's acquisition of T-Mobile would actually be far worse than these high market shares and concentration levels indicate.  First, by acquiring T-Mobile, AT&T would be removing a low price and innovative maverick competitor that provides particularly disruptive competition in the marketplace.  Second, Verizon, AT&T's most significant

competitor post-merger, would not have the incentive to constrain AT&T, and would have a substantially increased incentive to coordinate with AT&T rather than compete.  This would lead to higher prices for retail accounts, corporate accounts, backhaul, and roaming.  Third, Sprint's ability to discipline AT&T and Verizon in the marketplace would be diminished because of its reduced ability to obtain cutting-edge handsets, its foreclosure from key applications and content, and its unavoidable reliance on AT&T and Verizon for key inputs such as backhaul and roaming. Finally, the small wireless companies – MetroPCS, Leap, U.S. Cellular, and others – have in the aggregate less than a 7-percent share of all facilities-based wireless services and less than 3 percent of the postpaid segment, and accordingly would be unable to reposition and expand their businesses across the country to provide any real constraint on the Twin Bells.  In short, the adverse effects of this merger on competition would be far greater than a simple reduction from four competitors to three – which in this case is presumptively illegal in its own right.

4.     The ultimate and predictable effect of the proposed transaction would be to tip the U.S. wireless industry effectively toward a duopoly controlled by AT&T and Verizon.  With the assets AT&T seeks to acquire from T-Mobile, AT&T and Verizon together would have:  (1) duopoly control over three quarters of wireless customers and almost 90 percent of industry profits; (2) exclusive early access to iconic handsets (e.g., the iPhone) and the ability to capture the next such innovation – assets key to acquiring and retaining customers in today's market; (3) preferential access to the other products and services that make wireless services attractive to consumers, including the latest and best mobile operating systems, the ability to deploy a full suite of applications, access to content that consumers demand, and incorporation of the latest devices (e.g., cameras, GPS navigation, music, etc.); (4) significant inputs that smaller

competitors need to provide wireless service, including backhaul and roaming services; and (5) virtually all of the "beachfront" spectrum.

5.      Control over the wireline infrastructure commonly used to provide backhaul would further solidify the duopoly control of AT&T and Verizon if the acquisition is allowed to proceed.  For decades the Bell System controlled wireline monopolies across the country. Because it was widely recognized as stifling innovation, the DOJ broke up the Bell System in 1984.  But through a series of acquisitions, the "Ma Bell" descendants, AT&T and Verizon, have largely reassembled the Bell monopolies under their joint control.  These wireline assets, and the associated rights-of-way, are important for backhaul in many areas, which in turn is essential to wireless service because most wireless calls are wireless only from the user's handset to the nearest cell tower.  In 2010, Sprint paid almost $1 billion in backhaul charges related to wireless services, about two-thirds of which went to the Twin Bells – the largest players in the downstream wireless marketplace.  By removing T-Mobile as a major purchaser of independent backhaul services, the proposed transaction would both entrench AT&T and Verizon's market power over backhaul in their respective regions, and significantly raise the cost of access to backhaul services for Sprint and all other carriers.

6.      Economics and history teach that duopolies do not offer low prices or aggressively innovate.  During the FCC-created cell phone duopoly of the 1980s, consumers did not enjoy the benefits of either lower prices or significant innovation.  It was only with the auctions of spectrum in the 1990s and the advent of competition that prices began to fall rapidly and innovation blossomed.

7.      The proposed acquisition would not only harm consumers, it would injure Sprint (and the independent niche wireless providers) by increasing AT&T's market power through

acquisition rather than through competition on the merits.  After the proposed merger, AT&T would be able to use its enhanced market power as a result of the acquisition to demand harmful and inefficient handset exclusivity agreements and further restrict the access of Sprint and others to the newest cutting-edge handsets.  Moreover, as a result of the significant increase in market concentration resulting from the merger, AT&T and Verizon, both unilaterally and in coordination, would have the increased ability and incentive to directly raise the costs that their rivals must incur for backhaul and roaming.  Through these actions, which flow directly from the changes in market structure resulting from AT&T's takeover of T-Mobile, AT&T would ensure that Sprint and the smaller fringe carriers would be injured in their businesses and would be unable to restore the competition lost by the elimination of T-Mobile.

8.      The wireless industry is far too important to the U.S. economy to give gate-keeper control over it to the Twin Bells.  As a result of the transaction, the Twin Bells would gain effective control of the almost one-quarter of a *trillion*-dollar wireless services business that functions as the crucial link for many consumers and businesses to connect to the Internet, run their applications, obtain access to content, and otherwise communicate and manage their daily lives.  Allowing AT&T to achieve duopoly control of the wireless industry through acquisition would not only lead to harmful and lasting price effects on consumers, it would lessen the pace of innovation in multiple sectors connected to the wireless industry, including mobile operating systems, hardware and application development, access to content, and alternative forms of network delivery and infrastructure.

9.      The proposed transaction would thus leave a swath of victims in its wake.  United States consumers would face significantly fewer choices for effective national service with full access to broadband data services and iconic handsets.  Business customers would also suffer

increased prices and reduced innovation as a competitor for corporate accounts is eliminated. Sprint, as well as the independent niche wireless carriers, would suffer antitrust injury as the Twin Bell duopolists seize control of the wireless market, foreclose meaningful access to handsets without competition on the merits, use their assets to raise their rivals' costs, and reduce competition for wireless customers and backhaul services throughout the country.  Scores of companies in connected markets (e.g., mobile operating systems, applications development, WiFi developers, content providers, etc.) also would be injured under the Twin Bell duopoly control of access to the wireless bridge between upstream developers and the consumers they seek to connect with via wireless communications.

10.     No amount of speculative "efficiency" claims concocted by AT&T for the sole purpose of defending its takeover of T-Mobile can overcome or mitigate these predictable anticompetitive effects.

11.     Sprint seeks to permanently enjoin the proposed acquisition of T-Mobile by AT&T because the unavoidable – and intended – result of the transaction would be a substantial lessening in competition throughout the wireless industry, which would injure consumers, Sprint, and numerous other industry participants.  No other remedy would adequately protect the market and consumers from this avoidable harm.

12.     Tellingly, the DOJ has already filed suit to block this illegal transaction.  Fully recognizing the harm this transaction would cause the market and consumers (as Sprint also alleges in this Complaint), the DOJ filed a lawsuit in the District Court for the District of Columbia on August 31, 2011, seeking to permanently enjoin AT&T's proposed takeover of T-Mobile.

## II.   PARTIES

13.   Plaintiff Sprint is a Kansas corporation, having its principal place of business at 6200 Sprint Parkway, Overland Park, Kansas 66251. It provides mobile wireless telecommunications services in the United States.

14.   Defendant AT&T, Inc., is a Delaware corporation with its principal place of business at 208 S. Akard Street, Dallas, Texas 75202-2233. It has entered into an agreement with Deutsche Telekom AG to acquire T-Mobile.

15.   Defendant AT&T Mobility LLC is wholly owned by AT&T, Inc. It is a Delaware limited liability company with its principal place of business at Glenridge Highlands Two, 5565 Glenridge Connector, Atlanta, Georgia 30342. It provides mobile wireless telecommunications services in the United States. Its operations would be merged with T-Mobile's as a result of the transaction.

16.   Defendant T-Mobile USA, Inc., is a corporation organized under the laws of Delaware with its principal place of business located at 12920 SE 38th Street, Bellevue, Washington 98006. T-Mobile is a wholly owned subsidiary of Deutsche Telekom AG. It provides mobile wireless telecommunications services in the United States.

17.   Defendant Deutsche Telekom AG is a German corporation with its principal place of business at Friedrich-Ebert Allee 140, 53113 Bonn, Germany.

## III.   JURISDICTION AND VENUE

18.   Sprint brings this action pursuant to Section 16 of the Clayton Act, as amended, 15 U.S.C. § 26, to prevent and restrain AT&T, T-Mobile, and Deutsche Telekom from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18. Such a violation threatens to substantially lessen competition and cause significant losses and damages to Sprint.

19.     Defendants AT&T and T-Mobile sell mobile wireless services to individuals and businesses, and conduct related operations, in the flow of interstate commerce in the United States, and their activities substantially affect interstate commerce.  Defendant Deutsche Telekom entered into an agreement with AT&T that would, if permitted, have adverse effects on competition and consumers in a number of relevant markets in the United States.  The Court has subject matter jurisdiction over this action and jurisdiction over the parties pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337, and through Deutsche Telekom's actions in and affecting United States commerce.

20.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 22; and 28 U.S.C. § 1391.

## IV.     MOBILE WIRELESS INDUSTRY BACKGROUND

### A.     THE BELL WIRELINE MONOPOLY AND ITS LEGACY

21.     AT&T's corporate predecessors controlled wireline telephone service across the United States through a network of subsidiaries, called Bell Operating Companies ("BOCs"), that came to be known as the Bell System.  Through this network, AT&T controlled a vast infrastructure of fixed phone lines, and held a monopoly over both local and long-distance telephone service and equipment manufacturing.

22.     The DOJ brought suit against AT&T for its monopolization of the U.S. telephone industry that was ultimately resolved through a consent decree that unwound AT&T's control of the Bell System in 1984.  Under this resolution, AT&T continued to provide long-distance service, but had to relinquish its control over local wireline networks by creating seven independent regional BOCs ("RBOCs") to provide local telephone service:  Ameritech

Corporation, Bell Atlantic Corporation, BellSouth Corporation, NYNEX Corporation, Pacific

Telesis Group, Southwestern Bell Corporation (SBC Communications, Inc.) and US West, Inc.

23.     Since the mid-1990s, the industry structure created by the 1984 consent decree

has been consolidated by a series of mergers and acquisitions among the RBOCs.  The result is

that the vast majority of the Bell System's wireline infrastructure is now controlled by only two

legacy Bell companies, AT&T (which SBC acquired in 2005 and renamed the combined firm

AT&T) and Verizon (which is the result of the combination of NYNEX and Bell Atlantic

Corporation).  This wireline inheritance gives AT&T and Verizon significant advantages in

providing mobile wireless services because wireless communication is highly dependent on

landline infrastructure.

## B.     EMERGENCE OF WIRELESS COMMUNICATIONS

24.     Mobile wireless devices convert voice, text, and data into radio signals, which are

then transmitted to a cell site, typically located on a tower or building.  The signal is then carried

by "backhaul" from the cell site to the nearest mobile telephone switching office ("MTSO") by a

dedicated link.  The MTSO houses the wireless carrier's switch, a device for routing

telecommunications traffic, and related equipment.  From the MTSO, the transmission is routed

to the switching office of the terminating carrier and from there to the receiving device.

25.      In 1981, the Federal Communications Commission ("FCC"), which is authorized

under federal law to allocate the use of radio spectrum, established cellular telecommunications

service.  In initiating this service, the FCC decided to grant only two cellular spectrum licenses in

each geographic area, one to the local wireline company serving the area (almost always a BOC),

and the other to a company unaffiliated with any local landline telephone company.

26.     Under this duopoly system, competition was limited, service was expensive, and innovation was slow.  In 1992, a report by the U.S. General Accounting Office ("GAO") evaluated the system and concluded that, despite the existence of resellers, "duopoly markets are unlikely to provide a product at a competitively set price."[1]

27.     To improve wireless service, the GAO report recommended that the FCC inject competition by granting spectrum licenses to additional entrants.  The goal was to establish a market structure that would give consumers more choices for wireless providers, and spur improved service and lower prices.  Following this recommendation, in 1993 Congress authorized the FCC to auction additional spectrum for wireless services.  The FCC designed these auctions to open the wireless service market to competition.  It restricted the amount of spectrum that could be purchased by a single company and thereby created a competitive market with multiple providers.

28.     The introduction of competition was enormously successful, and by the late 1990s, several significant new carriers had emerged.  In April 2003, the GAO reported that Verizon had a 24-percent share nationwide, Cingular and AT&T each had 17 percent, Sprint had 13 percent, Nextel had 8 percent, T-Mobile had 7 percent, and all other carriers had 14 percent combined.[2] Such a market structure would be considered "unconcentrated" based on the methodology the DOJ and FTC use to determine the degree of market concentration.

---

[1]    U.S. Government Accountability Office, *Telecommunications: Concerns About Competition in the Cellular Telephone Services Industry* at 41-42 (Jul. 1992).

