**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SPRINT NEXTEL CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:11-cv-01600-ESH |
| ) | |
| AT&T INC., et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

<u>**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**</u>

Defendants AT&T Inc. ("AT&T"), T-Mobile USA, Inc. ("T-Mobile"), and Deutsche Telekom AG ("DT") (jointly, "Defendants") move this Court for an order dismissing Plaintiff's complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  In support of this motion, Defendants submit a supporting memorandum of points and authorities, along with a proposed order.

Date:  September 30, 2011                     Respectfully submitted,


                                             /s/ *Mark C. Hansen*
                                             Mark C. Hansen, D.C. Bar # 425930
                                             Michael K. Kellogg, D.C. Bar # 372049
                                             Aaron M. Panner, D.C. Bar # 453608
                                             Kellogg, Huber, Hansen, Todd,
                                                 Evans & Figel, P.L.L.C.
                                             1615 M Street, NW, Suite 400
                                             Washington, DC 20036
                                             (202) 326-7900


                                             Richard L. Rosen, D.C. Bar # 307231
                                             Donna E. Patterson, D.C. Bar # 358701
                                             Arnold & Porter LLP
                                             555 Twelfth Street, NW
                                             Washington, DC 20004-1206
                                             (202) 942-5000


                                             Wm. Randolph Smith, D.C. Bar # 356402
                                             Kathryn D. Kirmayer, D.C. Bar # 424699
                                             Crowell & Moring, LLP
                                             1001 Pennsylvania Avenue, NW
                                             Washington, DC 20004
                                             (202) 624-2500


                                             *Counsel for AT&T Inc.*


                                             George S. Cary, D.C. Bar # 285411
                                             Mark W. Nelson, D.C. Bar # 442461
                                             Cleary Gottlieb Steen & Hamilton LLP
                                             2000 Pennsylvania Avenue, NW
                                             Washington, DC 20006
                                             (202) 974-1500


                                             Richard G. Parker, D.C. Bar # 327544
                                             O'Melveny & Myers LLP
                                             1625 Eye Street, NW
                                             Washington, DC 20006
                                             (202) 383-5300


                                             *Counsel for T-Mobile USA, Inc. and*
                                                 *Deutsche Telekom AG*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SPRINT NEXTEL CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:11-cv-01600-ESH |
| | ) |
| AT&T INC., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

George S. Cary, D.C. Bar # 285411
Mark W. Nelson, D.C. Bar # 442461
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500

Richard G. Parker, D.C. Bar # 327544
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

*Counsel for T-Mobile USA, Inc. and*
*Deutsche Telekom A*G

Mark C. Hansen, D.C. Bar # 425930
Michael K. Kellogg, D.C. Bar # 372049
Aaron M. Panner, D.C. Bar # 453608
Kellogg, Huber, Hansen, Todd,
    Evans & Figel, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

Richard L. Rosen, D.C. Bar # 307231
Donna E. Patterson, D.C. Bar # 358701
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
(202) 942-5000

Wm. Randolph Smith, D.C. Bar # 356402
Kathryn D. Kirmayer, D.C. Bar # 424699
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500

September 30, 2011

*Counsel for AT&T Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .................................................................................................................1

BACKGROUND ...................................................................................................................3

ARGUMENT .......................................................................................................................6

I.      AS A COMPETITOR, SPRINT LACKS STANDING TO CHALLENGE A
        HORIZONTAL MERGER OF WIRELESS SERVICE PROVIDERS .............................6

II.     SPRINT HAS NOT PLAUSIBLY ALLEGED THAT THE TRANSACTION
        WILL HARM SPRINT AS A BUYER OF SERVICES OR EQUIPMENT ...................11

        A.      Sprint Fails To State a Claim That the Transaction Will Cause
                Anticompetitive Harm in the Alleged Market for Purchase of
                "Backhaul" Services and Lacks Standing To Pursue Such a Claim in
                Any Event ...........................................................................................................12

        B.      Sprint's Claims Related to "Roaming" Do Not Establish Standing
                Because Sprint Fails To Allege a Relevant Market or That the
                Proposed Transaction Would Affect Sprint's Supply of Roaming
                Services ...............................................................................................................17

        C.      Sprint's Allegations Related to Wireless Devices and Applications Fail
                Because Sprint Fails To Define a Relevant Market or To Provide a
                Factual Basis for Anticompetitive Effects ...........................................................20

CONCLUSION..................................................................................................................22

# TABLE OF AUTHORITIES

Page

## CASES

*Abbyy USA Software House, Inc. v. Nuance Communications Inc.*,
No. C 08-01035 JSW, 2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) ...............................14

*Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24 (D.C. Cir. 1987) ........................15

\* *Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235
(3d Cir. 1987)............................................................................................1, 10, 14, 15

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d
1159 (C.D. Cal. 2000)..........................................................................................2

\* *Associated Gen. Contractors of California v. California State Council of
Carpenters*, 459 U.S. 519 (1983) ...........................................................2, 16, 17

\* *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)......................1, 9, 10

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir. 1986) .......................9

\* *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................11, 19

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860 (W.D.N.Y. 1994) ...................11

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) .................................17

\* *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) .................................1, 7, 8, 9

*Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988).............................20

*Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111 (10th Cir. 2008)............................13

\* *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986)............................1, 7, 8, 9, 19, 20

*Community Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146
(W.D. Ark. 1995), *aff'd*, 139 F.3d 1180 (8th Cir. 1998) ...................................10

*Coors Brewing Co. v. Miller Brewing Co.*, 889 F. Supp. 1394 (D. Colo. 1995)...........................11

\* *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002)....................................13, 21

*Electronics Communications Corp. v. Toshiba Am. Consumer Prods., Inc.*,
129 F.3d 240 (2d Cir. 1997)............................................................................20

*Florida Seed Co. v. Monsanto Co.*, 105 F.3d 1372 (11th Cir. 1997) ............................................14

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004) ..............................12

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ...................................................21

*Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710 (7th Cir. 2006)..........................16

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ...................................20

*Lucas v. Bechtel Corp.*, 800 F.2d 839 (9th Cir. 1986)...................................................................17

\* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................................1, 10

*Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857 (D.C. Cir. 2008)........................................................18

\* *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565
  (7th Cir. 1994)...............................................................................................................10

*Pearl Brewing Co. v. Miller Brewing Co.*, Civ. No. SA-93-CA-205, 1993 WL
  424236 (W.D. Tex. Mar. 31, 1993), *aff'd*, 52 F.3d 1066 (5th Cir. 1995)........................7

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412 (5th Cir. 2010),
  *cert. denied*, 131 S. Ct. 1476 (2011) ...............................................................................11

*Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 Civ. 5499,
  2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) ......................................................................11

*Sullivan v. Tagliabue*, 25 F.3d 43 (1st Cir. 1994)........................................................................17

*Surgical Care Ctr. of Hammond, L.C. v. Hospital Serv. Dist. No. 1 of Tangipahoa
  Parish*, 309 F.3d 836 (5th Cir. 2002).............................................................................21

*Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250 (E.D. Pa. 1987) ..............................8

*Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119 (S.D.N.Y. 1996)................................11

\* *United States v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172 (D.D.C. 2001)...........................17

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003).................................................21

*U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589 (1st Cir. 1993) .................................21

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)...............................................................................................14, 19

*Wyandotte Co. v. United States*, 389 U.S. 191 (1967)...................................................8

## ADMINISTRATIVE DECISIONS

Fifteenth Report, *Implementation of Section 6002(b) of the Omnibus Budget
Reconciliation Act of 1993*, WT Docket No. 10-133, FCC 11-103 (rel.
June 27, 2011)....................................................................................................22

Report and Order and Further Notice of Proposed Rulemaking, *Reexamination of
Roaming Obligations of Commercial Mobile Radio Service Providers*, 22
FCC Rcd 15817 (2007), *modified on recon.*, Order on Reconsideration and
Second Further Notice of Proposed Rulemaking, *Reexamination of
Roaming Obligations of Commercial Mobile Radio Service Providers and
Other Providers of Mobile Data Services*, 25 FCC Rcd 4181 (2010)..............................19

Second Report and Order, *Reexamination of Roaming Obligations of Commercial
Mobile Radio Service Providers and Other Providers of Mobile Data
Services*, 26 FCC Rcd 5411 (2011), *appeals pending*, *Cellco P'ship v.
FCC*, Nos. 11-1135 & 11-1136 (D.C. Cir. filed May 13, 2011).........................................19

## STATUTES AND REGULATIONS

Clayton Act, 15 U.S.C. § 12 *et seq.* .................................................................................1, 9, 15

§ 7, 15 U.S.C. § 18.................................................................................3, 12

§ 16, 15 U.S.C. § 26.................................................................................3, 11

47 U.S.C. § 310(d) ...........................................................................................................14

47 C.F.R. pt. 69...............................................................................................................14

47 C.F.R. § 20.12 ............................................................................................................19

## OTHER MATERIALS

Phillip E. Areeda et al., *Antitrust Law* (3d ed. 2007):

    Vol. 2A.................................................................................8, 10, 11, 12, 14

    Vol. 2B ................................................................................................15

Sinead Carew, *Sprint Cries Foul Over Rivals' Mega-Merger*, Reuters
    (Mar. 23, 2011) ...................................................................................9

Roger Cheng, *Sprint To Launch Own 4G LTE Network in Early 2012*, CNET
    News (Sept. 27, 2011), *available at* http://news.cnet.com/8301-1-35_3-
    20112095-94/sprint-to-launch-own-4g-lte-network-in-early-2012-scoop/ ......................18

Comments of Sprint Nextel Corp., *Petition of Rural Cellular Ass'n for Rulemaking
    Regarding Exclusivity Arrangements Between Commercial Wireless
    Carriers and Handset Manufacturers*, RM-11497, DA 08-2272 (FCC filed
    Feb. 2, 2009) ......................................................................................20

Herbert Hovenkamp, *Merger Actions for Damages*, 35 Hastings L.J. 937 (1984) ......................15

Joint Opposition of AT&T Inc., Deutsche Telekom AG, and T-Mobile USA, Inc.
    to Petitions To Deny and Reply to Comments, *Applications of AT&T Inc.
    and Deutsche Telekom AG for Consent To Assign or Transfer Control of
    Licenses and Authorizations*, WT Docket No. 11-65 (FCC filed June 10,
    2011), *available at* http://fjallfoss.fcc.gov/ecfs/document/view?id=
    7021686831........................................................................................6

William H. Page, *The Scope of Liability for Antitrust Violations*, 37 Stan. L. Rev.
    1445 (1985) ........................................................................................7

Sprint Nextel Corp. Petition To Deny, *Applications of AT&T Inc. and Deutsche
    Telekom AG for Consent To Assign or Transfer Control of Licenses and
    Authorizations*, WT Docket No. 11-65 (FCC filed May 31, 2011),
    *available at* http://fjallfoss.fcc.gov/ecfs/ document/view?id=7021675883........................6

## INTRODUCTION

Nothing alleged in its complaint is half so significant as the fact that Sprint filed it. Sprint is the third largest provider of wireless services in the United States with more than 50 million customers.  Sprint competes in each of the top 100 "cellular market areas" defined by Federal Communications Commission ("FCC") regulations.  As such, Sprint would have everything to gain from the reduction in competition in wireless services that its complaint alleges.  But Sprint knows that competition will be enhanced, not harmed, by the combination of AT&T and T-Mobile and that a post-merger AT&T — freed of spectrum shortages that impair its ability to offer customers better services at lower prices — will be a more formidable competitor.  What is good for consumers is bad for Sprint, and that is why Sprint has filed suit.

That is also why the Court should dismiss Sprint's suit for lack of standing under the Clayton Act.  *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 122 (1986); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Sprint cannot wrap itself in the cloak of wireless service consumers' interest, because Sprint is not a consumer but instead a competitor in the sale of wireless services.  A *competitor* — which "stand[s] to gain" when markets are less competitive and prices rise — suffers no injury from a reduction in *competition*.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582-83 (1986); *see Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337 (1990); *Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1242 (3d Cir. 1987).

Sprint seeks to manufacture standing by arguing that the transaction will somehow impair its access to several categories of inputs it needs to provide service.  But these input arguments, which the Department of Justice found too insubstantial even to include in its complaint, are implausible on their face and fail the applicable pleading standards.

First, Sprint argues that the transaction will enhance AT&T's power in a supposed market for "backhaul" (transmission services used to carry traffic from a wireless service provider's tower to the wireline telephone network over which calls are routed).  But Sprint does not allege — nor could it — that it (or anyone else) purchases "backhaul" from T-Mobile.  Unable to claim that the transaction will eliminate a *seller* of backhaul, Sprint speculates that the loss of T-Mobile as a *purchaser* of such services will reduce demand and (even though a reduction in demand would ordinarily cause prices to *fall*) lead — indirectly, through the elimination of unaffiliated providers — to price increases.  But backhaul is simply one form of the dedicated transmission services known as "special access," and the complaint provides no factual allegations to support any claim that T-Mobile is such an important purchaser of special access services that its combination with AT&T will have any significant impact on market-wide demand, particularly given that prices for those services are subject to regulation by the FCC.  And, even if such allegations were included, they would not establish antitrust standing because any impact of the transaction on Sprint's ability to purchase special access services is both indirect (because it depends on the effect of the transaction on Sprint's suppliers) and speculative (because a reduction in demand from T-Mobile would lead, in the first instance, to additional supply available to Sprint and others and, thus, lower prices, not higher prices).  *See Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 537 (1983); *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159 (C.D. Cal. 2000).