[2]    U.S. Government Accountability Office, *Telecommunications: FCC Should Include Call Quality in its Annual Report on Competition in Mobile Phone Services* at 16 (Apr. 2003).

29.     As a result of competition among these carriers and advances in technology, prices for wireless service dropped dramatically, and demand for wireless service grew. Competition produced better quality, lower prices, and greater technological innovation.

30.     In recent years, however, the market for wireless has become far more consolidated, and concentration has risen in large part due to a series of mergers and acquisitions. In the last five years alone, AT&T has acquired wireless carriers Dobson Communications Corp. (2007), Edge Wireless LLC (2008), and Centennial Communication Corp. (2009), and acquired the spectrum holdings of Aloha Spectrum Holdings Company LLC (2008).  In that same period, Verizon acquired wireless carriers Rural Cellular Corp. (2008) and Alltel Corporation (2009), which itself had previously acquired wireless carriers Western Wireless Corp. (2005) and Midwest Wireless (2005).  T-Mobile also acquired Suncom Wireless Holdings, Inc. (2008), and Sprint acquired Nextel Communications (2005).

31.     Measured at a national level, the combination of AT&T and T-Mobile would result in a post-merger Herfindahl-Hirschman Index ("HHI") of over 3,300 with a change of about 750, well in excess of the market concentration levels that lead to a presumption of market power.  Measured at a local level, the change in HHI would also lead to a presumption of market power in well over a hundred local areas.

## C.     WIRELESS NETWORKS

32.     The quality of a carrier's network is an important factor to consumers when selecting a carrier.  The network quality is primarily a function of the geographic scope of coverage and the reliability of service.  Consumers prefer networks with extensive coverage and a fast, reliable network with few blocked or dropped data connections or calls.

33.     A network requires spectrum, radio equipment to send signals between cell sites and mobile devices, and backhaul to connect the cell sites to the public switched telephone network.  Roaming agreements between carriers can be used to add coverage for subscribers beyond the carrier's network, or supplement its capacity.

**1.     Spectrum**

34.     Spectrum is essential to providing mobile wireless services.  The FCC has licensed bands of spectrum in increments measured in hertz (with a megahertz (MHz) equal to one million hertz and a gigahertz (GHz) equal to one billion hertz) to wireless providers.  The value of particular spectrum bands depends on many factors, including the propagation characteristics of the spectrum and the extent to which an ecosystem of compatible infrastructure, equipment, and handsets exists for the bands.

35.     The FCC has licensed radio spectrum for commercial mobile wireless use primarily in bands between 700 MHz and 2500 MHz (2.5 GHz).  Lower frequency bands have more favorable propagation characteristics and their signals penetrate objects (e.g., buildings) more effectively than those from higher frequency spectrum.

36.     AT&T holds a nationwide average of 40 MHz below 1 GHz – almost three times Sprint's holdings below 1 GHz, and slightly less than Verizon's average of 54 MHz below 1 GHz.

37.     The 700 band is the lowest frequency spectrum that the FCC has licensed for commercial mobile wireless communications.  It is referred to as "beachfront" spectrum because it has excellent propagation characteristics.  This means it can be built out with fewer cell sites and therefore less expensively than high frequency spectrum.

38.     AT&T and Verizon together control 92 percent of the paired 700 MHz spectrum suitable for commercial mobile broadband use in the top 54 most populous U.S. markets, and 100 percent of the paired 700 MHz spectrum suitable for commercial mobile broadband in the top 10 markets.  AT&T and Verizon's control of this spectrum provides significant competitive advantages.

39.     Moreover, AT&T has filed an application with the FCC to acquire Qualcomm's 700 MHz spectrum, which would increase AT&T's 700 MHz nationwide coverage by an additional 8 MHz, bringing its below 1 GHz spectrum total coverage to 48 MHz.

40.     Wireless carriers design and build their network infrastructure for specific spectrum bands.  Mature spectrum bands that are in use already have ecosystems of compatible infrastructure, equipment, and handsets.  Newly allocated and assigned spectrum requires considerable investment to develop each of these elements.

41.     When multiple carriers build their networks and develop handsets at the same time in a newly allocated spectrum band, they all benefit from the shared costs of development.

### 2.     Technological Developments

42.     The speed and capacity of a network varies by the generation of its technology. Versions of mobile phone and network technologies are generally referred to by their generation. Carriers have multiple networks that support different technologies.

43.     The original mobile phones (first generation or "1G") were analog, not digital.

44.     2G technology allows digital communications, including text messaging.  AT&T and T-Mobile have equipment that uses Global System for Mobile Communications ("GSM") technology.  Sprint and Verizon use 1xRTT, which is a different type of transmission technology called Code Division Multiple Access ("CDMA").

45.     3G technology provides higher speed mobile broadband service, allowing for faster download speeds than 2G.  AT&T and T-Mobile use GSM-based High Speed Packet Access ("HSPA") technology, and a faster 3G technology called HSPA+.  Verizon and Sprint used CDMA-based Evolution Data Optimized ("EV-DO").

46.     4G technology is the newest technology currently available.  Verizon is using Long Term Evolution ("LTE") technology, and AT&T and T-Mobile have announced that their 4G networks will also use LTE.  Sprint's current 4G network uses WiMax technology.

47.     The newer generations of technology are more efficient than the older generations. For example, according to AT&T's FCC filings, 3G HSPA+ technology is about six times more efficient at using spectrum than 2G GSM technology, and 4G LTE technology is more than eight times more spectrally efficient than its 2G GSM technology.  Therefore, moving customers from GSM to LTE effectively frees up eight times as much capacity on the same spectrum band.

### 3.     Cell Sites

48.     The geographic coverage of wireless networks is defined by cell sites that can send and receive signals to mobile devices within their range.  Networks require cell towers, transceivers, and other supporting equipment, such as repeaters.

49.     The range of a cell site depends on the technology and power of the transceiver, the technology of the mobile device, and the spectrum that is used to send the radio signals.  In places where no cell sites are nearby, or where there are gaps between cell sites' coverage, a "dead" spot occurs where users cannot send or receive signals.  At the edges of a covered area, reception may be poor.

50.     Cell towers can be built or purchased, or space on them can be leased.  Cell towers can support multiple transceivers, so they can be used by more than one carrier and can contain equipment for different technologies for a single carrier.

51.     A cell site's signal strength affects reception, particularly in places where a user does not have a direct line of sight to a cell tower, such as indoors.  Signal strength depends on factors such as the proximity and power of a cell site, the technology deployed, and the quality of spectrum being used.  Lower frequency spectrum has better propagation than higher frequency spectrum.  It reaches further and it can better penetrate building walls.

52.     Each cell site can support only a limited number of subscribers who are using their phones at the same time.  A network's capacity in a particular geographic area therefore depends on the number of cell sites, the amount of available spectrum, and the network technology deployed.

53.     In places with a high concentration of subscribers, carriers can increase capacity by acquiring more spectrum, upgrading network equipment to increase spectral efficiency, and/or moving customers to more spectrum-efficient technologies.

54.     Technological solutions also include adding ("splitting") cell sites in congested areas to absorb the increased traffic and adding distributed antenna systems, pico cells and femto cells, which allow for increased usage over the same amount of spectrum.  In addition, carriers can establish WiFi spots, which allow subscribers to use a WiFi network for data transmission and thereby offload subscriber traffic from the carrier's licensed spectrum to the WiFi network.  WiFi signals are transmitted over a short range on unlicensed frequencies set aside by the FCC and therefore do not require use of the carrier's licensed spectrum.  They can be used in homes, offices, public buildings, stadiums, and outdoor spaces such as Times Square.

### 4.   Roaming

55.     A wireless carrier can expand the area in which its subscribers can use their phones through roaming agreements with other carriers.  Roaming agreements permit subscribers of one carrier to use another carrier's network when the subscriber's home network is not available, or to supplement its capacity.

56.     Verizon and AT&T have large wireless network footprints in the United States. They therefore have a higher percentage of on-network calls than other carriers, and their subscribers have less need for roaming.  AT&T and Verizon realize revenue from carriers who contract for roaming services over their networks.

57.     To roam, a mobile device also must use the same technology and have an antenna that is tuned to the same spectrum frequency as the visited network.

### 5.   Backhaul and "Special Access"

58.     A wireless network also requires connections between the cell sites and the wireline network to which wireless calls are routed.  These connections are made via dedicated copper, microwave, or fiber optic circuits, and some utilize packet-switched Ethernet technology. When used by wireless carriers, these connections are commonly referred to as "backhaul." Connections between a wireless carrier's facilities and wireline incumbent local exchange carriers ("ILECs") are regulated by the FCC's "special access" rules.

59.     The two remaining ILEC descendants of the old Bell System, AT&T and Verizon, are the predominant providers of special access.  There are some independent telecommunications firms that attempt to compete with the Twin Bells to provide backhaul, but many cell sites have too little traffic volume to sustain competitive providers.  For these

16

independent providers, the purchasing volume of T-Mobile can be critical to their viability and to their incentive to provide new services.

60.     The FCC does not regulate the rates for packet-switched special access, such as Ethernet.  Pricing for certain other special access is subject to partial regulation by the FCC, but this regulatory scheme has been widely regarded as ineffective at keeping special access rates at competitive levels.  The FCC's 1999 Pricing Flexibility Order relaxed its price regulations for special access in metropolitan statistical areas ("MSAs") where the ILECs could show that certain "triggers" had been met.  The triggers refer to the extent to which competitive special access providers have "colocated" equipment in the incumbent's wire center.

61.     Depending on the extent of colocation achieved in an MSA, the FCC grants either partial or full pricing flexibility to the incumbent carriers.  In MSAs where the incumbents can demonstrate a certain level of competitive colocation, they would satisfy the triggers that would result in "Phase II" pricing flexibility, which allows the incumbent to remove their special access rates throughout those areas from price cap regulation.

62.     The FCC has granted the ILECs pricing flexibility in numerous markets. According to a November 2006 GAO report, the ILECs have received Phase II price deregulation in 112 of the 369 MSAs in the United States and Puerto Rico. The FCC's pricing flexibility rules do not distinguish between competitive and non-competitive geographic areas within MSAs.  Special access pricing is regulated on an MSA-wide basis, but wireless carriers require access to ILEC facilities throughout the MSA, even in areas where there is no competition to the incumbent.

### D.     PLANS AND PRICES

63.     Mobile wireless carriers offer various subscription plans to accommodate different needs of users and their devices.  For example, different plans exist for individual retail customers, families, businesses and government accounts, and wholesale customers.

#### 1.     Retail Consumer Plans

64.     There are two general categories of retail wireless services:  postpaid and prepaid.

65.     Postpaid and prepaid wireless services each have their own unique characteristics that make them distinct service offerings.  Typically, postpaid services require two-year contracts and are available only to customers who satisfy a credit check.  Prepaid services, on the other hand, do not include two-year contracts like postpaid services, but instead these plans allow the subscriber to pay up front for a month of service, or are pay-as-you-go plans where a subscriber purchases a set number of minutes in advance.

66.     Because postpaid plans typically require two-year contracts, carriers are able to offer larger subsidies for the handsets they sell and spread the costs of these subsidies out over the life of the contract.  For example, the Samsung Galaxy S 4G, one of T-Mobile's newer smartphones, retails for $399, but with a two-year contract T-Mobile offers that phone for $99. Carriers are not able to offer the same level of handset subsidies with prepaid plans because their customers are not committed to two-year contracts.

67.     Carriers also offer high-end handsets with the latest technology to their postpaid customers.  These phones tend to have more advanced features and higher quality components, including processors, displays, and cameras.  They include iconic phones that are in high demand by consumers, including a wide selection of smartphones.  The phones available with prepaid plans, on the other hand, tend to be older models and/or have less functionality.  Many of the

phones offered with prepaid plans are less expensive and come with only basic voice and text messaging capability.  Although some carriers have recently introduced smartphones to their prepaid lineups, these handsets generally come with lesser features, such as inferior displays and cameras, as well as slower processing speeds than the smartphones offered by postpaid carriers.

68.     Average revenue per user ("ARPU") is higher for postpaid subscribers, and postpaid subscribers are less likely to switch carriers as frequently as prepaid subscribers.

69.     Postpaid and prepaid wireless services also tend to cater to different demographic groups.  The consumers who use postpaid wireless service are more likely to be older, married, wealthier, and live in the suburbs.  In contrast, consumers who use prepaid cellular service are more likely to be younger, single, members of an ethnic minority, are more likely to rent rather than own their home, and are more likely to have a low net worth.  Many prepaid subscribers receive government subsidies for their service through the Universal Service Fund's low-income program.