Second, Sprint claims that the transaction will enhance AT&T's power with respect to "roaming" services, ultimately increasing Sprint's costs.  But, as the complaint acknowledges, Sprint does not purchase roaming services from either AT&T or T-Mobile — its network is

technologically incompatible.  The transaction therefore will have no impact on Sprint's ability to obtain roaming services.  Sprint's claim that the transaction will induce *Verizon* to raise its rates for roaming is implausible and speculative both because Verizon does not currently compete with AT&T or T-Mobile to provide roaming services to Sprint and because roaming is subject to FCC regulation.

Finally, Sprint claims that the combined entity may reduce Sprint's access to new wireless devices.  But Sprint does not provide any factual allegations to support any suggestion that AT&T's acquisition of T-Mobile would enable it to foreclose competitors' access to handsets.  Sprint thus cannot plausibly allege that the elimination of T-Mobile as an independent company will have any adverse impact on Sprint's ability to purchase such advanced devices.

The Court should accordingly dismiss the complaint for lack of antitrust standing.

## BACKGROUND

On March 20, 2011, AT&T entered into a stock purchase agreement to acquire T-Mobile from its parent company, Deutsche Telekom, and to merge the two companies' mobile wireless telecommunications services businesses.  On August 31, 2011, the United States filed an action under section 7 of the Clayton Act, 15 U.S.C. § 18, seeking permanently to enjoin the acquisition.  *See* Compl. ¶ 12.  Sprint filed its own complaint one week later seeking the same injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26.  *See id.* ¶ 11.

**A.**    Sprint's allegations focus on the supposed effects the transaction will have on *consumers* of wireless telecommunications services, which Sprint is not.  Sprint characterizes the market for such services as "highly concentrated" and claims that it will become "substantially more so" as a result of AT&T and T-Mobile's merger.  *Id.* ¶ 139.  Therefore, according to Sprint, the merger "raises a presumption that it would be likely to enhance market power."  *Id.*  Sprint

also alleges that T-Mobile is "a low-price leader and innovator" in the wireless market, *id.* ¶ 154, whose elimination through the merger will "lead to higher prices and less innovation" for consumers of wireless services, *id.* ¶ 158.

Sprint also advances claims about the merger's alleged effects on input markets in which Sprint is a customer.  *First*, Sprint claims that the alleged market for "backhaul" will become less competitive.  "Backhaul" is one type of the dedicated transmission services known as "special access."  *Id.* ¶ 176.  Wireless providers purchase backhaul to connect their cell sites (i.e., the radio towers with which wireless handsets communicate) to the wireline network over which wireless calls are routed.  *See id.* ¶ 58.  Sprint alleges that AT&T and Verizon "are the predominant providers of special access," *id.* ¶ 59, and that AT&T's acquisition of T-Mobile "would harm competition by eliminating T-Mobile as a purchaser of backhaul with a strong interest in obtaining services from alternative backhaul providers," *id.* ¶ 178.  Sprint claims that, without T-Mobile in the market, "independent" providers of backhaul will be less able to compete with AT&T and Verizon and will have less incentive to do so.  *Id.* ¶¶ 178-179. According to Sprint, this alleged reduction in competition would allow both AT&T and Verizon to charge higher rates for backhaul, harming purchasers of those services — including Sprint. *See id.* ¶ 182.  But aside from alleging that T-Mobile purchases 20 percent of its own backhaul requirements from "competitive" providers, *see id.* ¶ 181, Sprint does not allege the scope of the market or the transaction's potential impact on it.

*Second*, Sprint alleges that prices for "roaming" — service that one wireless carrier provides to the customers of another in areas where the latter provider lacks network coverage — will rise.  *See id.* ¶ 55.  As Sprint acknowledges, however, roaming agreements are possible only between carriers that use compatible network technology.  *See id.* ¶ 57.  For their second- and

third-generation networks, Sprint alleges that both AT&T and T-Mobile use a technology known as Global System for Mobile Communications ("GSM"), while Sprint and Verizon employ Code Division Multiple Access ("CDMA") technology.  *See id.* ¶¶ 44-45.  For the newest, fourth-generation networks, Verizon allegedly uses Long Term Evolution ("LTE") technology, which AT&T will also use; Sprint, meanwhile, uses WiMax technology in its fourth-generation network.  *See id.* ¶ 46.  In other words, none of Sprint's current network technology is alleged to be compatible with AT&T's or T-Mobile's, meaning that Sprint cannot purchase roaming from either company.  Nonetheless, Sprint asserts that the merger will lead to increased *retail* wireless rates for consumers, which it claims would give the post-merger AT&T an incentive to increase its roaming rates as well, which, according to Sprint, would lead *Verizon* to increase its retail and roaming prices for other CDMA carriers, such as Sprint.  *See id.* ¶ 185.

*Third*, Sprint alleges that, after the merger, AT&T and Verizon will "coerce exclusionary handset deals" from device manufacturers and foreclose Sprint's and other carriers' access to those devices.  *Id.* ¶ 160.  Sprint also claims that this alleged increase in market power will "mak[e] Sprint a less attractive potential partner for handset manufacturers and related developers," impeding its ability to offer its customers the latest, technologically advanced devices.  *Id.*  Finally, Sprint alleges that the merger will prevent it from "ally[ing] with T-Mobile to create substantial scale for the creation of new handsets."  *Id.* ¶ 161.  The complaint, however, contains no allegations regarding product or geographic markets for wireless devices.