70.     The four national carriers – Verizon, AT&T, T-Mobile, and Sprint – offer postpaid service.  Regional carriers such as U.S. Cellular, Cellular South, Cincinnati Bell, nTelos, Alaska Communications, and Atlantic Telenetwork also offer postpaid services, but they collectively account for less than 3 percent of all postpaid subscribers nationwide.

71.     The four national carriers also offer prepaid service.  Sprint offers prepaid services through its Boost Mobile, Virgin Mobile, and Assurance Wireless brands.  AT&T (GoPhone), Verizon (Unleashed), and T-Mobile sell prepaid services under their own brands.  Prepaid services are also offered in certain parts of the country by MetroPCS and Leap, two regional firms that specialize in prepaid services.  MetroPCS and Leap each account for

approximately 2 percent of all wireless revenues.  Other firms offering prepaid service include Cellular South, U.S. Cellular, and TracFone (a reseller, not a facilities-based carrier).

### 2.    Corporate and Government Plans

72.    Businesses and government agencies are direct customers of wireless carriers and purchase plans that are different from the ones sold to retail consumers.  Pricing for corporate and government accounts is set independently of retail pricing for consumers.  For plans covering above a certain number of lines or volume of business, prices for corporate and government plans are typically determined through a competitive bidding process including negotiation between the carrier and the corporate customer.

73.    Total sales of wireless services to corporate and government accounts in the United States are over $50 billion per year.

74.    Businesses and governmental organizations typically procure mobile wireless services through formal Requests for Proposals ("RFPs") or similar competitive bidding process where a business or government agency will solicit offers for providing wireless service.  The larger the account, the more customary it is to obtain mobile communications services, or to renew a mobile communications contract, through a formal RFP.

75.    Business customers often demand nationwide service or a combination of nationwide and international service.  Nationwide footprints are important for business customers for at least two reasons.  First, many employees have to travel outside their local home base and require a dependable network that will provide coverage regardless of where they travel.  Second, many businesses are national or multi-regional in scope and have multiple locations throughout the country.

76.     Business customers often favor plans that will give them access to the newest and most innovative handsets and mobile applications.  As smartphone usage grows, new applications that enhance mobile productivity are becoming increasingly important to business customers, who want to maximize their employees' efficiency.

77.     To serve business and government accounts, wireless carriers typically have an internal organization dedicated to these accounts that is separate from the organization responsible for retail sales.  For example, Sprint's corporate and government account sales force has roughly 2,500 employees.

78.     For all these reasons, by far the most significant competitors for corporate and government accounts are AT&T, Verizon, Sprint and T-Mobile.  Smaller carriers such as MetroPCS and Leap, and regional carriers, are not meaningful competitors for the vast majority of corporate and government accounts.

**E.     HANDSETS AND OTHER DEVICES – THE DRIVERS OF WIRELESS INNOVATION**

79.     The types of handsets that are available is an important factor for consumers when choosing a wireless carrier.  This is most notably illustrated by AT&T's iPhone launch.  In 2007, AT&T secured an exclusive agreement with Apple to distribute the iPhone in the United States, and maintained that exclusivity until 2011.  The iPhone exclusive allowed AT&T to attract many new subscribers who wanted the iPhone, including subscribers who may not have otherwise chosen AT&T as their carrier.

**1.     Handset Features**

80.     Handset features such as screen size and definition, camera quality, and Internet access, play an important role in consumers' purchasing decisions.  The most advanced phones

are smartphones, which integrate computer operating systems with phone capabilities and high resolution cameras. Smartphones include the Apple iPhone, HTC Evo, Samsung Droid Charge, and HTC Sensation. The four national carriers sell the vast majority of smartphones as part of their postpaid services.

81.     Smartphones and tablets can download and run software applications ("apps") that have functions ranging from entertainment to business productivity, to navigation and traffic assistance. Smartphones and tablets are most useful when users can access a large selection of desirable apps for the devices. Through "app stores," users can browse and select apps they wish to download and run on their phones.

### 2.     Handset Development: the iPhone, the Storm and the Open Handset Alliance's Android Platform

82.     Developing new handsets requires integration of wireless carrier and original equipment manufacture ("OEM") technologies, including hardware, operating systems, user interfaces, applications, and wireless networks. To be operable, handsets must be built with specific chipsets, transmitters, and antennas that correspond to a carrier's network technology and spectrum bands. In addition, handsets must be tested on a carrier's network before they are introduced to ensure optimal use. Carriers may work with handset manufacturers to develop new features and functionalities that differentiate the new devices from those already on the market, to design user interfaces unique to a carrier, to ensure that the handset appropriately reflects the brand, and to ensure that the services, design, and features offered by the carrier will function appropriately on the handset.

83.     Wireless carriers and handset developers typically work together on issues such as network compatibility, timing, and cost, as well as design and component specifications for

chipsets, processors, displays, cameras, and memory.  The development of new handset

technology can be a lengthy process that requires large front-end investments.  For example,

Apple spent a reported $150 million developing the first generation iPhone.  Development of the

iPhone began in 2005 and the device was not released until 2007.

84.     Given the expense of developing new handsets, OEMs commonly require volume

commitments from carriers in order to spread R&D and production costs over a large volume of

unit sales.  Because of these volume commitments, carriers with smaller subscriber bases are at a

significant disadvantage in attracting OEMs to develop new devices or technology for their

networks.  For example, while regional carriers now offer some smartphones, OEMs developing

handsets with the latest technology tend to design them for the large national carriers because

they have the ability to sell the most phones, thus spreading R&D costs over a larger number of

units.

85.     Many cutting-edge smartphones are introduced under exclusivity arrangements or

"time-to-market" advantages that national carriers negotiate with OEMs.  During these periods

of exclusivity, OEMs will provide handsets with certain unique features to only select carriers.

Exclusivity arrangements benefit the wireless carriers because offering a unique, high-demand

handset (such as the iPhone) can give a carrier a significant competitive advantage over rival

companies.  The FCC recently pointed out that exclusive handset arrangements may create

competitive barriers to entry. [3]  In addition, the FCC also recognized that while it is common for

OEMs to provide exclusive arrangements to national carriers "that have large customer bases and

---

[3]     *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, Fifteenth Report, WT Docket No. 10-133, ¶ 65 (June  24, 2011) ("15th Report").

extensive network penetration," smaller regional carriers typically do not enjoy such exclusivity.[4]

### (a) *The iPhone and the Storm*

86.    The iPhone and the Storm are classic examples of the existing scale advantage of the two largest national wireless carriers.  Apple launched the iPhone with AT&T under an exclusive arrangement in 2007.  In early 2011, Apple then gave Verizon a time-to-market advantage for the iPhone, most likely because Verizon had the largest subscriber base in the United States.  Sprint has had to compete without access to the iPhone for nearly five years.  The Twin Bells have had a tremendous time-to-market advantage with the iPhone, and have been able to lock many customers into two-year contracts with the iconic device.

87.    Verizon has also worked with OEMs to develop and introduce advanced smartphones of its own.  For example, Verizon partnered with BlackBerry to introduce the exclusive touch screen Storm in 2008, and later introduced the high-end Motorola Droid in 2009.

### (b) *The Open Handset Alliance and T-Mobile's Ongoing Role in Wireless Innovation*

88.    Because of their more limited customer bases, T-Mobile and Sprint are both at a disadvantage in developing and launching their own smartphone technologies.  However, in the Open Handset Alliance ("OHA") they combined their scale in a joint effort.

89.    T-Mobile and Sprint were two critical, pioneering members of the OHA, which includes mobile device and component manufacturers, software developers, semiconductor manufacturers, wireless carriers, and other firms, including companies such as Google, Intel, Qualcomm, NVIDIA, and eBay.  Smartphones are typically first introduced in the United States

---

[4]    *Id.* ¶ 342.

and therefore it is important to have U.S.-based participants.  AT&T and Verizon never joined

the OHA.

90.     The OHA was responsible for developing the Android mobile device platform.

Smartphones running on the Android operating system are now the key competitors to the

iPhone and account for 34 percent of smartphones in the United States.  T-Mobile was the first

carrier to roll out an Android device.  As T-Mobile stated to the FCC:

> T-Mobile invested heavily in its partnership with Google to develop the
> G1™, the first handset to employ Google's open source mobile software
> platform, Android.  Development of the groundbreaking G1™ took more
> than a year of work and millions of dollars for research and development.
> The G1™ has already begun to inspire innovation in the wireless
> marketplace by leveraging open source software to facilitate the
> widespread development of new downloadable applications.  All
> consumers will benefit from the success of the G1™, which has paved the
> way for future Android-based handsets that will be available on the
> networks of other carriers as well as T-Mobile.[5]

91.     Through OHA and its own efforts, T-Mobile serves as a significant source of

innovation in the wireless industry.

92.     Regional carriers have not been able to serve as the catalysts of handset

innovation, and they typically offer a smaller selection of smartphones than the national carriers.

In addition, devices offered by regional carriers are typically lower-tier brands, older or lower

quality models, or are later versions of devices or technology previously brought to market by

national carriers.  For instance, industry product reviewer CNET.com found that MetroPCS's

"best" smartphone offering was its Samsung Galaxy Indulge.  CNET concluded, however, that

---

[5]     Reply Comments of T-Mobile USA, Inc., Rural Cellular Association Petition for Rulemaking Regarding
Exclusivity Arrangements Between Commercial Wireless Carriers and Handset Manufacturers, RM-
11497, at 7-8 (Feb. 20, 2009).

the "specs [on this handset] pale in comparison to [Samsung's] more premium Galaxy S cousins," which are offered by Sprint and T-Mobile.[6]

## V.   CURRENT COMPETITION FOR WIRELESS SERVICES

### A.   THE FOUR NATIONAL WIRELESS CARRIERS

93.   Competition for wireless services is national in scope, with only four companies – AT&T, Verizon, Sprint, and T-Mobile – providing 93 percent of all wireless services for consumers and 97 percent of postpaid wireless services in the United States.

94.   AT&T is currently the second largest wireless carrier in the United States.  In 2010, it had 95 million wireless customers and accounted for 32 percent of all mobile wireless services revenues.  AT&T is the result of many mergers, as it consists of the assets of SBC Communications (1997), Pacific Telesis (1997), Comcast Cellular (1999), Ameritech (1999), BellSouth (2006), Cingular (2006), Dobson Communications (2007), Edge (2008), and Centennial (2009).

95.   Verizon currently is the largest wireless carrier in the United States.  In 2010, it had 104 million wireless customers and accounted for 35 percent of all mobile wireless services revenues.  Verizon is the descendant of Bell Atlantic and is also the product of numerous mergers, including NYNEX (1995), Vodafone (2000), GTE (2000), Rural Cellular Corp. (2008), and Alltel Corporation (2009).

---

[6]   Jessica Dolcourt, *Samsung Galaxy Indulge – black (MetroPCS)*, CNET, (2/16/11) *available at*: http://reviews.cnet.com/smartphones/samsung-galaxy-indulge-black/4505-6452_7-34499172.html#reviewPage1.

96.     Sprint is the third largest national wireless carrier in the United States.  In 2010, it had 50 million wireless customers and accounted for 15 percent of all mobile wireless services revenues.

97.     T-Mobile is the fourth largest wireless carrier in the United States.  In 2010, it had 34 million wireless customers and accounted for 12 percent of all mobile wireless services revenues.

98.     AT&T, Verizon, Sprint, and T-Mobile are distinguished from other wireless carriers by the nationwide service that their networks and spectrum assets allow them to provide to their subscribers.  These four nationwide service providers all have mobile wireless networks that cover about 90 percent or more of the U.S. population.

99.     For postpaid services, Sprint closely monitors the prices offered by Verizon, AT&T, and T-Mobile for their postpaid plans, but does not consider prices offered by smaller carriers in evaluating its own pricing plans.  Verizon, AT&T, and T-Mobile demonstrate the same focus in their pricing behavior for postpaid plans.