**B.**     Sprint's allegations track those that it has already raised before the FCC, which regulates backhaul and roaming, in proceedings addressing the merging parties' applications to transfer control of certain licenses and authorizations from T-Mobile's current parent company (Deutsche Telekom) to AT&T.  First, in opposing the transaction, Sprint has argued before the

FCC that the merger will "increas[e] backhaul rates" by "eliminat[ing] a potential major customer of competitive services in AT&T's region [i.e., T-Mobile], making it harder for alternative providers of special access services . . . to generate sufficient business to attract investment and remain viable." Sprint Pet. To Deny[1] at 39.  Second, Sprint has there claimed that "AT&T's proposed takeover of T-Mobile would allow AT&T and Verizon to exclude competitors by raising their costs and degrading their service quality due to their control over roaming." *Id.* at 43.  Third, Sprint has complained to the FCC that the merger will "give [AT&T] far greater leverage to demand exclusive arrangements" from handset manufacturers and "mak[e] Sprint a less attractive potential handset partner." *Id.* at iii, 38.  AT&T and T-Mobile have comprehensively responded to Sprint's claims in that FCC proceeding.[2]

## ARGUMENT

## I.  AS A COMPETITOR, SPRINT LACKS STANDING TO CHALLENGE A HORIZONTAL MERGER OF WIRELESS SERVICE PROVIDERS

Although Sprint devotes the bulk of its complaint to describing supposed effects of the proposed transaction on competition in the provision of wireless services, Sprint, as a competitor, is categorically without standing to complain of those effects.  Whether the transaction will intensify competition in the provision of wireless services — as AT&T insists is true — or reduce competition — as Sprint, perhaps expediently, claims — Sprint lacks antitrust standing to challenge the transaction on those grounds.

---

[1] Sprint Nextel Corp. Petition To Deny, *Applications of AT&T Inc. and Deutsche Telekom AG for Consent To Assign or Transfer Control of Licenses and Authorizations*, WT Docket No. 11-65 (FCC filed May 31, 2011) ("Sprint Pet. To Deny"), *available at* http://fjallfoss.fcc.gov/ecfs/document/view?id=7021675883.

[2] *See* Joint Opposition of AT&T Inc., Deutsche Telekom AG, and T-Mobile USA, Inc. to Petitions To Deny and Reply to Comments, *Applications of AT&T Inc. and Deutsche Telekom AG for Consent To Assign or Transfer Control of Licenses and Authorizations*, WT Docket No. 11-65 (FCC filed June 10, 2011), *available at* http://fjallfoss.fcc.gov/ecfs/document/view?id=7021686831.

AT&T's acquisition of T-Mobile is driven by AT&T's need to alleviate a severe shortage of spectrum and network capacity constraints.  Where capacity is constrained, the cost of adding customers and traffic to a network increases, and prices rise.  Combining AT&T's spectrum and network facilities with those of T-Mobile will provide for greater capacity than the defendants can offer as separate companies and will ensure that AT&T can move much more rapidly to offer much more advanced — and spectrally efficient — services to consumers.  As a result, costs will be lower, prices will fall, output will rise, and consumers will benefit, not only from lower prices, but also from the accelerated innovation that the transaction will make possible.

What is good for consumers in this instance is bad for AT&T's competitors.  Sprint faces no spectrum constraints today, and it benefits so long as AT&T faces high costs and constraints on its ability to innovate.  When a competitor like Sprint sues to prevent a competitor's merger, it generally reflects anxiety that the transaction will make the market *more* competitive, not less, reducing the competitor's profits.  But an injury resulting from the intensification of competition that an efficient merger brings is not an *antitrust* injury — that is, it is not an injury flowing from a *reduction* in competition.  *See Cargill*, 479 U.S. at 115-17; *see also Brunswick*, 429 U.S. at 489; *Pearl Brewing Co. v. Miller Brewing Co.*, No. SA-93-CA-205, 1993 WL 424236, at *3 (W.D. Tex. Mar. 31, 1993) ("What plaintiffs apparently fear is the loss of profits due to price competition [resulting from the transaction]; this does not [rise] to a threat of antitrust injury.") (citing *Cargill*, 479 U.S. at 117), *aff'd*, 52 F.3d 1066 (5th Cir. 1995) (Table); William H. Page, *The Scope of Liability for Antitrust Violations*, 37 Stan. L. Rev. 1445, 1471 (1985) ("Competitors, most clearly of all, do not suffer antitrust injury as a result of a horizontal merger. In general, they will benefit from increased prices if the merger increases market power.  The only harm a merger may cause them is reduced profits from the increased efficiency of the

surviving firms."), *cited in Cargill*, 479 U.S. at 110 n.5; 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 356a, at 277 (3d ed. 2007).

For that reason, courts routinely dismiss competitor challenges to mergers for lack of standing.  In *Brunswick*, for example, three bowling alley operators challenged the acquisition by the defendant, one of the two largest manufacturers of bowling equipment in the United States, of several financially troubled bowling alleys.  429 U.S. at 480-81.  The plaintiffs argued that their profits would have increased if the insolvent bowling alleys had closed — thereby reducing competition in the bowling alley market — whereas the defendant would be a fierce competitor in that market.  *Id.* at 481.  The Court denied the plaintiff bowling alleys antitrust standing, holding that their alleged injury stemmed from enhanced competition and thus was "not of 'the type that the statute was intended to forestall.'"  *Id.* at 487-88 (quoting *Wyandotte Co. v. United States*, 389 U.S. 191, 202 (1967)).

For the same reason, the Court in *Cargill* rejected a suit by the nation's fifth largest beef packer to enjoin the merger of the second and third largest beef packers.  479 U.S. at 106-07.  The plaintiff's complaint charged that the merged company would wield its market power to "bid up the price it would pay for cattle, and reduce the price at which it sold boxed beef," in an effort to drive smaller competitors like the plaintiff out of the market.  *Id.* at 114.  The Court rejected this contention as a basis for antitrust injury and held that, as in *Brunswick*, any threatened harm stemmed from "competition for increased market share, [which] is not activity forbidden by the antitrust laws."  *Id.* at 116.[3]

---

[3] The *Cargill* Court described predatory pricing as a practice "capable of inflicting antitrust injury."  479 U.S. at 118; *accord Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250, 1272-74 (E.D. Pa. 1987).  But Sprint does not allege that the merged entity will engage in below-cost pricing for the purpose of eliminating competitors.  *Cf. Cargill*, 479 U.S. at 117 & n.12.

Insofar as Sprint complains that it will have difficulty competing against the merged entity on price and quality of services, its claim is no different from the one that failed in *Cargill*. *See* Compl. ¶ 1 (generally alleging that the transaction will "marginalize" Sprint).[4]  But, to establish antitrust standing, a plaintiff's claimed injury must be more than "causally related to an antitrust violation"; it must be "attributable to an *anti-competitive* aspect of the [transaction] under scrutiny." *Atlantic Richfield*, 495 U.S. at 334 (emphasis added).  The Clayton Act does not provide a remedy for all adverse effects of unlawful mergers; it does so only for those adverse effects that are directly connected to "the reason the merger was condemned" under the antitrust laws. *Brunswick*, 429 U.S. at 487.  Sprint therefore cannot establish standing based on injuries that flow from a preservation or enhancement of competition.  To permit competitors to sue for such harms would be "inimical to the purposes of [the antitrust] laws." *Id.* at 488.