100.     In September 2009, for instance, Sprint introduced an "Any Mobile, Anytime" plan that included unlimited mobile-to-mobile calling, as well as unlimited messaging and data, for $69.99.  This plan was a response to AT&T and Verizon's unlimited in-network calling plans. The following month, T-Mobile introduced a new unlimited pricing plan that brought its pricing structure more closely in line with Sprint's.  Next, in January 2010, Verizon dropped its unlimited voice calling postpaid plan from $99.99 to Sprint's $69.99 price point, and AT&T also matched this price.  As the FCC recognized, T-Mobile's October 2009 price move "appear[s] to

have prompted Verizon Wireless and AT&T to narrow the price premium on unlimited service offerings."[7]

101.    AT&T claims to offer some local handset promotions, but uniform national pricing is now almost universal among the four national carriers.  AT&T has stated that "[o]ne of [its] objectives is to develop its rate plans, features and prices in response to competitive conditions and offerings at the national level – primarily the plans offered by the other national carriers."[8]

102.    National brand equity is an important competitive attribute.  The four national carriers principally advertise nationally, presenting the same messages throughout the country and using their national attributes to position themselves as offering a nationwide product.  Their advertising campaigns tout the strength of those national attributes, including nationwide network quality, speed, coverage, innovation, and handsets.  Thus, Verizon's "Can You Hear Me Now?" and "Rule the Air" advertising campaigns touted Verizon as offering high nationwide network quality.  AT&T's advertising campaigns have promoted AT&T as the only carrier to offer the iPhone (until 2011) and touted the speed of its broadband network.  Sprint has differentiated itself nationally as standing for fast and reliable service and strong value, and the first and favorite 4G network.  T-Mobile has promoted itself as offering superior customer service, value, and the country's largest "4G" network.

---

[7]    *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, Fourteenth Report, 25 FCC Rcd 11407, 11472, ¶ 92 (2010).

[8]    Public Interest Statement, attached to Applications of AT&T Inc. and Centennial Communications Corp. for Consent to Transfer Control of Licenses, Authorizations, and Spectrum Leasing Agreements, WT Docket No. 08-246, at 28-29 (Nov. 21, 2008).

103.    Through this advertising, the four national carriers target each other, rather than smaller carriers.  Sprint's advertising for postpaid plans does not address smaller carriers, and instead positions Sprint against the three other national carriers.  The advertising campaigns of AT&T, T-Mobile, and Verizon demonstrate the same focus.  T-Mobile, in particular, advertises aggressively against AT&T.  T-Mobile recently ran a series of popular advertisements aimed specifically at AT&T and Verizon, and their iPhone offerings, in an attempt to lure smartphone customers away from the Twin Bells.  These recent campaigns have touted faster speeds on T-Mobile's HSPA+ network than on the networks of AT&T or Verizon, and have highlighted T-Mobile's own advanced smartphone offerings, such as the myTouch 4G.  T-Mobile began marketing its HSPA+ network as "4G" in 2010, and AT&T responded soon after by advertising its own HSPA+ network as having 4G speeds.

104.    The four national carriers also currently drive innovation in the wireless market, and do so with a national focus.  As described above, due to the costs of new product development and the volume commitments that handset manufacturers require, the national carriers – including, importantly, T-Mobile and Sprint through their participation in the OHA – are the only carriers that have a meaningful influence on handset innovation.  Smaller carriers do not have the scale or resources to significantly contribute to those development efforts.  The four national carriers also lead development efforts for network quality improvements.

105.    Notably, the national carriers' innovation efforts are aimed at developing new products for the entire United States, not for particular local areas.  Thus, each of the four national carriers generally offers a lineup of handsets that is consistent throughout the country and does not vary by region.  Additionally, while the national carriers are rolling out advanced

4G services sequentially around the country as network building progresses, these efforts are national in scope.

**B.    REGIONAL WIRELESS CARRIERS AND THEIR MINIMAL ROLE IN FUTURE COMPETITION**

106.    Mobile wireless service is also offered by several smaller carriers, but all of these carriers combined account for only approximately 7 percent of all mobile wireless sales.  Some of these firms, including MetroPCS and Leap (operating under the name Cricket), specialize in offering prepaid wireless service.  Other regional carriers include U.S. Cellular, which provides service in several states in the middle of the country and portions of New England and the Pacific Northwest; Cellular South, which provides service in Mississippi and portions of Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Tennessee, and Virginia; and Cincinnati Bell, which provides service in the Cincinnati and Dayton, Ohio metropolitan areas, as well as several counties in northern Kentucky and Indiana.

107.    These smaller carriers lack nationwide networks.  For example, Leap's network covers only about 30 percent of AT&T's population coverage, U.S. Cellular's network covers about 15 percent of AT&T's population coverage, and MetroPCS's network covers about 33 percent of AT&T's population coverage.

108.    Given their limited network footprints, the regional firms rely heavily on roaming to provide nationwide service.  As Leap explained in its 2010 Form 10-K:

> [S]ome of our competitors are able to offer their customers roaming services at lower rates.  As consolidation in the industry creates even larger competitors, advantages that our competitors may have, as well as their bargaining power as wholesale providers of roaming services, may increase.  For example, in connection with the offering of our nationwide voice and data roaming services, we have encountered problems with certain large wireless carriers in negotiating terms for roaming arrangements that we

believe are reasonable, and we believe that consolidation has contributed significantly to some carriers' control over the terms and conditions of wholesale roaming services.[9]

109.    Similarly, U.S. Cellular described the challenges of relying so extensively on roaming service in its 2010 Form 10-K:

> [T]he national wireless companies operate in a wider geographic area and are able to offer no- or low-cost roaming and long-distance calling packages over a wider area on their own networks than U.S. Cellular can offer on its network.  When U.S. Cellular offers the same calling area as one of these competitors, U.S. Cellular incurs roaming charges for calls made in portions of the calling area which are not part of its network, thereby increasing its cost of operations.[10]

110.    Unlike the plans generally offered by the national carriers, the regional carriers often impose additional charges on their customers for roaming to reflect their higher roaming costs.  In addition, some services may be degraded or unavailable while roaming, which reduces the quality of the service offered by the roaming carrier.

111.    The small regional firms' networks typically do not match the fast network speeds being rolled out by the national carriers.  Neither Leap nor U.S. Cellular currently has an LTE service, although Leap has plans to begin offering it in some markets next year and U.S. Cellular plans to begin offering it in certain markets later this year.  Although MetroPCS currently offers an LTE service in 14 metropolitan areas, it has no plans to expand the service to additional markets and offers only 2G service elsewhere.  Moreover, the LTE service of MetroPCS has much lower quality than that provided by the four national carriers due to the company's limited spectrum holdings.  In fact, it has been reported that MetroPCS's LTE service is capable of only slower 3G data speeds in some areas.

---

[9]    Leap Wireless International, Inc., Annual Report (Form 10-K) at 10 (Feb. 25, 2011).

[10]    U.S. Cellular Corp., Annual Report (Form 10-K) at 8 (Feb. 25, 2011).

112.    The lack of national 4G is not easily remedied by roaming agreements.

According to MetroPCS:

> Since at this time a limited number of carriers have publicly announced that they are planning to deploy 4G LTE in the near future, the number of potential roaming partners for 4G LTE will be extremely limited and are currently deploying 4G LTE on spectrum that is different than the spectrum we are deploying 4G LTE on.  In addition, the current automatic roaming requirements do not include data roaming.  Other carriers have in the past, and may in the future, be reluctant to provide data roaming to us at all or on terms we consider to be acceptable.  In addition, some of the carriers who currently provide roaming to us may be delayed in deploying, decide not to deploy, or be unable to deploy 4G LTE, which would limit our ability to provide 4G LTE services to our customers when they roam.  Further, since 4G LTE is relatively new and carriers may attempt to differentiate their services using 4G LTE, carriers may be reluctant to allow roaming at all or at prices that would make roaming cost effective for our customers. If our customers or potential customers demand 4G LTE services on a nationwide basis or our competitors offer 4G services on a nationwide basis, we may be unable to meet customer expectations or demands and we may attract less than the anticipated number of 4G LTE customers or we may experience higher than anticipated levels of churn.[11]

113.    The regional fringe players are less able than the national carriers to acquire cutting-edge handsets because they do not have the scale to be attractive to the developers and manufacturers of these handsets.  Given the costs of developing and manufacturing new handsets, the handset manufacturers seek to partner with large carriers to maximize the sales of their products.  No fringe carrier has even a 3-percent market share nationally, and therefore they are not attractive partners for handset manufacturers and are less able to obtain handsets with the latest technology.

---

[11]    MetroPCS Communications Inc., Annual Report (Form 10-K) at 37 (Mar.1, 2011).

## VI.   THE THREATENED INJURY TO COMPETITION FROM AT&T'S PROPOSED ACQUISITION OF T-MOBILE

### A.   RELEVANT PRODUCT MARKETS

114.    The effects of the proposed acquisition of T-Mobile can be evaluated in a number of relevant product markets, including all mobile wireless services to consumers, postpaid wireless services to consumers, business and government accounts, and backhaul.

### 1.   Mobile Wireless Services

115.    The provision of mobile wireless services to consumers is a line of commerce or relevant product market within the meaning of the antitrust laws.

116.    Mobile wireless services provide a unique offering to consumers and no reasonably interchangeable substitutes are available.  A small but significant, non-transitory increase in the fees for mobile wireless services by a hypothetical monopolist would not result in enough customers switching to other communications services, such as wireline telephone service, to make the price increase unprofitable.  Therefore, under the test set forth in the caselaw and the DOJ and FTC Horizontal Merger Guidelines, mobile wireless services to consumers is a relevant product market.

### 2.   Postpaid Mobile Wireless Services

117.    The provision of postpaid mobile wireless services to consumers is a line of commerce or relevant product market or submarket within the meaning of the antitrust laws.

118.    Postpaid mobile wireless services are distinguished from prepaid services in a number of important respects.  Postpaid services are characterized by two-year contracts, credit checks, a higher-end mix of handsets, larger handset subsidies, and higher-end data services. Postpaid services are also sold to largely different consumer demographic groups from prepaid

33

service.  Postpaid service is more expensive than prepaid service for monthly plans, generates

higher average revenues per user, and has a lower churn rate (i.e., customer turnover) than

prepaid service.  Unlike postpaid service, prepaid is rarely sold to corporate and government

accounts.

119.    As the American Antitrust Institute recently noted in a filing with the FCC:

> While prepaid plans have become more popular recently,
> especially the "all you can eat" variety, they do not appear to
> significantly constrain the pricing of postpaid plans, as the
> traditional national carriers have responded not by lowering the
> price of their postpaid plans, but by offering their own prepaid
> plans or entire "flanker" brands.[12]

120.    No reasonably interchangeable substitutes for postpaid mobile wireless services

are available to consumers of these services.  A small but significant, non-transitory increase in

the fees for postpaid mobile wireless services by a hypothetical monopolist would not result in

enough customers switching to other services, such as prepaid wireless services, to make the

price increase unprofitable.  Therefore, under the test set forth in the caselaw and the DOJ and

FTC Horizontal Merger Guidelines, postpaid mobile wireless services to consumers is a relevant

product market.

### 3.    Business and Government Accounts

121.    The provision of mobile wireless services to business and government accounts is

a line of commerce or relevant product market or submarket within the meaning of the antitrust

laws.

122.    Mobile wireless services offered to business and government accounts is a distinct

service offering.  Wireless carriers bid for these contracts, and network coverage, reliability, and

---

[12]    Comments of the American Antitrust Institute, WT Docket No. 11-65, at 6-7 (May 31, 2011).

account support are important drivers of competition.  Plan prices are often negotiated individually, unlike prices for retail plans.

123.    There are no reasonably interchangeable substitutes for the services provided to business and government accounts.  A small but significant, non-transitory increase in the fees charged to business and government accounts by a hypothetical monopolist would not result in enough customers switching to other services, to make the price increase unprofitable.  Therefore, under the test set forth in the caselaw and the DOJ and FTC Horizontal Merger Guidelines, business and government accounts are a relevant product market.

### 4.    Backhaul

124.    The provision of backhaul is a line of commerce or relevant product market within the meaning of the antitrust laws.

125.    Wireless carriers, including Sprint, depend on backhaul to connect their cell sites to their networks and to the public switched telephone network.  Backhaul is a recognized service category among telecommunications carriers.

126.    There are no reasonably interchangeable substitutes for backhaul.  A small but significant, non-transitory increase in the fees charged to carriers for backhaul by a hypothetical monopolist would not result in enough customers switching to other services to make the price increase unprofitable.  Therefore, under the test set forth in the caselaw and the DOJ and FTC Horizontal Merger Guidelines, backhaul is a relevant product market.