Nor can Sprint establish standing based on an allegation that wireless service prices will rise.  Sprint laments that the transaction will lead to "higher prices" for retail services, Compl. ¶ 3, but such an effect would be to Sprint's *benefit*.  *See Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986) ("The risk that consumers and plaintiffs may have divergent interests arises when . . . the plaintiff and the defendant are horizontal rivals.  Then the plaintiff wants higher prices, consumers want lower prices.").  For that reason, an increase in wireless service prices would not cause Sprint antitrust injury.  Where challenged conduct allegedly would result in "raising market price or limiting output," that conduct, "though harmful

---

[4] After the merger was announced, Sprint's president for network operations was quoted as saying that a combined AT&T and T-Mobile could become more aggressive in reducing prices, putting Sprint at a disadvantage.  "If we have to go down in pricing, it will affect our profitability."  Sinead Carew, *Sprint Cries Foul Over Rivals' Mega-Merger*, Reuters (Mar. 23, 2011).

to competition, actually *benefit[s]* competitors by making supracompetitive pricing more attractive." *Matsushita*, 475 U.S. at 583.

Taking Sprint's allegations as true, all of the ways in which it claims that competition will be curtailed in wireless services would clear the way for Sprint to raise its prices and earn higher profits. *See*, *e.g.*, Compl. ¶ 158 (claiming that the transaction "would lead to higher prices and less innovation"). Those allegations therefore do not plead antitrust injury — or any injury to Sprint at all. *See Atlantic Richfield*, 495 U.S. at 337; *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 572-73 (7th Cir. 1994) ("Clearly, price increases could not be considered an antitrust injury to competitors."); 2A *Antitrust Law* ¶ 356a, at 277.[5] For example, in *Alberta Gas*, the plaintiff challenged the acquisition of Conoco by Du Pont, claiming that Du Pont would curtail Conoco's plans to produce and build demand for methanol as a fuel. The plaintiff's theory was that this decision would reduce market-wide demand for methanol, thereby harming the plaintiff, which also intended to sell that fuel. The court of appeals affirmed dismissal of the complaint for want of antitrust injury. "[The plaintiff], as a competitor, is in no position to claim compensable injury from Du Pont's elimination of a potential increase in output." 826 F.2d at 1242. The same is true here.

---

[5] In *Community Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146 (W.D. Ark. 1995), *aff'd*, 139 F.3d 1180 (8th Cir. 1998), a competitor established a cognizable injury based on the fact that the merged entity — a newspaper company — would be so large as to constitute "a 'must buy' for regional advertisers," enabling the combined firm to raise advertising rates and thereby "soak up all the available advertising revenue," leaving nothing for the plaintiff. *Id.* at 1165, 1166. Here, Sprint has not (and plainly could not) allege that wireless consumers commonly purchase wireless service from more than one carrier at a time and that an increase in prices for AT&T's service would prevent consumers from continuing to purchase wireless service from *both* Sprint and AT&T.

## II.    SPRINT HAS NOT PLAUSIBLY ALLEGED THAT THE TRANSACTION WILL HARM SPRINT AS A BUYER OF SERVICES OR EQUIPMENT

In those few cases where competitors have established standing to challenge a merger under section 16 of the Clayton Act, 15 U.S.C. § 26, their alleged harms were not based on an alleged increase or decrease in competition in the competitor's market resulting directly from the merger.  Rather, competitors have established standing where they have plausibly alleged that they would be excluded from a market or suffer harm as a result of vertical effects of a merger — usually, foreclosure of supply of a needed input.[6]  Here, Sprint's claims that the transaction will impair competition in the provision of various inputs into wireless service fail to establish standing because Sprint fails to plead facts that support any claim that the transaction will cause either a substantial effect on competition in any market or harm to Sprint (or both).  Sprint has thus failed to plead "enough facts to state a claim [of standing] that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 419 (5th Cir. 2010) ("No rule of reason can require defendants to litigate antitrust claims that do not state an antitrust injury beyond motion to dismiss."), *cert. denied*, 131 S. Ct. 1476 (2011).

---

[6] *See Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 Civ. 5499, 2000 WL 264295, at \*22, \*24 (S.D.N.Y. Mar. 9, 2000) (owner of movie theaters alleged that merger of two vertically integrated firms that both distributed movies and owned theaters would deprive plaintiff of access to first-run movies); *Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 878 (W.D.N.Y. 1994) (plaintiff department store owner alleged that merged firm would control all available store space in the relevant market, thereby excluding plaintiff from the market); *see also Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119 (S.D.N.Y. 1996) (suggesting standing on a similar basis), *criticized in* 2A *Antitrust Law* ¶ 356a, at 277 n.6 (characterizing the grant of standing in *Union Carbide* as "inappropriate" insofar as it rested on allegations that the merger would decrease competition in the competitor's market); *Coors Brewing Co. v. Miller Brewing Co.*, 889 F. Supp. 1394, 1396 (D. Colo. 1995) (claiming that transaction would give defendant access to plaintiff's proprietary information, which could be used to inhibit plaintiff's ability to compete).

Strict enforcement of the antitrust standing requirement is particularly important in this context because competitors will always have an incentive to attempt to block mergers that promise to intensify competition.  Because competitors nearly always lack a cognizable injury from the impact of a horizontal merger in the markets in which they compete, a savvy plaintiff will attempt to plead an attenuated claim of injury in some other market sufficient to open the courthouse door.  *See* 2A *Antitrust Law* ¶ 348d, at 210 (noting the "incentive for competitors to try to block efficiency-creating mergers").

> **A.     Sprint Fails To State a Claim That the Transaction Will Cause Anticompetitive Harm in the Alleged Market for Purchase of "Backhaul" Services and Lacks Standing To Pursue Such a Claim in Any Event**

Sprint claims that the merger of AT&T and T-Mobile will harm competition in the alleged market for "backhaul" and thereby increase Sprint's costs.  Compl. ¶¶ 175, 178.  But Sprint fails to allege that any reduction in demand for backhaul would be the result of any anticompetitive aspect of the merger, as opposed to pro-competitive efficiencies to be gained by consolidation.  Moreover, even if Sprint alleged an antitrust injury, it would lack standing to pursue that claim because of the indirect and speculative nature of its injury.

**1.**     At the outset, Sprint does not allege that anyone purchases backhaul from T-Mobile (nor could it).  The transaction therefore will not increase concentration in any supposed market for the supply of backhaul services.  Section 7 of the Clayton Act prohibits only those mergers that "may . . . substantially . . . lessen competition," 15 U.S.C. § 18, and "is concerned with whether an acquisition or merger *itself* may cause antitrust injury," *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 511 (2d Cir. 2004).  The absence of any allegation that the transaction will combine two existing suppliers of backhaul services makes Sprint's burden correspondingly heavier.