### B.    THE RELEVANT GEOGRAPHIC MARKETS

127.    The effects of the proposed acquisition of T-Mobile can be evaluated in a number of relevant geographic markets.

### 1. Wireless Services

128.    The United States is a relevant geographic market within the meaning of the antitrust laws for all mobile wireless services to consumers and for postpaid mobile wireless services to consumers.  The national carriers price their services and equipment on a national basis.  Handsets are developed, procured, and offered nationally; the four major carriers advertise predominantly on a national basis to build up national brand equity; and the national carriers promote their national networks.  These and other factors support a U.S. geographic market for all mobile wireless services to consumers and postpaid mobile wireless services to consumers.

129.    On November 21, 2008, David Christopher, Chief Marketing Officer of AT&T's Mobility and Consumer Markets Division, submitted a declaration to the FCC in connection with the FCC's review of AT&T's then-pending acquisition of Centennial Communications Corp.  In that declaration, Mr. Christopher stated:

> Within the continental United States, excluding Puerto Rico and
> the U.S. Virgin islands, AT&T makes nearly all competitive
> decisions in response to national competition.  AT&T offers
> national plans that give subscribers a consistent number of minutes
> of service for a single monthly price, with no roaming charges, and
> does not provide regional or local plans that vary depending on
> subscriber location.  (A small number of customers continue to
> receive service on previously purchased local plans that are no
> longer promoted or sold.)
>
> AT&T's plans are uniform for a number of reasons.  Demand for
> wireless telephony is generally similar throughout the country, and
> we have found that plans that appeal to consumers in one part of
> the country also appeal to customers living elsewhere.  Providing
> the same plans across the country is more cost efficient:  national
> plans eliminate the administrative costs that were associated with
> local plans, which required customized training for sales and
> customer service personnel, and also permit AT&T to contract

more easily with national retailers to sell AT&T wireless service, an additional efficiency.[13]

There are clearly national aspects of wireless competition, and therefore it is appropriate to evaluate the effects of the transaction on wireless services in a national market.

130.    The effect of the proposed acquisition can also be evaluated in local markets, in addition to a national market.  The attributes of the four national carriers, including offering cutting-edge handsets, postpaid plans, and true national network footprints and coverage, enhance their competitiveness in local markets, whereas the fringe carriers lack some or all of these attributes.  Therefore, the analysis is the same whether the deal is evaluated in a single national market, or separately in hundreds of local  markets.  Indeed, the DOJ and FTC acknowledged in their Commentary on the Horizontal Merger Guidelines that "[i]f the answer for the broader market is likely to be the same as for any plausible smaller relevant market, there is no need to pinpoint the smallest market as the precise line drawn does not affect the determination of whether a merger is anticompetitive."[14]

131.    The FCC has evaluated the competitive effect of transactions in Component Economic Areas ("CEAs") and in Cellular Market Areas ("CMAs").  Each individual CEA or CMA in which AT&T and T-Mobile compete is also a relevant geographic market within the meaning of the antitrust laws for all mobile wireless services and postpaid mobile wireless services.

---

[13]    Declaration of David A. Christopher, attached to Applications of AT&T Inc. and Centennial Communications Corporation for Consent to Assign or Transfer Control of Licenses and Authorizations, WT Docket No. 08-246, ¶¶ 3-4 (Nov. 21, 2008).

[14]    U.S. Department of Justice and Federal Trade Commission, *Commentary on the Horizontal Merger Guidelines* at 8 (2006) *available at*:  http://www.justice.gov/atr/public/guidelines/215247.pdf.

132.    The United States is a relevant geographic market within the meaning of the antitrust laws for mobile wireless services for business and government accounts.  The plans are not sold in local stores, but are typically awarded through negotiation and bidding procedures that generally cover all the employees of the enterprise throughout the country and call for at least national service.  Many businesses and government organizations have multiple locations across the country, or employees who travel outside their local home base, and deem service by a nationwide carrier to be important.  These and other factors support a U.S. geographic market for mobile wireless services for corporate and government accounts.

### 2.    Backhaul

133.    The relevant geographic market for backhaul is no larger than a metropolitan-based local market and may in fact be more limited.  This is dictated by the need to connect each individual cell site to the carrier's network.  There are no reasonable substitutes for the provision of backhaul, as almost all originating or terminating wireless calls must be connected through backhaul to the public switched telephone network.  A small but significant, non-transitory increase in price in service to one cell site by a hypothetical monopolist would not cause a wireless carrier to switch to a cell site in a different location because that would impact its network coverage.

134.    The geographic areas most directly affected by this transaction with respect to backhaul are the CEAs and CMAs within AT&T's traditional service territory where they control the legacy wireline assets.

### C.    ALL THE RELEVANT MARKETS ARE HIGHLY CONCENTRATED WITH HIGH BARRIERS TO ENTRY

135.    The relevant markets are highly concentrated and the potential relevant wireless markets would become significantly more concentrated as a result of AT&T's proposed acquisition of T-Mobile.

136.    The 2010 Horizontal Merger Guidelines employ the Herfindahl-Hirschman Index ("HHI") as a measure of market concentration.  Market concentration is a useful indicator of the level of competitive vigor in a market and the likely competitive effects of a merger.  The more concentrated a market, and the more a transaction would increase concentration in a market, the more likely it is that a transaction would result in a meaningful reduction in competition. Markets in which the HHI exceeds 2,500 points are considered to be highly concentrated.  Under the Horizontal Merger Guidelines, transactions that increase the HHI by more than 200 points in highly concentrated markets, "will be presumed to be likely to enhance market power."

137.    The FCC has also adopted an HHI measure to gauge the competitive effects of transactions.

### 1.    All Mobile Wireless Services

138.    There are four national facilities-based wireless carriers in the United States.  In 2010, Verizon accounted for 35 percent of all mobile wireless services revenue, AT&T accounted for 32 percent of all mobile wireless services revenues, Sprint accounted for 15 percent of all mobile wireless services revenues, and T-Mobile accounted for 12 percent of all mobile wireless services revenues.  The remainder of the market is comprised of small local and regional carriers that in the aggregate account for less than 7 percent of the market.  These carriers include regional prepaid carriers MetroPCS and Leap, which each accounts for

approximately 2 percent of U.S. mobile wireless services revenues, and regional firms such as U.S. Cellular and Cincinnati Bell.

139.    Using the 2010 market shares set forth above, the U.S. mobile wireless services market has a pre-merger HHI of over 2,600, and the proposed transaction would increase this number by about 750, resulting in a post-acquisition HHI over 3,300.  Under the standards set out in the Horizontal Merger Guidelines, the market for U.S. mobile wireless services is "highly concentrated" and would become substantially more so as a result of the transaction.  Therefore, the transaction raises a presumption that it would be likely to enhance market power.

140.    In many highly populated local markets, the levels of concentration after the merger would be even higher.  For example, according to one analyst report, AT&T's current share of 40 percent in the Dallas CMA would jump to 54 percent after the merger.  The post-merger HHI would be over 3,400 and the change would be about 1,100.  In the Miami CMA, AT&T's current share of 39 percent would rise to 53 percent.  The post-merger HHI would be over 3,200 and the change would be almost 1,100.  In San Francisco, AT&T's post-merger share would be 52 percent, with a post-merger HHI over 3,300 and an HHI increase of about 700.  In fact, the combined firm would have at least a 35-percent share in 20 of the 27 most populous CMAs.  Other measures yield similar statistics reflecting high market concentration and increases in market concentration that would result from AT&T's acquisition of T-Mobile.  As the DOJ states in its complaint, "the transaction likely would substantially lessen competition for mobile wireless telecommunications services" in 97 out of the nation's top 100 CMAs.[15]  The

---

[15]    Complaint at 9, *United States v. AT&T Inc. et al.*, 1:11-cv-01560-ESH (D.D.C. filed Aug. 31, 2011).

DOJ's estimates of HHI increases for the top 100 CMAs confirm that the acquisition would result in impermissibly high market concentrations.[16]

141.    Substantial barriers to entry and expansion exist in the provision of mobile wireless services due to a number of factors, including the considerable time and expense of acquiring spectrum, building and supporting a network, developing handsets, building brand equity, and investing in new technology and network support.  New firms are unlikely to enter the mobile wireless services market in a timely and sufficient manner to overcome the anticompetitive effects of the proposed transaction.  The fringe firms, independently or in the aggregate, cannot expand significantly enough in a reasonable period of time to be able to discipline the pricing of the national carriers.

### 2.    Postpaid Mobile Wireless Services

142.    There are four national facilities-based carriers in the U.S. postpaid mobile wireless services market.  At the end of 2Q 2011, Verizon accounted for 40 percent of all postpaid subscribers, AT&T accounted for 32 percent of all postpaid subscribers, Sprint accounted for 15 percent of all postpaid subscribers, and T-Mobile accounted for 11 percent of all postpaid subscribers.  The remainder of the market is comprised of regional carriers, such as U.S. Cellular and Cincinnati Bell, which collectively account for 3 percent of postpaid subscribers.

143.    AT&T's proposed acquisition of T-Mobile would result in a highly concentrated market for postpaid mobile wireless services in the United States.  Post-acquisition, AT&T would account for 43 percent of U.S. postpaid subscribers, and together with Verizon, the Twin

---

[16]    *Id.* at Appendix B.

Bells would service about 82 percent of U.S. postpaid subscribers. Using the market shares set forth above, the U.S. postpaid mobile wireless services market has a pre-merger HHI over 2,800, and the proposed transaction would increase this number by more than 700, resulting in a post-acquisition HHI of about 3,600. Consistent with the Horizontal Merger Guidelines, this means the market for U.S. mobile wireless services is highly concentrated and would become substantially more so after the proposed transaction, resulting in a presumption that the merger would enhance market power. Other measures yield similar statistics reflecting high market concentration and increases in market concentration that would result from AT&T's acquisition of T-Mobile.

144.    The levels of concentration for postpaid service would be even higher in many highly populated local markets than they are in a national market.

145.    Substantial barriers to entry, expansion, and repositioning exist in the provision of postpaid mobile wireless services due to the considerable time and expense of acquiring spectrum, building and supporting a network, developing handsets, building brand equity, and investing in new technology and network support. New firms are unlikely to enter the mobile wireless services market in a timely and sufficient manner to overcome the anticompetitive effects of the proposed transaction. The fringe firms, independently or in the aggregate, cannot expand significantly and rapidly enough to discipline the pricing of the national carriers.

### 3.    Mobile Wireless Services for Business and Government Accounts

146.    Only the four national carriers effectively compete for mobile wireless services for business and government accounts to any meaningful extent. The smaller prepaid and regional carriers do not often compete for, let alone win, business from corporate and

government accounts because they lack the size and scope that these customers typically seek, as well as the national network and brand recognition and reputation.

147.    The market for business and government accounts in the United States is highly concentrated, and the transaction would reduce the number of competitive bidders for these accounts from four to three.  On information and belief, post-merger AT&T would control over 40 percent of the market for business and government accounts.

148.    Substantial barriers to entry and expansion exist in the provision of postpaid mobile wireless services due to the considerable time and expense of developing a wireless network and product offering sufficient to meet the needs of business and government customers. Another barrier to entry is establishing the necessary organization to solicit and support these customers.  Sprint, for example, has about 2,500 employees that are dedicated to marketing and serving business and government accounts.  Thus, new firms and the regional carriers are unlikely to enter the business and government accounts market in a timely and sufficient manner to be able to reverse the anticompetitive effects of the proposed transaction.

### 4.    Backhaul

149.    Over 90 percent of all special access services in the United States, including backhaul, are provided by the ILECs, primarily AT&T and Verizon.  Most of the remaining backhaul services are provided by cable companies such as Comcast, fiber owners such as tw telecom and Level 3, and other providers including FiberTower.

150.    Substantial barriers to entry and expansion exist, because the cost of developing backhaul infrastructure can be significant and the opportunity to recover that investment depends on the volume of anticipated backhaul traffic in that specific area.  Where there are more and

larger customers for backhaul, the opportunities to recoup the necessary investment are higher and competitive entry is more likely.

151.     AT&T has market or monopoly power for backhaul in a number of relevant geographic markets.  By controlling the wireline infrastructure as a result of its Bell legacy, AT&T has been a dominant provider of backhaul in its traditional service territories.  In many of these relevant areas, law and regulations do not limit the pricing flexibility of the legacy Bell carriers.