Sprint nevertheless complains that AT&T's acquisition of T-Mobile — which, like Sprint, *purchases* backhaul service — will reduce competition among backhaul *providers* because, after the acquisition, T-Mobile will stop purchasing backhaul from competitors other than AT&T (and perhaps Verizon — the complaint is unclear).  As a result, Sprint asserts that the transaction will "diminish the prospects" that such "alternative backhaul providers would be able to compete effectively with AT&T and Verizon," and thereby enable "AT&T (and Verizon) to charge higher rates" for backhaul.  Compl. ¶ 182.

Sprint's allegations, however, provide no factual basis for that legal conclusion.  All that Sprint alleges (based on the unverified statement of a third-party industry association) is that T-Mobile purchases backhaul "for approximately 20 percent of its cell sites" from "competitive transport providers."  *Id.* ¶ 181 (internal quotation marks omitted).  But, as Sprint acknowledges, "backhaul" is just one type of special access service — that is, dedicated point-to-point transmission service.  *See id.* ¶ 59.  The allegation that T-Mobile fulfills a certain percentage of *its* backhaul needs using "competitive" providers says nothing about how significant T-Mobile is as a purchaser of special access services overall.  Sprint's complaint does not allege anything about the scope of the relevant market or markets in which T-Mobile purchases special access services and therefore provides no basis for the conclusion that the elimination of T-Mobile's purchases would have a substantial impact on competition.  *See*, *e.g.*, *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1120 (10th Cir. 2008) (affirming dismissal of claims of unlawful vertical agreement where plaintiff failed to allege a proper relevant market); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 209 (4th Cir. 2002) (affirming dismissal of exclusive dealing claim where complaint failed to include "an allegation regarding [defendants'] power or share in the [relevant] market" and thus provided "no basis . . . for concluding that [the] agreements at

13

issue . . . [were] likely to foreclose a significant share of the relevant . . . markets"); *Abbyy USA Software House, Inc. v. Nuance Communications Inc.*, No. C 08-01035 JSW, 2008 WL 4830740, at *2 (N.D. Cal. Nov. 6, 2008) ("Even accepting as true the allegation that [plaintiff] is foreclosed from 'certain retail outlets,' this fails to constitute an allegation of harm to the market generally or specific harm suffered by [plaintiff].").  Nor does Sprint allege that it would be unable to increase its purchases of backhaul services from the same competitive backhaul providers used by T-Mobile in the event of a price increase by AT&T and Verizon.

Sprint likewise fails to explain why the FCC — which not only regulates special access under Title II of the Communications Act of 1934, *see generally* 47 C.F.R. pt. 69, but also has authority to review the transaction under a statutory "public interest" standard, *see* 47 U.S.C. § 310(d) — cannot fully protect consumers from any impact of the transaction on the sale of special access services.  *Cf.Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004) (recognizing that, "in certain circumstances, regulation significantly diminishes the likelihood of major antitrust harm") (internal quotation marks omitted).

**2.**     Moreover, taking the conclusory allegations of the complaint at face value, they fail to establish antitrust injury.  Virtually any vertical merger will tend to remove some independent demand for an input or some independent source of supply from the market.  But a competitor that provides that input or relies on that source of supply cannot claim antitrust injury when the complained-of effect simply reflects "the efficiency effects of a vertical merger."  2A *Antitrust Law* ¶ 356c, at 283; *see Alberta Gas*, 826 F.2d at 1244-46; *Florida Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374-75 & n.3 (11th Cir. 1997).  Nowhere in the complaint does Sprint challenge that consolidating and reducing overall special access purchases would be an

efficiency of the transaction, allowing the combined firm to reduce its costs of providing wireless services. Such cost savings from vertical mergers benefit competition and consumers, and cannot be the basis for antitrust injury. Indeed, that is why courts and antitrust scholars have recognized that, "'of all mergers, vertical acquisitions are the most likely to produce efficiencies and the least likely to enhance the market power of the merging firms.'" *Alberta Gas*, 826 F.2d at 1244 (quoting Herbert Hovenkamp, *Merger Actions for Damages*, 35 Hastings L.J. 937, 961 (1984)).

**3.** Even if Sprint could plead antitrust injury, it would not establish Sprint's standing under the Clayton Act to pursue this claim because any injury it suffered would be both highly speculative and entirely derivative of the supposed injury suffered by independent providers of special access. "In addition to alleging 'antitrust injury,' the would-be claimant must show that it is a 'proper plaintiff.'" *Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24, 26 (D.C. Cir. 1987). The remoteness of Sprint's claimed injury argues strongly against recognizing standing here.

*First*, the immediate impact of any supposed reduction in demand for special access as a result of the merger would be to *reduce* the prices that Sprint pays for special access, not to increase them. That is because, so long as existing suppliers continue to compete for customers, any reduction in demand for special access will cause them to lower their prices to attract the remaining customers.[7] *See* 2B *Antitrust Law* ¶ 402b, at 6 n.7. That reduction in prices would benefit Sprint and would not constitute antitrust injury. *See supra* pp. 9-10.

---

[7] Sprint's allegations are particularly implausible because they ignore the continued role of Verizon as a provider of special access services. Although the complaint is less than clear, Sprint appears to claim that T-Mobile will reduce its purchases of special access services not only from independent providers, but from Verizon as well. *See* Compl. ¶ 181 (quoting letter claiming that "AT&T has indicated that it will move T-Mobile's backhaul traffic on to its own transport

*Second*, if the merger genuinely threatened to eliminate independent suppliers of special access and thereby (eventually) to increase concentration and prices, the threatened suppliers would be better situated than Sprint to pursue such a claim.  Those suppliers — at least compared to Sprint — are in a better position to anticipate the impact of the acquisition on their businesses, taking account of alternative purchasers, the trend in market demand, the nature of their business arrangements with T-Mobile, and other factors.  *Cf. Associated Gen. Contractors*, 459 U.S. at 541-42 ("The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general.");  *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 719 (7th Cir. 2006) (rejecting plaintiff's claim of standing given existence of parties more "directly affected").  The point is not only that any injury that Sprint might suffer is derivative of the injury that its suppliers might suffer, but also that Sprint is not in a position reasonably to evaluate whether its suppliers will be likely to suffer any injury at all.