152.     By eliminating T-Mobile as a potential purchaser of backhaul, the transaction would raise entry barriers for potentially new or expanding providers of independent backhaul.

## D.     THE PROPOSED TRANSACTION WOULD SUBSTANTIALLY REDUCE COMPETITION IN ALL OF THE RELEVANT MARKETS.

153.     AT&T's acquisition of T-Mobile would reduce competition in all relevant markets and transform the wireless industry from one with four national firms to one dominated by an AT&T and Verizon duopoly in which Sprint and other smaller firms would be less able to compete on the merits.

### 1.     The Proposed Transaction Would Eliminate a Low-Price and Innovation Leader.

154.     AT&T's acquisition of T-Mobile would eliminate a low-price leader and innovator which, in combination with Sprint and other smaller players, has made the retail mobile wireless markets more competitive.  For example, as illustrated above, AT&T and Verizon have lowered their retail prices in response to T-Mobile.

155.     In addition, in the last year T-Mobile has been aggressively pursuing additional business from federal accounts.  T-Mobile has bid for accounts that it previously did not bid for,

and has recruited employees from Sprint to expand its position in this market segment.  In June of 2011, T-Mobile started offering rebates to further attract business customers.  Even when T-Mobile does not win an account, customers may use T-Mobile's bid as leverage to obtain price concessions from other bidders, including AT&T.

156.   T-Mobile and AT&T are the only two national wireless providers with networks using the GSM standard.  This is the most common standard used outside the United States and gives them a distinct advantage when competing for business and government customers with international roaming needs.  Therefore, T-Mobile is a particularly close competitor of AT&T for such accounts.

157.   Equally important, T-Mobile has been a leader in developing new and innovative handsets, both individually and through alliances like the OHA.  It was the first U.S. carrier to offer the BlackBerry and the first to offer a smartphone running on the Android operating system.  Android smartphones are now the principal competitors to the iPhone, which until early 2011 was sold exclusively by AT&T.  AT&T has also responded to competition from T-Mobile by offering its own line of Android smartphones.  T-Mobile has also played a significant role in the development of HSPA+ and the deployment of WiFi hotspots as a method of meeting demand.

158.   By eliminating T-Mobile, the proposed transaction would lead to higher prices and less innovation than would exist if the two companies remain independent competitors.

### 2.   The Proposed Transaction Would Allow AT&T to Reduce its Rivals' Access to Handsets and Raise its Rivals' Costs.

159.   By controlling access to over three quarters of all wireless subscribers, and over 80 percent of postpaid subscribers, the Twin Bells of AT&T and Verizon, other than through competition on the merits, would be able to foreclose their competitors' access to the most

innovative handsets and raise their costs, including for handsets, deployment of services in new spectrum, backhaul, and roaming.  These anticompetitive acts, and their resulting adverse impact on Sprint's costs and sales, would in turn leave Sprint and other smaller carriers with a reduced ability to invest in their networks, to make other capital improvements, and to support their brands and marketing efforts, further marginalizing them as competitors and entrenching AT&T and Verizon as a wireless duopoly.

> (a) ***The proposed transaction would provide AT&T (and Verizon) the market power to foreclose Sprint and other carriers from access to cutting-edge handsets, and would reduce handset innovation.***

160.    As a result of the proposed transaction's illegal increase in market concentration, the size and scale differential between AT&T and Verizon on the one hand, and Sprint and the fringe carriers on the other hand, would increase dramatically.  This would enable both AT&T and Verizon to coerce exclusionary handset deals – making Sprint a less attractive potential partner for handset manufacturers and related developers – without AT&T having gained that advantage through competition on the merits.  With reduced access to the latest handsets post-acquisition, Sprint's offers to its customers would be less attractive and its business would be injured.

161.    The proposed transaction also would eliminate the ability of independent competitors, including Sprint, to ally with T-Mobile to create substantial scale for the creation of new handsets and to compete with the Twin Bells for such handsets.

162.    The direct accretion of incremental market power to AT&T that would result from its proposed transaction would be particularly anticompetitive as it relates to Sprint and other smaller carriers.  This artificially created, enhanced market power would enable AT&T to demand increased periods of market exclusivity other than through competition on the merits.

AT&T's purpose in coercing a post-merger increase in the length and scope of its handset exclusivity periods would be to foreclose its rivals from a critical input necessary to compete effectively, rather than to recoup legitimate costs of development.

163.    For all of these reasons, handset manufacturers would be less likely to build devices for smaller carriers using different spectrum bands and, even when they did, those devices would cost more given the carriers' lack of scale relative to AT&T and Verizon.  This would result in Sprint, as well as smaller carriers, facing artificially and improperly increased costs for the latest phones and consumer devices, and lead to reduced innovation in handsets and other consumer devices.  And even if Sprint eventually were able to obtain access to new devices, there likely would be substantial delays during which time AT&T and Verizon would be able to obtain a significant competitive advantage.

164.    In addition, with the elimination of T-Mobile, both AT&T and Verizon would have an increased ability and incentive to exacerbate the lack of network interoperability of new components and handsets, further increasing costs of development for Sprint and other carriers.

165.    Other wireless carriers have recognized the proposed transaction's likely and anticompetitive impact on handset access.  Leap, for example, has attested that AT&T and Verizon have a record of "demand[ing] devices that are not compatible with other networks in order to limit their availability to other carriers" and that:

> The proposed acquisition would make an already problematic situation dramatically worse.  AT&T's dominant position after this acquisition would greatly enhance its ability to exclude competitors from obtaining the most sought-after devices.  Even absent express exclusivity agreements, AT&T's monopsony power would enable it in practice to procure the lion's share of a manufacturer's production, particularly during parts shortages. AT&T also would have a much greater ability to extend the duration of exclusivity periods for new devices.  The acquisition also would increase AT&T's ability to prevent or delay the

development of spectrum management technologies that would help interoperability of devices across spectrum bands by leveraging its buying power to coerce the production of non-interoperable devices.  Such interoperability is crucial for carriers such as Leap to provide their subscribers with the services that they demand.[17]

166.    The Rural Cellular Association (RCA), an organization representing rural and regional carriers, has expressed the same concern:

If the proposed transaction were approved, AT&T's already-immense buying power—along with its ability to pressure handset manufacturers to enter into exclusivity agreements—would only increase.  RCA's members and other competitive carriers would find it even more difficult to gain access to the most popular handsets, and AT&T would be able to further solidify its market dominance.

The proposed transaction also would strengthen AT&T's ability to exert its monopsony power to prevent handsets from being interoperable on competitive carriers' networks….[T]he more leverage AT&T brings to bear to make handsets non-interoperable on a large scale, the harder it will be for rural and regional carriers to offer devices that can roam seamlessly and to compete against the national carriers.  A lack of interoperability also compounds device-availability concerns, as manufacturers will resist producing devices that can operate only on smaller providers' networks, and not on AT&T's.[18]

167.    In a similar vein, Cincinnati Bell Wireless (CBW) has indicated that, even without formal exclusive contracts, "[s]everal manufacturers have refused to sell some product lines to CBW, citing [] pressure from AT&T.  Others facing such pressure have simply refused to sell

---

[17]    Petition to Deny of Leap Wireless International, Inc. and Cricket Communications, Inc., WT Docket No. 11-65, at 26-27 (May 31, 2011).

[18]    Petition to Deny of Rural Cellular Association, WT Docket No. 11-65, at 19-20 (May 31, 2011) (emphasis added).

any of their products *at all* to CBW.  The merger would only increase AT&T's ability to engage in this anticompetitive behavior."[19]

168.    Thus, by acquiring T-Mobile and illegally increasing its size through acquisition – while simultaneously decreasing the percentage of the market that is not controlled by the Twin Bells – AT&T would have an increased ability to improperly limit access by its smaller wireless rivals to the latest handsets.  Reducing the ability of its rivals to offer the latest handsets would improperly make them less effective competitors to AT&T.  This, in turn, would allow AT&T to profitably raise prices to consumers without losing customers to its competitors and while increasing its market share, something it would be unable to do absent the acquisition of T-Mobile.

169.    The acquisition of T-Mobile by AT&T would also reduce innovation in handsets.  T-Mobile has been an important driver of handset innovation, both in its own right and in partnership with other firms, including Sprint through the OHA.  Absent the proposed acquisition by AT&T, T-Mobile would continue to have the incentive and ability to partner with Sprint and other carriers.  Without the ability to partner with T-Mobile to approximate the scale of AT&T or Verizon when seeking handset development partners, Sprint would be far less attractive to these developers because of the artificially increased disparity in scale as compared with the Twin Bells, and therefore would be less able to drive innovation.  This inevitable and predictable reduction in innovation would cause injury to consumers who would be deprived of additional choices and features that they otherwise would enjoy, and injures Sprint and other

---

[19]    Petition of Cincinnati Bell Wireless LLC to Condition Consent or Deny Applications, WT Docket No. 11-65, at 35, n.54 (May 31, 2011) (emphasis in original).

carriers who, because of the exclusionary acts made possible by the transaction, would be less able to compete on the merits.

> **(b)** ***The proposed transaction would increase the costs of developing newly allocated spectrum bands for all carriers other than the duopolists, AT&T and Verizon.***

170.    The proposed illegal transaction would add T-Mobile's spectrum to AT&T's already substantial spectrum holdings.  In addition, AT&T already has asked the FCC to approve its acquisition of additional 700 MHz spectrum from Qualcomm.  Combined, this would give AT&T an unprecedented nationwide average of 144 MHz of licensed spectrum, which would be nearly three times Sprint's nationwide spectrum holdings and five times the <u>combined</u> holdings of MetroPCS, Leap, and U.S. Cellular.  At the same time, Verizon would continue to hold a nationwide average of 93 MHz of spectrum.

171.    AT&T's spectrum holdings are predominantly in developed bands for which network equipment, chipsets, and device antennae are readily available.  Other spectrum bands have not yet been widely used for wireless telephony, and therefore network infrastructure equipment would need to be developed to function on those specific frequencies.  Absent the acquisition of T-Mobile, all of the national wireless carriers, with the possible exception of Verizon, likely would seek spectrum in "new" bands for which the research and development costs for new equipment have not yet been incurred.  By acquiring developed spectrum through the T-Mobile acquisition, AT&T would effectively and improperly shift the costs of spectrum development to Sprint and other carriers.  This would further weaken their ability to compete on the merits by increasing their costs and delaying their access to new equipment.

172.    Lightsquared and Clearwire have spectrum but need development partners to build a network and provide the other attributes necessary to be able to offer wireless service.

The transaction would eliminate T-Mobile as an independent carrier that could license spectrum or otherwise purchase network services from Lightsquared or Clearwire – two companies focused on exploiting spectrum above 1 GHz.

173.    The transaction would also eliminate T-Mobile as an important partner in developing WiFi as a way to relieve congestion on mobile wireless networks.  Network congestion, with the resulting dropped calls and slow data speeds, is a well-known problem within the wireless industry.  To avoid network congestion, Sprint and T-Mobile have been strong proponents of installing WiFi systems within buildings as a way to simultaneously offload traffic from their cell towers and increase data speeds.  AT&T and Verizon have resisted this innovation, preferring instead to push their LTE networks.  Absent this particular transaction, T-Mobile's incentives to develop WiFi with Sprint would remain unaltered.  Post-acquisition, Sprint would be left on its own to develop WiFi systems for mobile devices.

174.    The purported cost savings to AT&T from not developing newly allocated spectrum is not a competition-enhancing efficiency, because the cost is simply shifted to other carriers who must each pay a higher share than they otherwise would have been required to do absent the merger.  As a result of the proposed transaction, Sprint's costs to develop new spectrum would be artificially increased, which in turn would make it less effective as a competitor.  As a result of the illegal transaction, Sprint would have less capital to spend on additional development and improvements, and with a higher cost position would also be less able to charge lower prices to compete profitably against AT&T and Verizon.  The other independent wireless firms would face the same hurdles.  The result of the transaction would be less total development throughout the industry.

     (c)     ***The proposed transaction would raise Sprint's input costs for backhaul.***

175.    The merger would increase Sprint's costs for backhaul, a critical input that wireless carriers need to link their cell sites to their switches and the rest of their network.

176.    Backhaul, a type of special access, represents a significant portion of the costs of providing mobile wireless services.  Sprint pays about $1 billion per year for wireless backhaul, mostly to AT&T and Verizon.  A material increase in special access rates would increase the costs of providing wireless services and place upward pressure on the prices charged to end users.