*Third*, and relatedly, Sprint's claim of harm is highly speculative and depends on a lengthy set of unpleaded assumptions and causal connections.  For the transaction to have any cognizable effect on any market for special access services, not only would the transaction have to lead to the withdrawal of efficient suppliers of special access services, but the remaining suppliers would also have to obtain sufficient market power to raise prices above the levels that would otherwise prevail.  Sprint fails, however, to allege even the most basic information, such as the size of the market, the suppliers in the market, the relative positions of suppliers, and the

---

network wherever possible").  Such a reduction in demand for Verizon's services would (all else being equal) tend to reduce Verizon's special access prices as well — which, again, would benefit Sprint.

size of T-Mobile's demand relative to other current and anticipated future sources of demand (including Sprint itself).  Market conditions after the transaction will depend on any number of factors that have nothing to do with the volume of purchases that the combined wireless company may choose to make from unaffiliated suppliers of special access services.  In light of this complexity, Sprint cannot plausibly claim that the transaction will cause the prices that it pays for special access to rise, even in the distant future.  *Cf. Associated Gen. Contractors*, 459 U.S. at 545 (noting that "the tenuous and speculative character of the relationship between the alleged antitrust violation and the [plaintiff's] alleged injury" weighs against standing); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 321-22 (3d Cir. 2007) (dismissing claims as "too speculative" in part based on remoteness of alleged injury to plaintiff); *Sullivan v. Tagliabue*, 25 F.3d 43, 51-52 (1st Cir. 1994) (denying standing where "an extended chain of independent events would have had to have occurred to give credence to the Plaintiff's damages claim," rendering that claim "highly speculative") (internal quotation marks omitted); *Lucas v. Bechtel Corp.*, 800 F.2d 839, 844 (9th Cir. 1986).

      **B.**      **Sprint's Claims Related to "Roaming" Do Not Establish Standing Because Sprint Fails To Allege a Relevant Market or That the Proposed Transaction Would Affect Sprint's Supply of Roaming Services**

Sprint fails to plead sufficient facts regarding any supposed market for roaming, including anything about the terms or conditions under which it currently purchases or sells roaming services.  Sprint's roaming argument fails to allege any way in which the merger threatens any substantial reduction in competition that could affect Sprint.  Indeed, because Sprint does not define the scope of any alleged market for "roaming services," it fails even to plead any predicate for an assertion of competitive harm.  *See, e.g.*, *United States v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172, 182 (D.D.C. 2001).

In addition, Sprint's claim that the transaction will reduce competition for so-called "roaming services" fails to establish standing because Sprint does not allege that it purchases such services from AT&T, from T-Mobile, or from any competitor of or supplier to the merging entities.  As Sprint's allegations make clear, a particular carrier's available suppliers of roaming depends on the network technology used by that carrier.  *See* Compl. ¶ 57.  A carrier that uses CDMA technology can no more purchase roaming from a GSM carrier than a diesel truck can run on gasoline.[8]

Sprint allegedly uses CDMA and WiMax technology, and therefore it can purchase roaming only from carriers that employ those technologies.  *See id.* ¶¶ 44-46, 57.  AT&T and T-Mobile use different technologies — namely, GSM (which Sprint evidently means to refer not only to second-generation technology but also to a related, third-generation standard known as UMTS) and (in AT&T's case) LTE, which AT&T is just beginning to deploy in its network.  *See id.*  Sprint does not — and could not — allege that it purchases roaming services from AT&T or T-Mobile; nor does Sprint allege that any of its current suppliers (or purchasers) of roaming services supply roaming to (or purchase roaming from) the merging parties.[9]  Any impact on the available supply of roaming services *for GSM carriers* therefore does not affect Sprint.  Because

---

[8] There are additional technological constraints on roaming, including the spectrum bands the carrier and the particular customer's device use.  But, even if the spectrum bands match, a mismatch in transmission technology will prevent roaming.

[9] Published reports indicate that Sprint may deploy an LTE network in 2012.  *See* Roger Cheng, *Sprint To Launch Own 4G LTE Network in Early 2012*, CNET News (Sept. 27, 2011), *available at* http://news.cnet.com/8301-1-35_3-20112095-94/sprint-to-launch-own-4g-lte-network-in-early-2012-scoop/.  If Sprint added such an allegation to its complaint, it would not give any greater substance to its claims concerning roaming.  Not only does Sprint have no LTE network today, but T-Mobile is not alleged to have any current LTE network or any concrete plans to deploy one.  Where a plaintiff sues under the antitrust laws based on the alleged exclusion of a *potential* competitor from the market, it must establish — as a predicate for antitrust standing — that the competitor "was willing and able to supply it but for" the alleged violation.  *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008).  Sprint does not and cannot allege that here.

Sprint's available supply of CDMA roaming services will be completely unaffected by the merger, Sprint cannot claim antitrust standing based on its roaming allegations. *See Cargill*, 479 U.S. at 113.

Sprint asserts that AT&T and T-Mobile's merger will nevertheless somehow result in Sprint paying higher roaming rates *to Verizon*, but it alleges no plausible factual basis for that claim. *See Twombly*, 550 U.S. at 557. Sprint alleges that, after the merger, AT&T will increase retail wireless service rates and that Verizon "would have an incentive to increase its retail prices and also to raise its roaming fees to CDMA carriers" as a result. Compl. ¶ 185. But Sprint does not and cannot explain how the transaction would increase Verizon's ability and incentive to use roaming fees to insulate itself from competition by other CDMA carriers.

Sprint also ignores the impact of the FCC's regulation of roaming. The FCC currently requires all mobile wireless carriers to provide roaming for common carrier services to other carriers on a just, reasonable, and non-discriminatory basis.[10] The FCC also currently requires all wireless broadband providers to negotiate data roaming agreements in good faith and to offer rates and terms that are commercially reasonable.[11] The FCC's regulations render Sprint's attempt to demonstrate a threatened injury sufficient to confer antitrust standing even more implausible. *Cf. Trinko*, 540 U.S. at 412.

---

[10] *See* 47 C.F.R. § 20.12; Report and Order and Further Notice of Proposed Rulemaking, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers*, 22 FCC Rcd 15817 (2007), *modified in part on recon.*, Order on Reconsideration and Second Further Notice of Proposed Rulemaking, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, 25 FCC Rcd 4181 (2010).

[11] *See* Second Report and Order, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, 26 FCC Rcd 5411, 5423-24, ¶ 23 (2011), *appeals pending*, *Cellco P'ship v. FCC*, Nos. 11-1135 & 11-1136 (D.C. Cir. filed May 13, 2011).