177.    AT&T and Verizon are the most significant providers of backhaul, but typically do not compete with each other because the backhaul infrastructure for each carrier is focused on their respective areas in which they have legacy wireline assets.

178.    AT&T's proposed acquisition of T-Mobile would harm competition by eliminating T-Mobile as a purchaser of backhaul with a strong interest in obtaining services from alternative backhaul providers.  Because T-Mobile would stop purchasing backhaul from competitive alternatives to AT&T and Verizon, the ability of independent providers to remain in business and compete with the Twin Bells for this service would be greatly diminished.  AT&T and Verizon have similar interests in maintaining control over their incumbent backhaul markets.

179.    Eliminating T-Mobile as an independent purchaser of backhaul would also reduce the incentives for additional competitive providers of backhaul to make the necessary investment in infrastructure in certain areas to compete against the ILECs in the future.  T-Mobile plays an important role in generating business opportunities for competitive providers of backhaul services by providing additional scale for them as a potential customer.  The loss of T-Mobile as a potential customer would significantly shrink the size of the potential customer base for a

backhaul provider considering adding new service and therefore would reduce their incentive to invest.

180.    For example, just last year T-Mobile told the FCC that "T-Mobile is proud of its success in creating competition for Ethernet services in major metropolitan areas."[20]  This demand helps to fuel the growth of alternative special access, leading to greater competition for ILECs and lower prices for carriers and their customers.  T-Mobile's important role in stimulating competition for special access services would be eliminated if it were acquired by AT&T and eliminated as a purchaser of competitive special access services.

181.    COMPTEL, a leading industry association representing telecommunications service providers, including alternative backhaul suppliers, recently stated to the FCC that:

> T-Mobile [uses] competitive transport providers, including COMPTEL members, for approximately 20 percent of its cell cites. Because AT&T has indicated that it will move T-Mobile's backhaul traffic on to its own transport network wherever possible, the competitive carriers that currently provide backhaul to T-Mobile or that could vie for T-Mobile's business in the future will be foreclosed from competing for this business in AT&T's 22 state ILEC territory if the transaction is approved.  The loss of such a major customer will increase the difficulty for competitive providers to achieve minimum viable scale and will create a serious risk that competitive providers will either exit the special access market altogether or significantly scale back their investment in special access facilities.  Any such reduction in investment in competitive special access facilities will harm not only backhaul purchasers, but all purchasers of special access service who will be left with fewer choices in services and providers.[21]

182.    By eliminating T-Mobile as a purchaser of independent backhaul, and thus reducing the aggregate scale of the non-Bell wireless carriers, the proposed transaction would

---

[20]    Letter from Kathleen O'Brien Ham, T-Mobile, to Marlene H. Dortch, FCC, WC Docket No. 05-25, at 2 (May 6, 2010).

[21]    Petition to Deny of COMPTEL, WT Docket No. 11-65, at 25 (May 31, 2011) (emphasis added).

substantially diminish the prospects that alternative backhaul providers would be able to compete effectively with AT&T and Verizon in their incumbent wireline service areas. This would allow AT&T (and Verizon) to charge higher rates and impose more restrictive terms and conditions on its wireless rivals than it would be able to do without the acquisition of T-Mobile. Further, because the transaction would provide AT&T with the ability to increase its retail wireless prices, it would also give AT&T an incentive to increase its backhaul prices, as increasing its backhaul prices to its rivals would support higher retail prices.

### (d)    *The proposed transaction would raise Sprint's input costs for roaming.*

183.    The merger would raise Sprint's input costs for roaming.

184.    AT&T's acquisition of T-Mobile would eliminate GSM roaming competition between AT&T and T-Mobile. By combining the only two nationwide facilities-based GSM carriers in the United States, this transaction would be a merger to monopoly for GSM roaming. Cincinnati Bell Wireless, a purchaser of GSM roaming, raised exactly this concern to the FCC:

> As the only other national GSM carrier, T-Mobile today plays a critical role in the GSM roaming market – for example, its rates, although significantly higher than what would be available in a fully competitive market, are virtually half those of AT&T, and it has been willing to include advanced data roaming services over its 3G network in its roaming contracts with CBW and other GSM carriers, something that AT&T has only recently ever offered to do, albeit with significantly higher prices and unreasonable terms and conditions. T-Mobile's absorption into AT&T would, unless the [Federal Communications] Commission protects against it, give AT&T monopoly power in this segment of the market.[22]

185.    Increasing its retail wireless rates would give AT&T an incentive to increase its roaming prices, and increasing its roaming prices to its rivals would support higher retail prices.

---

[22]    Petition of Cincinnati Bell Wireless LLC to Condition Consent or Deny Applications, WT Docket No. 11-65, at 3 (May 31, 2011).

With AT&T setting higher prices, Verizon would have an incentive to increase its retail prices and also to raise its roaming fees to CDMA carriers, including Sprint.

186.    Increasing the cost of roaming to rivals would increase AT&T's (and Verizon's) ability to profitably raise wireless prices or reduce quality without losing customers to competitors while increasing their market shares.

**(e)    *The proposed transaction would increase costs for upstream products and services.***

187.    Developers of mobile operating systems, applications, substantive content, and other businesses rely on wireless access to consumers to deliver their products and services, and consumers rely on the same wireless access to buy products, access entertainment, pay bills, use the Internet, and otherwise interact with these businesses through their wireless devices.  This path to consumers is becoming increasingly important as (1) a substantial number of consumers rely on their mobile device for Internet access, sometimes exclusively; and (2) businesses rely less on "brick and mortar" stores to make sales and interact with customers, and more on wireless communications.

188.    AT&T and Verizon would be able to use their increased market power to select and promote only those upstream providers that are willing to accede to the business terms that they propose.  Innovation would be diminished as many of the upstream developers would be denied access to the market, and overall incentives to innovate by the upstream companies would be diminished as the duopolists appropriate part of any return.  Increased costs to upstream companies would cause harm to those companies, to independent wireless carriers who would not have the features and content required to compete, and ultimately to consumers who would suffer from higher costs and reduced innovation.

### 3.     The Regional Carriers Would Be Unable to Constrain AT&T and Verizon, Post Merger.

189.     The regional wireless carriers would be unable to constrain AT&T post-transaction because they are very small and lack the necessary attributes required to be effective competitors to AT&T and Verizon.  In total these fringe carriers have a share of less than 7 percent of all facilities-based wireless services, and the largest of them (U.S. Cellular) is losing share.  Moreover, these small carriers rely on the Twin Bells for inputs that are critically necessary to compete, such as backhaul and roaming.

190.     These regional carriers are unable to constrain AT&T and Verizon, including because they lack national footprints, and therefore their services to their subscribers who roam may be more expensive or degraded.  The competitive importance of a nationwide network has been acknowledged by AT&T.  G. Michael Sievert, Chief Marketing Officer of AT&T Wireless Services (AWS) justified the need for AT&T's acquisition of Cingular in 2004 at least in part on the fact that AT&T was competitively disadvantaged because it did not then have a nationwide network:

> AWS needs a true nationwide network, offering consistently high quality service with consistent features, to market its national plans effectively.  However, there are presently some gaps in AWS's national coverage, in areas where it has either not been possible or cost-effective for AWS to build out its network.
>
> These gaps in coverage affect AWS's ability to market nationwide service.[23]

191.     These smaller carriers have weak brand names, and have limited access to the leading-edge handsets.  Two of the largest fringe carriers – MetroPCS and Leap – offer only

---

[23]     Declaration of G. Michael Sievert, attached to Applications of AT&T Wireless Services, Inc. and Cingular Wireless Corporation for Consent to Transfer Control of Licenses and Authorizations, WT Docket No. 04-70 at ¶¶ 10-12.

prepaid wireless service. These small carriers have business models designed for specific

locations and demographics. They typically focus on densely populated urban areas (with lower

network costs per subscriber) and urban segments of the population that tend to be younger, have

a higher concentration of ethnic minorities, and have lower incomes. They offer flat rate

international calling options that target specific countries to which particular ethnic groups have

ties. Such business models do not lend themselves to substantial expansion opportunities across

the nation. These carriers have relatively high costs, resulting from their roaming and backhaul

needs. For all of these reasons, these fringe competitors would not be able to reposition or

expand to replace the competition that would be lost as a result of the elimination of T-Mobile as

a competitor, or to prevent AT&T unilaterally, or AT&T and Verizon both, from increasing

prices post-merger.

192.     Indeed, Leap made exactly this point in a filing with the FCC responding to

AT&T's argument that its acquisition of T-Mobile would not reduce competition because of the

presence of the smaller carriers, stating:

> [AT&T/T-Mobile's] discussion of the supposedly "highly
> competitive" wireless market has an air of unreality. They point
> to a number of wireless companies as potential constraints on
> post-merger AT&T's pricing with no acknowledgement that these
> companies are a fraction of AT&T's size, and indeed a fraction of
> T-Mobile's size. Leap, for example, is one of the applicants'
> principal examples of vibrant competition to AT&T, yet Leap
> remains dramatically smaller than AT&T by any possible
> measurement….The notion that a handful of small competitors, as
> scrappy and resilient as they may be, could have a serious impact
> on post-acquisition AT&T's pricing decisions is little more than
> wishful thinking, and consumers inevitably would pay higher
> prices as a result of this acquisition….AT&T continues to dwarf
> Leap by any measurement that should matter for evaluating
> whether Leap can discipline AT&T's pricing.[24]

---

[24]    Reply of Leap Wireless International, Inc. and Cricket Communications, Inc., WT Docket No. 11-65, at 7
(June 20, 2011).

193.    As the Consumers Union (the publisher of Consumer Reports) and others also noted:

> Were they capable of enticing the data-intensive smartphone market's customers away from AT&T or Verizon and to their limited networks, small and regional carriers nevertheless could not absorb that many.  This is because such carriers have fewer funds to acquire spectrum and invest in infrastructure, making it more difficult to expand and improve upon their networks. To put it differently, if AT&T's failure adequately to invest in its sizable spectrum holdings has limited its future growth, imagine the barriers before those firms without its assets.[25]

194.    Lacking the size and attributes necessary to compete, particularly for postpaid service, the smaller regional and local carriers would be unable to replace the competition lost as a result of the elimination of T-Mobile.

### 4.    The Proposed Transaction Would Effectively Create a Duopoly of AT&T and Verizon, Who Are Much More Likely To Coordinate Their Competitive Behavior.

195.    With the elimination of T-Mobile, each of the alleged relevant markets possesses structural characteristics that increase the likelihood of coordination between AT&T and Verizon post-acquisition.  These characteristics include the large post-merger combined market share of AT&T and Verizon; the significant reduction in Sprint's competitive significance as its costs for critical inputs would be increased as a result of the merger; elimination of T-Mobile as a low-price competitor with a business plan to be an emerging challenger; price transparency in the retail market; barriers to entry and expansion facing other competitors that would be exacerbated

---

[25]    Joint Petition to Deny of Center for Media Justice, Consumers Union, Media Access Project, New America Foundation, and Writers Guild of America, West, WT Docket No. 11-65, at 12-13 (May 31, 2011).

by the merger; and the fact that AT&T and Verizon are similarly situated ILECs that are interdependent on one another for backhaul services.

196.    After the acquisition, AT&T and Verizon would control 78 percent of all facilities-based mobile wireless revenues and would account for 82 percent of postpaid subscribers.  Importantly, they would possess those dominant shares without the competitive constraint that T-Mobile's independent presence provides in the marketplace.  Post-merger, AT&T and Verizon would be able to monitor each other's prices, and their competitors would have higher costs in part because they depend on AT&T and Verizon for essential inputs like backhaul and roaming.

197.    If the proposed transaction were allowed to proceed, neither Sprint nor the smaller prepaid and regional carriers would be able to disrupt the coordination between AT&T and Verizon that likely would result.  Even with Sprint's current 15-percent share of wireless revenues, its competitive significance would be marginalized by the permanent removal of T-Mobile as a potential development partner, including through organizations such as the Open Handset Alliance, and because of AT&T's increased ability and incentive to engage in exclusionary acts that would compromise Sprint's ability to compete on the merits.