C.     **Sprint's Allegations Related to Wireless Devices and Applications Fail Because Sprint Fails To Define a Relevant Market or To Provide a Factual Basis for Anticompetitive Effects**

Sprint's claim that the merger will impair competition in wireless services by denying competitors access to handsets and applications is unsupported by any well-pleaded factual allegations.  As a threshold matter, Sprint cannot establish antitrust standing simply by alleging that, because of this transaction, the merged entity will be able to obtain new and innovative handsets and thereby to compete more effectively with Sprint and other carriers.  Even if that allegation had a factual basis, "the antitrust laws do not require the courts to protect small businesses from the loss of profits" resulting from "vigorous competition," but only "against the loss of profits from practices forbidden by the antitrust laws." *Cargill*, 479 U.S. at 116.  Sprint has not pleaded any plausible factual allegations in support of the latter showing.

Sprint's primary claim is that, after the merger, Verizon and AT&T will "coerce exclusionary handset deals" from device manufacturers.  Compl. ¶ 160.  But exclusive distribution arrangements, like other vertical restraints, generally *enhance* interbrand competition — as Sprint itself has emphasized elsewhere.[12]  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007); *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 725 (1988).  For that reason, "exclusive distributorship arrangements are presumptively legal." *Electronics Communications Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997).  It is only where exclusive dealing arrangements "allow[ ] one supplier of

---

[12] Sprint then argued — correctly — that "handset exclusivity promotes competition among carriers and manufacturers and results in innovative products that benefit the American mobile phone market."  Comments of Sprint Nextel Corp. at ii, *Petition of Rural Cellular Ass'nfor Rulemaking Regarding Exclusivity Arrangements Between Commercial Wireless Carriers and Handset Manufacturers*, RM-11497, DA 08-2272 (FCC filed Feb. 2, 2009).  Sprint's current characterization of exclusivity arrangements as "anticompetitive" and contrary to "competition on the merits," Compl. ¶ 162, is not credible in light of the position Sprint took when advocating for its own right to enter such arrangements.

goods or services unreasonably to deprive other suppliers of a market for their goods, or . . .

allow[ ] one buyer of goods unreasonably to deprive other buyers of a needed source of supply,"

that "[e]xclusive dealing can have adverse economic consequences."  *Jefferson Parish Hosp.*

*Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring).  Exclusive dealing

arrangements involving handsets and applications cannot harm competition in the alleged market

for wireless services if those arrangements do not foreclose competitors from alternative

handsets and applications.  *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir.

2003) ("For an exclusive dealership arrangement to cause a harm to competition," that

arrangement "must prevent competitors from getting their products to consumers *at all*.")

(emphasis added); *Dickson*, 309 F.3d at 208-09; *Surgical Care Ctr. of Hammond, L.C. v.*

*Hospital Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 842 (5th Cir. 2002); *U.S.*

*Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 595-97 (1st Cir. 1993) (Boudin, J.).

Sprint has failed to allege that exclusive dealing arrangements — which are widespread

in the handset marketplace today — could conceivably have that effect because it fails to allege

anything about the nature of the market for wireless devices and applications or the degree of

foreclosure that exclusive dealing arrangements supposedly might achieve.  Among Sprint's

allegations concerning product and geographic market definitions, it includes nothing about the

nature of the relevant markets for devices and applications.  Sprint's reticence is no accident:

any such allegations would make clear that the notion of substantial foreclosure of handsets is

implausible.  The FCC recently found that, "[f]rom 2006 to 2010, the number of mobile wireless

handset manufacturers that distribute in the U.S. market increased from eight to 21" and that, as

of June 2010, "these 21 handset manufacturers offered a total of 302 handset models to mobile

wireless service providers in the United States."[13]  According to the FCC, the top five

manufacturers of smartphones offered a total of 96 different models; the top five handset

manufacturers offered a total of 207 handset models.[14]  And no manufacturer — let alone any

single device — has anything like a dominant share of device sales.[15]  Sprint does not even

attempt to explain why — in light of the unconcentrated and highly competitive nature of the

wireless device marketplace — this transaction will impair competitors' access to wireless

devices.

Sprint also claims that the merger will prevent Sprint from "ally[ing] with T-Mobile to

create substantial scale for the creation of new handsets."  Compl. ¶ 161.  But, in the absence of

any allegations concerning the size and scope of the relevant market, Sprint provides no basis for

its assertion that the merger will have any impact on the nature of demand for wireless devices in

the global market.  Even ignoring this fatal defect, Sprint does not explain how it could create

any "scale" for handset manufacturers by cooperating with T-Mobile, given that the two carriers

use different network technologies that require different handsets.

## CONCLUSION

The Court should dismiss Sprint's complaint for lack of antitrust standing.

---

[13] Fifteenth Report, *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993*, WT Docket No. 10-133, FCC 11-103, ¶ 326 (rel. June 27, 2011).

[14] *See id.* ¶ 327.

[15] *See id.* ¶¶ 329-331.

Dated:  September 30, 2011                    Respectfully submitted,

                                             /s/ *Mark C. Hansen*
                                             Mark C. Hansen, D.C. Bar # 425930
                                             Michael K. Kellogg, D.C. Bar # 372049
                                             Aaron M. Panner, D.C. Bar # 453608
                                             Kellogg, Huber, Hansen, Todd,
                                                Evans & Figel, P.L.L.C.
                                             1615 M Street, NW, Suite 400
                                             Washington, DC 20036
                                             (202) 326-7900

                                             Richard L. Rosen, D.C. Bar # 307231
                                             Donna E. Patterson, D.C. Bar # 358701
                                             Arnold & Porter LLP
                                             555 Twelfth Street, NW
                                             Washington, DC 20004-1206
                                             (202) 942-5000

                                             Wm. Randolph Smith, D.C. Bar # 356402
                                             Kathryn D. Kirmayer, D.C. Bar # 424699
                                             Crowell & Moring, LLP
                                             1001 Pennsylvania Avenue, NW
                                             Washington, DC 20004
                                             (202) 624-2500

                                             *Counsel for AT&T Inc.*

                                             George S. Cary, D.C. Bar # 285411
                                             Mark W. Nelson, D.C. Bar # 442461
                                             Cleary Gottlieb Steen & Hamilton LLP
                                             2000 Pennsylvania Avenue, NW
                                             Washington, DC 20006
                                             (202) 974-1500

                                             Richard G. Parker, D.C. Bar # 327544
                                             O'Melveny & Myers LLP
                                             1625 Eye Street, NW
                                             Washington, DC 20006
                                             (202) 383-5300

                                             *Counsel for T-Mobile USA, Inc. and
                                                Deutsche Telekom AG*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 30, 2011, I caused the foregoing Motion To Dismiss Plaintiff's Complaint and Memorandum in Support to be filed using the Court's CM/ECF system, which will send e-mail notification of such filings to counsel of record.  This document is available for viewing and downloading on the CM/ECF system.


/s/ *Mark C. Hansen*
Mark C. Hansen