198.    As a result of the merger, AT&T would have the ability and incentive to carry out exclusionary acts against Sprint and other independent carriers.  These carriers would either be denied access or face increased costs for many of the key inputs of wireless services, including handsets, backhaul, roaming, operating systems, applications, content, and network infrastructure. The foreclosure and increased costs caused by the merger would effectively make the offers of Sprint and the other independent carriers less attractive to customers. The independent carriers would be injured in their businesses resulting from, among other things, the combination of a

substantial loss of customers, increased costs, and decreased attractiveness of their product

offerings.  These injuries would also translate into reduced competition, higher prices, and

decreased innovation for consumers.  As a result, the wireless markets would inevitably revert to

a duopoly structure that would put more profits in the pockets of AT&T and Verizon, while

harming consumers and independent competitors.

## VII.   CLAIMED EFFICIENCIES OF THE PROPOSED TRANSACTION ARE OVERSTATED OR ILLUSORY AND ARE NOT MERGER-SPECIFIC.

199.   AT&T has publicly argued that the merger would create significant network

efficiencies with respect to spectrum, cell sites, and rural buildout, and that these benefits should

justify the transaction.  These alleged efficiencies are overstated, unverifiable, and could be

achieved in whole or large part without the acquisition of T-Mobile and the resulting injury to

competition and Sprint.

200.   AT&T claims that it faces spectrum shortages and therefore needs T-Mobile's

spectrum to maintain quality service.  However, AT&T has large holdings of spectrum, much of

which is completely unused.  AT&T holds a population-weighted national average of 40 MHZ of

unused or underused spectrum – nearly 40 percent of its total holdings.  These unused holdings

include a population-weighted average of 27 MHz of highly valuable 700 MHz spectrum.

201.   In public statements before it reached agreement to acquire T-Mobile, AT&T

expressed confidence that it had adequate spectrum to support growing user demand for several

years.  In March 2011, Pete Ritcher, the CFO of AT&T's wireless business stated, "[f]ortunately

for AT&T, we're in a pretty good situation regarding where we are in the spectrum that we have

and that we need here for the next few years."[26]

---

[26]   AT&T at Credit Suisse Group Convergence Conference, FAIR DISCLOSURE WIRE, at 7 (Mar. 9, 2011).

202.   AT&T has cited its current poor network quality as evidence of its need for spectrum.  In reality, however, AT&T has adequate spectrum holdings but uses its spectrum inefficiently because it has failed to invest sufficiently in its system technology and infrastructure. Tellingly, AT&T's spectrum holdings are comparable to or greater than those of Verizon, which has stated that its own spectrum holdings are sufficient until 2015.

203.   AT&T's claims that its acquisition of T-Mobile's cell sites would help expand capacity are also inflated.  Many of T-Mobile's cell sites are located in the same place or very close to existing AT&T sites, so they would not be useful to AT&T.  Moreover, AT&T can acquire or build new cell sites for much less than cost of the T-Mobile takeover, and can do so without reducing competition.

204.   There are many viable alternatives for AT&T to improve the capacity of its existing network without eliminating a competitor.  For example, experts have opined that AT&T could make network enhancements by accelerating its transition to more spectrally efficient 3G and 4G technologies and by using small cells such as picocells, femtocells, and WiFi hotspots.  These types of network management techniques would enhance spectral efficiency and do not require the same amount of investment, planning or lag time as acquiring or building new cell sites.

205.   Although AT&T claims that it will build out its LTE to 97 percent of the U.S. population only if it acquires T-Mobile, there is nothing about the T-Mobile merger that makes rural buildout more possible or efficient for AT&T.  In fact, it was recently reported in public news articles that AT&T's own internal estimates suggest that it could build out LTE to 97 percent of Americans for only $3.8 billion without T-Mobile – a mere fraction of the $39 billion

AT&T proposes to pay Deutsche Telekom for the anticompetitive acquisition of T-Mobile.[27]
Further, Verizon has already announced that it will build out its LTE network to 97 percent of
the population.  To keep up with Verizon, AT&T will need to do the same, regardless of whether
it acquires T-Mobile.

206.    AT&T's alleged efficiencies are not merger-specific, are largely unverifiable, and
are too speculative to justify allowing a transaction that would significantly reduce competition.

## VIII.  INJURY TO COMPETITION AND ANTITRUST INJURY TO SPRINT

207.    AT&T's proposed takeover of T-Mobile would substantially increase market
concentration in a number of product and geographic markets identified above.  The transaction
would substantially reduce competition in these markets by allowing AT&T to raise prices
unilaterally and/or through an increased likelihood of coordinated interaction with Verizon.
Consumers would be injured by higher prices and lessened competition.

208.    Sprint and other independent wireless carriers also would be injured by the
transaction.  The proposed illegal acquisition of T-Mobile would enable AT&T to engage in
exclusionary acts that would foreclose Sprint from access to the newest and most innovative
handsets, which are a critical dimension of competition for a national wireless carrier.  None of
these acts would constitute competition on the merits.  As a result, Sprint would be injured
because it would be less able to compete on the merits against AT&T and Verizon, post-merger,
than it is today with T-Mobile as an independent company.

209.    AT&T's proposed acquisition of T-Mobile would also give AT&T the power and
incentive to engage in exclusionary acts to raise Sprint's costs for key inputs (including

---

[27]    Amy Schatz, *FCC Asks AT&T For More Info on LTE*, WALL STREET JOURNAL (Aug. 25, 2011) *available at*:
http://online.wsj.com/article/SB10001424053111904787404576528613428221284.html?mod=googlenews_wsj.

development of handsets and equipment), development of spectrum, operating systems, applications, content, backhaul, and roaming.  None of these exclusionary acts by AT&T would constitute competition on the merits.  As a result, Sprint would be less able to compete on the merits against AT&T and Verizon, post-merger, than it is today with T-Mobile as an independent company.

210.   AT&T's proposed acquisition of T-Mobile would also likely lead to higher prices for Sprint as a customer of backhaul services.  As a result, Sprint would be injured.  Further, Sprint would be less able to compete in the wireless markets against AT&T and Verizon on the merits than it is today with T-Mobile an independent company.

211.   The effects of AT&T's proposed acquisition would be to entrench the Twin Bells' control of the wireless communications markets, injuring Sprint and making it less effective as a competitor on the merits, while simultaneously causing harm to consumers.  The injury to Sprint's business would result from, among other things, the combination of decreased attractiveness of its product offerings, increased costs, and a substantial loss of customers.

212.   Because the injury to Sprint flows directly from both the reduction in competition caused by the merger, as well as from anticompetitive acts made possible by the illegal transaction, the injury to Sprint would constitute antitrust injury.

213.   The injuries to Sprint and the public at large would be irreparable if the merger were completed.  Those injuries would not be adequately compensable by money damages.

214.   The public interests, including the interests in preserving competition, weigh heavily in favor of an injunction.

215.   AT&T, Deutsche Telekom, and T-Mobile have no legitimate and cognizable interest in completing an illegal acquisition.

216.    Sprint has a strong private interest in preserving its ability to compete on the merits.

217.    The balance of equities weighs heavily in favor of an injunction.

## IX.    COUNT I (HORIZONTAL EFFECTS)

218.    Sprint repeats and re-alleges the allegations of Paragraphs 1-217 as though alleged herein.

219.    AT&T, T-Mobile, and Deutsche Telekom are engaged in interstate commerce.

220.    The relevant product markets include at least an all mobile wireless services market to consumers, a postpaid mobile wireless services market to consumers, and a market for mobile wireless services for corporate and government accounts.  The relevant geographic markets for the all wireless and postpaid wireless markets are the United States and each local CMA and CEA in which AT&T and T-Mobile compete.  The relevant geographic market for wireless services for corporate and government accounts is the United States.

221.    The markets for wireless services are concentrated, and the transaction would further substantially increase market concentration in the relevant product and geographic markets.

222.    The transaction would increase the likelihood that AT&T could raise prices unilaterally, increase the likelihood that AT&T could increase prices as a result of coordinated interaction, and increase the likelihood that AT&T could and would engage in exclusionary conduct that harms Sprint and other smaller wireless carriers.

223.    Barriers to entry and expansion are high, and new entry or expansion would not be timely, likely or sufficient to replace the competition that would be lost as a result of the merger.

224.    The transaction would not create efficiencies that are merger-specific, verifiable, and sufficient to overcome the loss of competition that would result from the merger.

225.    The proposed transaction would result in injury to consumers and competition.

226.    The proposed transaction would result in injury in fact to Sprint.

227.    Because Sprint's injury would flow from the reduction in competition caused by the merger, as well as from anticompetitive acts made possible by the illegal transaction, the injury to Sprint would constitute antitrust injury.

228.    Sprint would suffer irreparable injury if the merger were completed, and is entitled to injunctive relief.

## X.    COUNT II (VERTICAL EFFECTS)

229.    Sprint repeats and re-alleges the allegations of Paragraphs 1-228 as though alleged herein.

230.    AT&T, T-Mobile, and Deutsche Telekom are engaged in interstate commerce.

231.    The relevant product markets include at least an upstream market for the provision of backhaul services and downstream markets including an all-mobile wireless services market to consumers, a postpaid mobile wireless services market to consumers, and a market for mobile wireless services for corporate and government accounts.  The relevant geographic markets for backhaul are no larger than a metropolitan-based local market and include each market in which AT&T offers backhaul services and T-Mobile provides wireless services.  The relevant geographic markets for the all wireless and postpaid wireless markets are the United States and each local CMA and CEA in which AT&T and T-Mobile compete.  The relevant geographic market for wireless services for corporate and government accounts is the United States.

232.    The relevant markets for backhaul are concentrated and the proposed transaction would increase AT&T's market power in the relevant product and geographic markets.

233.    The transaction would increase the likelihood that AT&T could raise prices unilaterally, increase the likelihood that AT&T could increase prices as a result of coordinated interaction, and increase the likelihood that AT&T could engage in exclusionary conduct.  The transaction would also increase the likelihood that independent backhaul providers would be foreclosed from entry or expansion, which would increase prices in the upstream markets for backhaul and also in the downstream markets for wireless services.

234.    Barriers to entry and expansion are high and new entry would not be timely, likely or sufficient to replace the competition that would be lost in the alleged backhaul markets as a result of the merger.

235.    The transaction would not create efficiencies that are merger-specific, verifiable, and sufficient to overcome the loss of competition in the alleged backhaul markets that would result from the merger.

236.    The proposed transaction would reduce competition in the backhaul markets and result in injury to purchasers of backhaul services.  The proposed transaction would also injure downstream consumers of wireless services and competition.

237.    As a purchaser of backhaul services, Sprint would be injured in fact as a result of the combination of AT&T and T-Mobile.

238.    Because Sprint's injury would flow from the reduction in competition for backhaul services, as well as anticompetitive acts in backhaul markets made possible by the illegal transaction, the injury to Sprint would constitute antitrust injury.

239.    Sprint would suffer irreparable injury if the merger were completed, and is entitled to injunctive relief.

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Sprint respectfully requests that the Court enter a judgment in its favor and against Defendants and grant the following relief:

1.    Entering a judgment that AT&T's proposed acquisition of T-Mobile violates Section 7 of the Clayton Act, 15 U.S.C. § 18;

2.    Entering a judgment permanently enjoining and restraining Defendants from carrying out the Stock Purchase Agreement by and between Deutsche Telekom AG and AT&T, Inc. dated March 20, 2011, or from entering into or carrying out any agreement, understanding, or plan, the effect of which would be to bring the wireless services of AT&T and T-Mobile under common ownership or control;

3.      Awarding Sprint attorneys' fees and costs; and

4.      Awarding Sprint such further relief as the Court deems just and proper.


Dated September 6, 2011

Respectfully submitted,

Steven C. Sunshine (D.C. Bar No. 450078)
Tara L. Reinhart (D.C. Bar No.462106)
Tiffany Rider Rohrbaugh (D.C. Bar No. 481520)
   (*pro hac vice* to be submitted)
Tara S. Emory (D.C. Bar No. 492138)
SKADDEN, ARPS, SLATE,  MEAGHER &
   FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
(202) 371-7000
Steven.Sunshine@skadden.com
Tara.Reinhart@skadden.com
Tiffany.Rider@skadden.com
Tara.Emory@skadden.com

Matthew P. Hendrickson
   (*pro hac vice* to be submitted)
James A. Keyte
   (*pro hac vice* to be submitted)
SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
4 Times Square
New York, NY 10036
(212) 735-3000
James.Keyte@skadden.com
Matthew.Hendrickson@skadden.com

*Counsel for Sprint Nextel Corporation*


68