**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SPRINT NEXTEL CORPORATION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:11-cv-01600-ESH |
| AT&T INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |
| | ) ) ) | |
| CELLULAR SOUTH, INC., et al., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:11-cv-01690-ESH |
| AT&T INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**JOINT OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**
**THE COMPLAINTS OF SPRINT AND CELLULAR SOUTH**

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS .............................................................................. 5

    The Industry's Monopoly Roots .................................................................. 6

    Mobile Wireless Competition Today ........................................................... 6

    The Proposed Transaction's Harm to Competition and Antitrust Injury to
        Plaintiffs ............................................................................................ 9

ARGUMENT ................................................................................................. 10

I.      DEFENDANTS' MOTIONS VIOLATE THE RULE 12(b)(6)
        STANDARD .................................................................................... 11

II.     PLAINTIFFS HAVE STANDING TO CHALLENGE THE MERGER'S
        HARM TO COMPETITION IN THE WIRELESS MARKETS ................... 13

      A.     Defendants Misstate the Supreme Court's Standard for Competitor
           Standing to Challenge Horizontal Mergers ......................................... 14

      B.     A Competitor Suffers Antitrust Injury When the Market Power
           Resulting from the Merger Impairs Its Ability to Compete or
           Raises Its Costs, Giving the Merged Firm Incremental Market
           Power.................................................................................... 16

           1.     Defendants Do Not Dispute That the Complaints State a
               Claim that the Acquisition Increases AT&T's Market
               Power ......................................................................... 16

           2.     A Competitor Has Standing if It Alleges That the Market
               Power Achieved Through the Acquisition Can Be Used to
               Impair Rivals' Ability to Compete, Aligning the Rivals'
               Injury with Likely Harm to Consumers................................. 17

               (a)    Tipping Effects ................................................ 18

               (b)    Increased Ability to Coerce Agreements that Impair
                    Rivals ................................................................. 20

               (c)    Disruption of Access to Upstream Inputs ................... 21

i

(d)    Impairment Through Raising Rivals' Costs ................................. 22

(e)    Other Ways of Impairing Rivals ...................................... 23

C.    When Assessed Under the Actual Legal Standards and Precedents, the Complaints Clearly Plead Antitrust Injury ................................... 25

1.    The Proposed Acquisition Would Impair Plaintiffs' Access to Competitive Handsets ................................................ 26

2.    The Proposed Acquisition Would Impair Innovation by Disrupting Sprint's Historical Collaboration with T-Mobile .................. 29

3.    The Merger Would Increase the Ability and Incentive of AT&T and Verizon to Inhibit Plaintiffs' Access to Roaming and Backhaul .................................................... 29

4.    The Transaction Would Shift Network Development Costs to AT&T's Rivals .................................................... 33

5.    The Merger Would Make AT&T and Verizon the Gatekeepers of Mobile Wireless Services ................................ 34

6.    The Merger Would Irrevocably Drive the Wireless Service Industry Back Toward Duopoly ............................................ 34

D.    Defendants' Motions Are Directed at Strawmen and Apply Inapplicable Legal Standards ............................................ 35

III.    SPRINT HAS STANDING TO CHALLENGE THE MERGER BASED ON HARM TO COMPETITION IN THE BACKHAUL MARKETS ........................... 38

A.    Firms That Are Both Competitors and Customers Have Standing to Challenge Vertical Aspects of Mergers ............................. 39

B.    Sprint Plainly Pleads Facts Showing That It Will Suffer Antitrust Injury Through a Reduction in Competition in the Backhaul Markets ................................................................ 40

1.    Sprint's Claim Is Based on a Well-Recognized Theory of Customer Foreclosure ............................................ 40

2.    Defendants' Objections to Sprint's Customer Foreclosure Claim Are Unavailing ............................................ 42

CONCLUSION ................................................................ 45

## TABLE OF AUTHORITIES

Cases                                                                                                          Page

*Abbyy USA Software House, Inc. v. Nuance Communications Inc.*, No. C 08-
    01035 JSW, 2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) ............................................43

*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8 (D.C. Cir.
    2008) ............................................................................................................................11

*Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co.*, 826 F.2d 1235 (3d
    Cir. 1987) ........................................................................................... 25, 43, 44

* *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568 (7th Cir. 1999) ......................39

*American Tobacco Co. v. United States*, 147 F.2d 93 (6th Cir. 1944) ........................37

*Ansell Inc. v. Schmid Laboratories, Inc.*, 757 F. Supp. 467 (1991) ............................24

* *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ............................................................11, 12

*Associated General Contractors of California, Inc. v. California State Council of
    Carpenters*, 459 U.S. 519 (1983) ........................................................... 39, 40

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ............................36

*Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105 (6th Cir. 1989) ........................................25

* *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................4, 11, 12

*Board of Trustees of Unite Here Local 25 v. MR Watergate LLC*, 677 F. Supp. 2d
    229 (D.D.C. 2010) ......................................................................................11

* *Bon-Ton Stores, Inc. v. May Department Stores Co.*, 881 F. Supp. 860 (W.D.N.Y.
    1994) ....................................................................................4, 18, 22, 23, 34

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ..............................44

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........................................14, 41

* *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ..................*passim*

*Campfield v. State Farm Mutual Automobile Insurance Co.*, 532 F.3d 1111 (10th
    Cir. 2008) ....................................................................................................42

* *Cargill, Inc. v. Montfort of Colorado, Inc.*, 479 U.S. 104 (1986) ......................*passim*

\* *Community Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146 (W.D. Ark. 1995), *aff'd sub nom. Community Publishers, Inc. v. DR Partners*, 139 F.3d 1180 (8th Cir. 1998) ......................................................................................*passim*

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ..........................37

\* *Coors Brewing Co. v. Miller Brewing Co*, 889 F. Supp. 1394 (D. Colo. 1995) ........ 16, 18, 23, 24

*In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litigation*, No. 09-ML-2048-C, 2010 WL 5136047 (W.D. Okla. Jan. 19, 2010)....................................31

\* *De Csepel v. Republic of Hungary*, No. 10-1261-ESH, 2011 WL 3855862 (D.D.C. Sept. 1, 2011) ........................................................................................................11

*Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) ........................................................42

*Downs v. Insight Communications Co.*, No. 3:09-CV-00093, 2011 WL 1100456 (W.D. Ky. Mar. 22, 2011)........................................................................................31

\* *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435 (4th Cir. 2011)...........................................................................................................................42

\* *Ford Motor Co. v. United States*, 405 U.S. 562 (1972) ......................................................41, 42

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) .........................................................36, 44

*FTC v. Swedish Match*, 131 F. Supp. 2d 151, 166 (D.D.C. 2000) ..............................................17

*FTC v. University Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991) ................................................37

*Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774 (7th Cir. 1994)......................................25

*Hart Intercivic, Inc. v. Diebold, Inc.*, No. 09-678, 2009 WL 3245466 (D. Del. Sept. 30, 2009) .........................................................................................................25

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775 (7th Cir. 1999) ...........................30

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th Cir. 1998)....................................................................................................39

*Maljack Productions, Inc. v. Motion Picture Ass'n of America, Inc.*, 52 F.3d 373 (D.C. Cir. 1995)........................................................................................................11

*O.K. Sand & Gravel, Inc. v. Martin Marietta Technologies, Inc.*, 36 F.3d 565 (7th Cir. 1994) ..................................................................................................................36

iv

*Palmyra Park Hospital, Inc. v. Phoebe Putney Memorial Hospital*, 604 F.3d 1291 (11th Cir. 2010) ................................................................................................ 15, 25

*Pearl Brewing Co. v. Miller Brewing Co.*, No. SA-93-CA-205, 1993 WL 424236 (W.D. Tex. Mar. 31, 1993) ................................................................................ 24

*Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95 (5th Cir. 1988) ......................................... 24

* *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 593 F. Supp. 2d 29 (D.D.C. 2008) ....................................................................................................................... 41

*Remington Products, Inc. v. North American Philips Corp.*, 717 F. Supp. 36 (D. Conn. 1989), *aff'd on reh'g*, 755 F. Supp. 52 (D. Conn. 1991) ...................................... 25

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ................................................................................. 12

* *Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.*, No. 97 CIV. 5499 (DNE), 2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) ..................................... *passim*

* *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250 (E.D. Pa. 1987) .................... *passim*

* *Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119 (S.D.N.Y. 1996) ............. 18, 21, 22, 38

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990) ......................................... 37

*United States v. Dean Foods Co.*, No. 10-CV-59, 2010 WL 1417926 (E.D. Wis. Apr. 7, 2010) ............................................................................................... 12

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ...................................... 36

*United States v. Philadelphia National Bank*, 374 U.S. 321 (1963) ...................................... 17, 31

*United States v. Sungard Data Systems, Inc.*, 172 F. Supp. 2d 172 (D.D.C. 2001) .................... 37

*United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) ................................................... 31

*United States v. UPM-Kymmene Oyj*, No. 03 C 2528, 2003 WL 21781902 (N.D. Ill. July 25, 2003) ......................................................................................... 26

*United States ex rel. Folliard v. CDW Technology Services, Inc.*, 722 F. Supp. 2d 20 (D.D.C. 2010) ................................................................................................ 11

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ......................................................................................................... 31

Statutes and Rules

15 U.S.C. § 15..................................................................................................14

15 U.S.C. § 18..........................................................................................1, 10, 14

15 U.S.C. § 26..............................................................................................10, 14

Fed. R. Civ. P. 8(a)(2) ...................................................................................11

Fed. R. Civ. P. 12(b)(6)..................................................................................1


Other Authorities

1 ABA Section of Antitrust Law, *Antitrust Law Developments* (6th ed. 2007).............................1

Phillip E. Areeda et al., *Antitrust Law* (2d and 3d eds., 2011)

    Vol. 2A ¶ 356a ......................................................................................22

    Vol. 11 ¶ 1802c .....................................................................................41

Jonathan M. Jacobson & Tracy Greer, *Twenty-One Years of Antitrust Injury:
    Down the Alley with* Brunswick v. Pueblo Bowl-O-Mat, 66 Antitrust L.J.
    273 (1998)............................................................................................1, 22

Declaration of Janusz Ordover and Robert Willig, attached to AT&T Corp.
    Petition for Proposed Rulemaking to Reform Regulation of Independent
    Local Exchange Carrier Rates for Interstate Special Access, RM-10593
    (F.C.C. filed Oct. 15, 2002), *available at*
    http://ecfsdocs.fcc.gov/filings/2002/10/15/5508448142.html .........................................41

Michael H. Riordan & Steven C. Salop, *Evaluating Vertical Mergers:  A Post-
    Chicago Approach*, 63 Antitrust L.J. 513 (1995)........................................................39, 40

U.S. Department of Justice & Federal Trade Commission, Horizontal Merger
    Guidelines § 2.2.3, ex. 2 (2010) .......................................................2, 16, 20, 33

Plaintiffs Sprint Nextel Corporation ("Sprint") and Cellular South, Inc., together with its subsidiary Corr Wireless Communications, L.L.C. (collectively "Cellular South"), respectfully submit the following memorandum in opposition to Defendants' motions to dismiss Plaintiffs' complaints pursuant to Federal Rule of Civil Procedure 12(b)(6).

**PRELIMINARY STATEMENT**

In the three decades since *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), a simple and unassailable principle for competitor standing under Section 7 of the Clayton Act, 15 U.S.C. § 18, has emerged that Defendants simply disregard:  a competitor has standing to bring a claim for injunctive relief under the Clayton Act if it alleges that the transaction is likely to give the merged firm *the incremental ability to exercise market power by impairing that rival's ability to compete*.  It is a fundamental principle underlying the numerous cases granting competitor standing since *Brunswick* and *Cargill, Inc. v. Montfort of Colorado, Inc.*, 479 U.S. 104 (1986), and is now hornbook law.  *See, e.g.*, 1 ABA Section of Antitrust Law, *Antitrust Law Developments* 420 (6th ed. 2007) ("[C]ompetitors may challenge mergers that result in anticompetitive practices that may injure competitors in a manner that also reflects potential harm to consumers."); Jonathan M. Jacobson & Tracy Greer, *Twenty-One Years of Antitrust Injury: Down the Alley with* Brunswick v. Pueblo Bowl-O-Mat, 66 Antitrust L.J. 273, 311 (1998) (when, through a horizontal merger, defendants are "likely to achieve an incremental ability to exercise market power by impairing rivals' ability to compete effectively, there is no basis for denying [the competitor plaintiff] the right to maintain a claim").  Where such allegations are made, the "interests of rivals and of consumers would be broadly aligned in

preventing such a merger." U.S. Dep't of Justice & Federal Trade Comm'n, Horizontal Merger Guidelines § 2.2.3, ex. 2 (2010) ("2010 Guidelines").[1]

At the September 21 status conference, Defendants denied that this principle—or any cases applying it—even exists. While Defendants have retreated from this position somewhat, they still obfuscate the fundamental basis for Section 7 competitor standing and the detailed complaints of Sprint and Cellular South that fall directly within it. Defendants ignore this settled law by violating—intentionally or otherwise—at least three guiding principles critical to the motions before the Court.

*First*, and most simply, Defendants violate the cardinal Rule 12(b)(6) principle that a defendant cannot rewrite a plaintiff's complaint to serve its own purposes and must accept all of the factual allegations as true. If Defendants followed Rule 12(b)(6)'s strictures, they would have no basis to seek dismissal of Plaintiffs' claims. Sprint and Cellular South set forth detailed allegations as to how the enhanced market power from the merger will impair their ability to compete, thereby further enhancing the market power that AT&T will gain from the proposed transaction. This harm is the very embodiment of "antitrust injury."

*Second*, Defendants misstate the law for competitor standing in a merger case, including the standard articulated in *Brunswick*. Specifically, Defendants omit the following bolded language from the Supreme Court's recitation of the standard:

> Plaintiff must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. **The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.**

---

[1] While Defendants attempt to make much of the fact that the Department of Justice ("DOJ") did not include allegations as to how the merger would impair the ability of rivals to compete effectively, the DOJ does not need to allege such matters, which, in any event, Plaintiffs anticipate will be part of the DOJ's proof on anticompetitive effects.

*Brunswick*, 429 U.S. at 489 (boldface added).  The omitted language is fatal for Defendants.

Based on the Supreme Court's standard, courts now consistently recognize that competitors in a

Section 7 case *can* be injured by the market power acquired through the merger, or the "acts"

made possible by that increase in market power, including in at least six post-*Cargill* cases that

found competitor standing.  None of these cases required plaintiffs to prove the likelihood of

independent antitrust law violations in input markets or otherwise.  All that is required for

"antitrust injury" to a horizontal competitor is that the likely impairment of rivals incrementally

increases the market power resulting from the merger.

   Accepting the truth of the allegations in the complaints, this antitrust injury

requirement is easily met.  Defendants do not even challenge the complaints' allegations setting

forth a structural violation of Section 7 of the Clayton Act, which, exactly like the DOJ's

complaint, raises a presumption that the merger unlawfully creates market power.  In turn, to

have standing, Sprint and Cellular South need only allege that this resulting market power will

likely impair their ability to compete in the future, thereby further enhancing AT&T's ability to

raise prices or reduce competition.  Consistent with these prior Section 7 cases affording

competitor standing, the merger's impairment of Sprint's and Cellular South's future competitive

significance is laid out in great detail in the complaints:

- The market would transform from one with four national competitors to an AT&T and Verizon duopoly, where Sprint is marginalized and no longer able to constrain prices.  (Sprint Compl. ¶ 4.)  *See Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1164-66 (W.D. Ark. 1995), *aff'd sub nom. Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180 (8th Cir. 1998); *infra* Section II.C.6.

- AT&T would have greater ability and incentive to coerce handset manufacturers and others into not dealing with Plaintiffs.  (Sprint Compl. ¶¶ 159-69, 187-88; CS Compl. ¶¶ 50-63.)  *See Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250, 1273-74 (E.D. Pa. 1987); *infra* Section II.C.1.

3

- The acquisition would impair innovation by taking an important historical collaborative partner away from Sprint.  (Sprint Compl. ¶ 169.)  *See Cmty. Publishers*, 892 F. Supp. at 1166; *infra* Section II.C.2.

- AT&T would have greater ability and incentive to foreclose Plaintiffs' access to necessary inputs like backhaul and roaming.  (Sprint Compl. ¶¶ 182, 184-85; CS Compl. ¶¶ 64-72.)  *See Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 CIV. 5499 (DNE), 2000 WL 264295, at *22-26 (S.D.N.Y. Mar. 9, 2000); *infra* Section II.C.3.

- The acquisition would shift network development costs to AT&T's competitors.  (Sprint Compl. ¶ 171.)  *See Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 876-78 (W.D.N.Y. 1994); *infra* Section II.C.4.

- AT&T and Verizon would become the gatekeepers to the mobile wireless industry.  (Sprint Compl. ¶ 187-88.)  *See infra* Section II.C.5.

These allegations and authorities confirm that Sprint's and Cellular South's complaints easily satisfy the standards articulated in *Brunswick* and reconfirmed in *Cargill*.

   *Third*, Defendants, in various iterations, misstate the standard that must be the backdrop for their standing challenges, including Defendants' promised invocation of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Defendants do not acknowledge that Section 7 is an "incipiency" standard that is necessarily forward looking:  it prohibits mergers that "may" tend substantially to reduce competition in the future; there is no requirement that the likely effects must also constitute independent Sherman Act violations.  Moreover, courts have made clear that, in assessing these potential effects under Section 7, one looks to the "totality" of the circumstances, without compartmentalization, to determine if there is an "appreciable danger" that the merger may harm competition.  Only by ignoring this standard, as well as the detailed factual allegations of the complaints and the well-settled legal standard of *Brunswick*, *Cargill*,

and their progeny, can Defendants even suggest that Sprint and Cellular South lack standing to challenge this anticompetitive merger.[2]

## STATEMENT OF FACTS

On the face of the complaints ("Sprint Compl." and "CS Compl."), the following facts that must be accepted for their truth are as follows:

The mobile wireless industry today consists of four national wireless carriers, as well as a handful of regional firms. (Sprint Compl. ¶¶ 93, 106.) AT&T and Verizon are the two largest carriers, each accounting for over 30 percent of revenues in an all wireless market. (*Id.* ¶¶ 94-95; CS Compl. ¶ 79.) Sprint, with only 15 percent of wireless revenues, is less than half the size of AT&T and Verizon, followed by T-Mobile with just over 12 percent of the wireless market. (Sprint Compl. ¶¶ 96-97; CS Compl. ¶ 79.) The remaining carriers collectively account for less than 7 percent of the market. (Sprint Compl. ¶ 138; CS Compl. ¶ 79.) One such carrier is Cellular South, which serves just under 890,000 customers. (CS Compl. ¶ 9.)

AT&T now proposes to acquire T-Mobile's U.S. mobile wireless businesses in a transaction that would give the combined firm over 44 percent of the all wireless market. (Sprint Compl. ¶¶ 2, 138.) If permitted to proceed, the proposed transaction would concentrate approximately 80 percent of the all wireless and postpaid markets in the hands of AT&T and Verizon. (*Id.* ¶¶ 2, 196.) The transaction would not only enhance AT&T's market power, but also make Sprint and Cellular South less competitive (and therefore less able to discipline AT&T's and Verizon's anticompetitive behavior) both by allowing AT&T (and Verizon) to

---

[2]   Defendants' challenge to Sprint's independent Section 7 claim relating to backhaul services is even more puzzling. Sprint is a *direct customer* of AT&T for backhaul services and therefore has direct purchaser standing. (Sprint Compl. ¶ 176.) *See also infra*, Section III.A. While Defendants challenge the merits of that claim, those are factual disputes for another day.

inhibit their access to critical inputs—including handsets, backhaul, and roaming—and otherwise raising their costs of doing business.  (Sprint Compl. ¶ 198; CS Compl. ¶ 76.)

**The Industry's Monopoly Roots**

AT&T and Verizon are the two principal remaining descendents of the old Bell System, under which the old AT&T controlled a vast infrastructure of fixed phone lines and held a monopoly over both local and long-distance telephone service.[3]  (Sprint Compl. ¶¶ 21, 23.) When the Federal Communications Commission ("FCC") began licensing radio spectrum for cellular communications service in 1981, it initially granted only two licenses in each geographic area, one to the local wireline company serving the area (almost always the "RBOC" Bell descendent), and the other to a company unaffiliated with any local landline telephone company. (*Id.* ¶ 25.)  Under this duopoly system, competition was limited, service was expensive, and innovation was slow.  (*Id.* ¶ 26.)  To increase competition, in 1993. Congress authorized the FCC to auction additional spectrum for wireless services, which ultimately led to the creation of a competitive market with multiple national providers, including AT&T, Verizon, Cingular, Sprint, and T-Mobile.  (*Id.* ¶¶ 27-28.)  As a result, prices dropped dramatically, technology increased, and demand for wireless service grew.  (*Id.* ¶ 29.)

**Mobile Wireless Competition Today**

Due to consolidation over the last decade, the mobile wireless industry today is composed of four national carriers—AT&T, Verizon, Sprint, and T-Mobile—and a handful of

---

[3]     After the DOJ brought an antitrust suit for monopolization of the U.S. telephone industry, the Bell System was broken up into separate companies for local and long-distance service, with AT&T retaining responsibility for long-distance service and seven newly-created regional bell operating companies ("RBOCs") providing local service.  (Sprint Compl. ¶ 22.)  Through a series of mergers and acquisitions, the vast majority of the Bell System's wireline infrastructure has now wound up back in the control of AT&T and Verizon.  (*Id.* ¶ 23.)

regional firms, including Cellular South, and prepaid providers MetroPCS and Leap.[4]   (Sprint

Compl. ¶ 138.)  Within this environment, AT&T and Verizon possess attributes not shared by

other mobile wireless providers.

First, their vast wireline networks, inherited from the old Bell System, make them

the predominant providers of "backhaul"—the infrastructure used to connect a carrier's cell sites

to the wireline network over which calls are routed.  (Sprint Compl. ¶¶ 58-59.)  Sprint is a

customer of both AT&T and Verizon for backhaul.  (*Id.* ¶ 176.)  Since their wireline network

assets largely do not overlap, AT&T and Verizon each enjoy market power for backhaul in their

inherited territories.  (*Id.* ¶¶ 149-51, 177.)  AT&T and Verizon thus each has the ability to

influence its competitors' costs of providing wireless service and is able to subsidize its own

wireless businesses through the revenues it collects from competing firms.  (*Id.* ¶¶ 5, 176.)[5]

Although the provision of backhaul is regulated by the FCC's "special access" rules, this

regulatory scheme is ineffective, and in many parts of the country the FCC does not actively

regulate the price and terms of backhaul services.  (*Id.* ¶¶ 60-62.)  In areas without independent

backhaul providers, AT&T and Verizon are able to impose significantly higher prices and more

onerous contract terms than in areas where they face competition.  (*Id.* ¶¶ 59, 149-52.)

Second, AT&T and Verizon have the largest mobile wireless networks, and are

therefore less dependent on roaming for nationwide coverage than other carriers.  (Sprint Compl.

¶ 56.)  Regional carriers like Cellular South, on the other hand, are particularly dependent on

reasonable access to roaming to provide nationwide coverage because their networks cover only

---

[4]   Prepaid providers offer wireless service plans that allow a subscriber to pay up front for a month of service or a set number of minutes rather than require a subscriber to enter into a two-year contract, as is the case with post-paid services.  (Sprint Compl. ¶ 65.)

[5]   There are some independent providers of backhaul, in places where there is sufficient volume to support their entry.  (Sprint Compl. ¶ 59.)

limited geographic territories.  (CS Compl. ¶ 64.)  For one carrier's subscribers to roam on another carrier's network, the two carriers must have a roaming agreement and their networks must employ compatible technology.  AT&T, T-Mobile, and Corr Wireless employ GSM-based technology, while Verizon and Sprint employ CDMA-based technology.  (Sprint Compl. ¶¶ 44-45; CS Compl. ¶ 20.)  AT&T has a history of being particularly difficult in negotiating roaming agreements with other GSM carriers, such as Corr Wireless, making T-Mobile an important roaming partner for these firms.  (CS Compl. ¶ 67.)

Third, AT&T and Verizon are in a position to demand favored access to the top handset manufacturers.  Handset selection is one of the primary drivers in the selection of wireless service providers by consumers.  (Sprint Compl. ¶ 79; CS Compl. ¶ 54.)  Due to their large subscriber bases, AT&T and Verizon are able to require lengthy and restrictive exclusivity agreements for the most popular handsets.  (Sprint Compl. ¶¶ 84-86; CS Compl. ¶ 53.)  Even without actual exclusivity arrangements, AT&T and Verizon are able to demand terms from handset manufacturers that disadvantage smaller wireless rivals.  For example, Cellular South is often denied the ability to sell current handsets until they are no longer the latest models.  (CS Compl. ¶ 53; *see also* Sprint Compl. ¶ 167 (similar concerns by another carrier).)[6]

Despite the dominant positions of AT&T and Verizon, Sprint and T-Mobile have been successful at disciplining the Twin Bells' premium pricing.  When Sprint and T-Mobile dropped prices for unlimited plans in the fall of 2009, AT&T and Verizon responded by dropping their own prices.  (Sprint Compl. ¶ 100.)  Moreover, Sprint and T-Mobile have been successful in joining forces to develop innovative new handsets to compete with those offered by AT&T and Verizon, such as through the Open Handset Alliance ("OHA"), which brought

---

[6]   Indeed, Cellular South's inability to secure LTE handsets has delayed its plans to roll out a 4G network.  (CS Compl. ¶ 56.)

Android smartphones to market.  (*Id.* ¶ 89-90.)  Android smartphones now account for 34

percent of all U.S. smartphones (*id.* ¶ 90), and have benefited smaller carriers, like Cellular

South, who are now able to offer some smartphones.

**The Proposed Transaction's Harm to Competition and Antitrust Injury to Plaintiffs**

By acquiring T-Mobile, AT&T would eliminate one of only two firms that have

demonstrated an ability to discipline AT&T's premium pricing and would concentrate

approximately 80 percent of the relevant markets in the hands of it and Verizon.  (Sprint Compl.

¶ 196.)  Given their shared corporate history, symmetrical cost structures and competitive assets,

and similar pricing behavior, the merger would facilitate increased tacit coordination between

AT&T and Verizon.  (*Id.* ¶ 195; CS Compl. ¶¶ 73-74.)  In turn, the market power created by the

merger would be reflected in the exacerbated size disparity between the Twin Bells and their

rivals, thereby making Sprint and Cellular South less effective competitors.  (Sprint Compl. ¶¶

195-98; CS Compl. ¶ 76.)  The acquisition would also make acquiring the latest handsets more

costly and difficult for smaller rivals, assuming, post-acquisition, they could even obtain those

devices while they were still cutting-edge.  (Sprint Compl. ¶¶ 160-63; CS Compl. ¶¶ 58-59.)  The

proposed merger would also create a greater incentive and ability for AT&T and Verizon to raise

Sprint's and Cellular South's costs by charging higher prices for roaming and backhaul.  (Sprint

Compl. ¶¶ 175-86; CS Compl. ¶¶ 71-72, 74-76.)

The likely exclusionary conduct facilitated by the enhanced market power flowing

from the proposed transaction would lead to a vicious anticompetitive cycle:  as Sprint's and

Cellular South's costs increased and access to handsets decreased, they would lose customers to

AT&T and Verizon.  (Sprint Compl. ¶¶ 160-69; CS Compl. ¶¶ 58, 63.)  In turn, this loss of

customers would make Plaintiffs even less able to secure desirable handsets, making it even

harder for them to compete.  (Sprint Compl. ¶ 168; CS Compl. ¶¶ 63, 76.)  AT&T and Verizon

would be able to raise prices while still gaining subscribers.  (Sprint Compl. ¶¶ 160, 168; CS Compl. ¶¶ 58, 63.)  Ultimately, the wireless industry would be transformed from one where smaller rivals act as competitive constraints on AT&T and Verizon into an AT&T and Verizon duopoly.  (Sprint Compl. ¶ 198; CS Compl. ¶¶ 73-76.)

## ARGUMENT

In their motions to dismiss ("Defs.' Sprint Br." and "Defs.' CS Br."), Defendants continue to inaccurately assert that competitors *necessarily* benefit from anticompetitive mergers, and therefore cannot have standing to seek to enjoin a merger that violates Section 7 of the Clayton Act, 15 U.S.C. § 18.  However, the law is well-established as to what must be pled, both to fall within the purview of Section 7 on the merits and to warrant competitor standing under Section 16 of the Clayton Act, 15 U.S.C. § 26.[7]  The simple application of these established standards confirms that Sprint's and Cellular South's detailed complaints fall well within Section 7's pleading requirements, including those concerning standing.

The discussion below is set forth in three parts.  First, we reiterate the law—ignored by Defendants—that the factual allegations in Sprint's and Cellular South's complaints are all that can be considered for purposes of the motions.  Second, we address Sprint's and Cellular South's standing as *horizontal* competitors in the various alleged wireless markets, including a proper recitation of the controlling law for competitor standing, and the application of those principles to the complaints at issue here.  Third, we address Sprint's distinct *vertical* claim relating to backhaul services, in which its standing as a *customer* is obvious.  The factual basis of this claim is laid out in great detail; it easily meets any potential application of *Twombly*.

---

[7]   Section 16 of the Clayton Act is the statutory provision that provides a private right of action for injunctive relief for parties threatened with loss or damage by a violation of the antitrust laws.  *See infra*, Section II.A.

## I.   DEFENDANTS' MOTIONS VIOLATE THE RULE 12(b)(6) STANDARD

Defendants' motions ignore the Rule 12(b)(6) standard by asking this Court to accept as true their own version of the "facts," effectively deciding the cases on the merits in their favor as a precursor to addressing their Rule 12(b)(6) motions.  Such an approach would turn *Twombly*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 556 U.S. ___ (2009), and the Federal Rules of Civil Procedure on their heads, and mark a sharp departure from well-established jurisprudence.

Plaintiffs' complaints need only contain "a short and plain statement of the claim showing that [they are] entitled to relief."  Fed. R. Civ. P. 8(a)(2); *see also Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008).  In assessing the merits of a complaint on a motion to dismiss under Rule 12(b)(6), "[t]he allegations in plaintiff's complaint are presumed true at this stage and all reasonable factual inferences must be construed in plaintiff's favor."  *Bd. of Trs. of Unite Here Local 25 v. MR Watergate LLC*, 677 F. Supp. 2d 229, 231 (D.D.C. 2010) (Huvelle, J.) (citing *Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995)).  Critically, the Court's factual inquiry is limited to the "facts alleged in the complaint, documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed," but only "if they are referred to in the complaint and integral to a claim."  *De Csepel v. Republic of Hungary*, No. 10-1261-ESH, 2011 WL 3855862, at *8 (D.D.C. Sept. 1, 2011) (Huvelle, J.) (citing *United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 24-25 (D.D.C. 2010) (Huvelle, J.)).

A complaint may not be dismissed if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570); *accord Unite Here Local 25*, 677 F. Supp. 2d at 231.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949; *see United States v. Dean Foods Co.*, No. 10-CV-59, 2010 WL 1417926, at *1, *4-6 (E.D. Wis. Apr. 7, 2010) (declining to dismiss a Section 7 claim where post-merger price increases were plausible, notwithstanding defendants' objection as to likelihood).  The "plausibility" standard does not amount to a "probability" standard; it simply requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949.  Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Defendants' motions violate every one of these principles.  Instead of addressing what Sprint and Cellular South in fact allege, Defendants:  (i) attempt to import an enormous amount of extraneous material and "facts" from outside the complaints[8]; (ii) literally make up their own facts (*e.g.*, asserting procompetitive effects of the transaction and suggesting that Sprint and Cellular South must necessarily benefit from any anticompetitive effects) and then address these "facts" as if they are in the complaints; and (iii) make various bald assertions that appear to be directed more at the media than this Court.

In this latter respect, Defendants' self-serving characterization of an email exchange between Cellular South and AT&T executives is revealing in two respects.  (Defs.' CS Br. at 1.)  First and foremost, it is inappropriate and irrelevant to the motions as it deals—and

---

[8]   To name just a few instances, Defendants cite an email exchange between Cellular South's President and the President of AT&T Mobility (Defs.' CS Br. at 1), cite to statements made in Sprint's and Defendants' filings before the FCC, which Sprint did not refer to in its complaint (Defs.' Sprint Br. at 5-6), cite out-of-context public statements made by a Sprint executive concerning the proposed acquisition (*id.* at 10), mischaracterize Sprint's allegations by asserting that, taken as true, they would lead to higher profits for Sprint post-transaction (*id.* at 7), and cite isolated comments by Sprint before the FCC regarding exclusivity arrangements (*id.* at 20 & n.12).

quite incompletely at that—with matters outside of the Cellular South complaint.[9]  But second, Defendants simply ignore that Cellular South voiced "serious concerns over the effect that the [merger] will have on the wireless industry as a whole and on Cellular South's ability to compete," including that the combination will "exacerbate the anticompetitive effects of handset exclusivity agreements, AT&T's reluctance (or refusal) to provide full data (including 4G) and voice roaming access and interoperability. . . ."  (Defs.' CS Br. Ex. A.)  That AT&T thinks this helps it *disprove* Cellular South's (or Sprint's) standing as likely weakened rivals is hard to imagine, but, in any event, any such discussions—or other ways AT&T may be trying to resolve similar concerns throughout the industry—are not for these motions.

## II.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE MERGER'S HARM TO COMPETITION IN THE WIRELESS MARKETS

What is most startling about Defendants' motions is that they misstate the Supreme Court's clear standard for Section 7 competitor standing and then essentially ignore the applicable case law applying that standard.  These cases hold that a horizontal competitor has standing if it alleges that the market power created by a proposed transaction is likely to impair its competitive vigor, thereby exacerbating the market power flowing from the merger.  Rather than acknowledge this long-established application of *Brunswick* and *Cargill*, Defendants assert incorrectly that competitor standing cannot exist for *any* horizontal claims in the wireless markets, and then further argue that a competitor cannot have standing, even if it will be less able to obtain inputs necessary to compete as a result of the merger, unless the foreclosure from those inputs constitutes independent Sherman Act or Clayton Act violations.  Not only would Defendants' approach directly contradict the *Brunswick* standard, it would also effectively

---

[9]   *See* Memorandum of Points and Authorities in Support of the Motion of Cellular South, Inc. to Strike Portions of Memorandum in Support of Defendants' Motion to Dismiss, *Cellular South, Inc. v. AT&T Inc.*, No. 1:11-cv-01690-ESH (D.D.C. filed Oct. 7, 2011).

overturn all of the cases granting competitor standing since *Cargill* and nullify the "incipiency" standard that forms the basis of Section 7 jurisprudence.

### A.  Defendants Misstate the Supreme Court's Standard for Competitor Standing to Challenge Horizontal Mergers

Defendants open their argument with the statement, notably without citation, that Sprint is "*categorically* without standing to complain" of "effects of the proposed transaction on competition in the provision of wireless services."  (Defs.' Sprint Br. at 6 (emphasis added).) This statement is *categorically* false, as a review of *Brunswick* and *Cargill* reveals.

Section 16 of the Clayton Act creates a private right of action for injunctive relief for any corporation or firm "threatened [with] loss or damage by a violation of the antitrust laws," including mergers and acquisitions that violate Section 7 of the Clayton Act.  *See* 15 U.S.C. §§ 18, 26.  In *Brunswick* and *Cargill*, the Supreme Court explained that the loss or damage referenced in Section 16 must constitute "antitrust injury" for a party to have standing to pursue the action.  *See Brunswick*, 429 U.S. at 489; *Cargill*, 479 U.S. at 110-13. [10]  As defined in *Brunswick*, "antitrust injury" is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," meaning an injury that "*reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation*."  *Brunswick*, 429 U.S. at 489 (emphasis added).

While it is axiomatic that the antitrust laws "were enacted for 'the protection of competition not competitors,'" *Brunswick*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)), it is equally well-recognized that conduct can injure competitors in ways that also injures consumers through higher prices, diminished service, and

---

[10]   Specifically, *Brunswick* held that the "antitrust injury" doctrine was a requirement for standing in actions for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  *Cargill* subsequently held that "antitrust injury" was a requirement for standing in actions for injunctive relief under Section 16 of the Clayton Act.

reduced innovation for consumers.  *See, e.g.*, *Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1303 (11th Cir. 2010).  Those injuries to competitors, which align with harm to consumers, are "antitrust injuries," and create standing for a competitor.  *Id.* at 1303-04.  Recognizing that acquisitions can have these anticompetitive effects on rivals, *Cargill* expressly declined to create a rule against competitor challenges to horizontal acquisitions.  *See Cargill*, 479 U.S. at 120-22.

Defendants' motions simply ignore the full statement of law from *Brunswick*, and thus never address the necessary conclusion that flows from it:  that part of what can make a horizontal acquisition illegal is that it can facilitate anticompetitive acts or forces against rivals, simultaneously causing antitrust injury to the rival and further harm to competition and consumers in the horizontal market.  Moreover, despite their use of the word "categorical," in a footnote, Defendants retreat and concede that *Brunswick* and *Cargill* acknowledge that horizontal acquisitions can cause antitrust injury to rivals, but according to Defendants, only in the form of possible post-merger price predation.  (Defs.' Sprint Br. at 8 n.3.)  But neither case is so narrow.  *Brunswick* mentioned predatory pricing simply as an example of the type of anticompetitive behavior an acquisition can foster.[11]  Likewise, *Cargill* acknowledged predatory pricing as a cognizable form of antitrust injury fostered by a merger, simply because that was the theory of competitive harm argued by the plaintiff in that case.  *See* 479 U.S. at 417-19.  Nowhere did the Court state or imply that predatory pricing is the only type of anticompetitive

---

[11]  Specifically, the Court in *Brunswick* stated:

> [The antitrust injury requirement] does not necessarily mean, as the Court of Appeals feared, that . . . plaintiffs must prove an actual lessening of competition in order to recover.  The short-term effect of certain anticompetitive behavior[,] predatory below-cost pricing, *for example* may be to stimulate price competition.  But competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened.

> *Brunswick*, 429 U.S. at 489 & n.14 (emphasis added; citation omitted).

behavior against rivals that a merger can foster.  The variety of anticompetitive effects on rivals

warranting standing and recognized in subsequent horizontal merger cases underscores this point.

*See infra*, Section II.B.2.  *See also Coors Brewing Co. v. Miller Brewing Co*, 889 F. Supp. 1394,

1400-02 & n.14 (D. Colo. 1995) (rejecting the argument that a merger can cause antitrust injury

to rivals only through predatory pricing).

**B.      A Competitor Suffers Antitrust Injury When the Market Power
          Resulting from the Merger Impairs Its Ability to Compete or Raises
          Its Costs, Giving the Merged Firm Incremental Market Power**

For a private plaintiff, the elements of a Section 7 action for injunctive relief are:

(1) a violation of Section 7, through showing that the acquisition "may . . . substantially lessen

competition, or . . . tend to create a monopoly" in any line of commerce; and (2) threatened

antitrust injury, meaning the plaintiff's injuries stem from effects of the acquisition that tend to

reduce, rather than enhance, competition.  *See Cargill*, 479 U.S. at 109-11, 113.

**1.      Defendants Do Not Dispute That the Complaints
          State a Claim that the Acquisition Increases AT&T's Market Power**

Defendants do not seriously contest that Plaintiffs have sufficiently alleged the

first element of the private right of action—that the acquisition violates Section 7 by increasing

AT&T's market power in the relevant wireless markets.  Indeed, the complaints allege and

define relevant wireless product and geographic markets (*see* Sprint Compl. ¶¶ 114-23, 128-32;

CS Compl. ¶¶ 29-35), and describe the undue increases in concentration in those markets,

leading to a presumption under established merger-review principles that the acquisition is

"likely to enhance market power."  (Sprint Compl. ¶¶ 135-48 (citing 2010 Guidelines); CS

Compl. ¶¶ 78-83.)  The complaints also describe how eliminating T-Mobile, a low-price leader

and innovator, further enhances AT&T's power to raise prices post-merger.  (Sprint Compl.

¶¶ 154-58; CS Compl. ¶¶ 73-76.)  These allegations state a plausible *prima facie* Section 7 claim

16

for harm to competition and increased market power by AT&T in wireless markets. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 166 (D.D.C. 2000). Defendants rightly do not attempt to argue otherwise.

Instead, Defendants inject into the motions their own presentation of "facts," baldly claiming that the deal will make AT&T's network more efficient, will increase output, and will lead to lower wireless prices. (Defs.' Sprint Br. at 7.) Rule 12(b)(6) is not so generous. The complaints specifically allege how AT&T's purported efficiencies are unfounded (*see, e.g.*, Sprint Compl. ¶¶ 199-206), leaving Defendants' assertions in these motions as simply merits arguments that they hope to establish at trial. Instead, the DOJ and numerous State Attorneys General have alleged that the proposed merger is *not* efficiency-enhancing and will not increase output or lead to lower prices. Consequently, there is no basis in the complaints for the Court to accept Defendants' assertion that the actions filed by Sprint and Cellular South simply reflect fear of a procompetitive acquisition. (Defs.' Sprint Br. at 7.)

### 2. A Competitor Has Standing if It Alleges That the Market Power Achieved Through the Acquisition Can Be Used to Impair Rivals' Ability to Compete, Aligning the Rivals' Injury with Likely Harm to Consumers

Defendants disregard not only the antitrust injury standard in *Brunswick* and *Cargill*, but also ignore the significance of all of the post-*Cargill* cases that have found standing for competitors in horizontal mergers. Defendants thus assert incorrectly that "courts routinely dismiss competitor challenges to mergers for lack of standing." (Defs.' Sprint Br. at 8.) Since *Cargill*, only 13 cases have addressed competitor standing to challenge horizontal mergers, and the outcome of the cases are about evenly split between those granting and denying standing. Moreover, the cases that did not find standing turned—with one exception—on a failure of *proof* of antitrust injury at the preliminary injunction or summary judgment stages.

17

Critically, these cases reveal a *consensus* since *Cargill*:  a horizontal merger causes "antitrust injury" to competitors when it impairs their ability to compete in a way that gives the merged firm further incremental market power to raise prices or otherwise reduce competition.  *See Six West*, 2000 WL 264295, at *22; *Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1148-49 (S.D.N.Y. 1996); *Cmty. Publishers*, 892 F. Supp. at 1164-66; *Coors Brewing*, 889 F. Supp. at 1400-02; *Bon-Ton Stores*, 881 F. Supp. at 871; *Tasty Baking*, 653 F. Supp. at 1273-74 (E.D. Pa. 1987).  These effects can arise in a variety of contexts, any of which would state a plausible theory affording a competitor standing to challenge a merger.  Moreover, none of these cases required independent Sherman Act or Clayton Act violations in separate input markets.

### (a)   *Tipping Effects*

The acquisition of market power through purchasing a rival can have the effect of "tipping" the market such that remaining rivals can no longer compete effectively and discipline post-merger price increases by the merged firm.  *See Cmty. Publishers*, 892 F. Supp. at 1164-66. In *Community Publishers*, a small newspaper, the *Daily Record*, established standing on this basis to challenge the combination of two larger rivals, the *Times* and the *Morning News*, forming a combined paper with an over 80-percent market share.  *Id.* at 1165, 1168.  The evidence presented at trial indicated that the size of a newspaper's readership was critical to attracting advertisers.  *Id.* at 1165.  It also indicated that newspaper advertising exhibited a "negative feedback loop."  *Id.* at 1159-60.  Specifically, local readers often subscribe to a newspaper in order to access advertisements and promotions, and advertisements also partially fund the newspaper.  *Id.*  Thus, an initial loss of advertising would cause a downward spiral, triggering a loss of readers, which in turn would lead to still more advertising losses.  *Id.*

In light of this evidence, the *Community Publishers* court concluded that the plaintiff would be unable to compete effectively and discipline post-merger price increases by the combined firm, and found standing on this basis. *Id.* at 1164-66.  In particular, the merger created such a size disparity between the plaintiff and the defendants that the combined firm became a "must buy" for advertisers. *Id.* That is, advertisers would feel compelled to stay with the combined firm, despite price increases, in order to access that newspaper's much wider readership. *Id.* Moreover, the plaintiff would be unable to restrain these price increases by expanding output, because it would be stuck in the downward spiral triggered by the "negative feedback loop." *Id.* at 1166.  Accordingly, the court found antitrust injury and standing for the smaller rival, noting:

> A monopolistic price increase by the *Morning News* and the *Times* would harm not only readers and advertisers, but also competitors like the *Daily Record*.  That harm to the *Daily Record* would not be caused by increased efficiency due to the acquisition, but rather due to its monopolistic practices made possible by the acquisition.

*Id.* Thus, *Community Publishers* recognizes that antitrust injury can be present when a competitor's acquisition of a rival pushes the market over the line at which smaller rivals can no longer effectively compete and discipline post-merger price increases.  This is "antitrust injury" to the smaller rivals because the same effects that lead to anticompetitive price increases to consumers also lead to lost business for smaller rivals.

*Community Publishers* also found a "second source of antitrust injury" on the ground that the acquisition created an incentive for the acquiring newspaper, the *Morning News*, to terminate a news and advertising sharing agreement the plaintiff had with the acquired paper, which had allowed both to compete against their larger rival. *Id.* at 1166-67.  In other words, another anticompetitive effect of the acquisition was that it effectively ended a partnership between the plaintiff and the acquired paper that had made both more effective competitors.

19

The 2010 Guidelines issued by the DOJ and FTC also recognize the exacerbation of a size disparity as a potential source of injury to both rivals and consumers.  In describing how horizontal mergers can have anticompetitive effects on rivals, the 2010 Guidelines give an example of a merger in a network industry, in which rivals routinely interconnect with each other to provide their services.  *See* 2010 Guidelines § 2.2.3, ex. 2.  "Prior to the merger, [the] rivals voluntarily interconnect with one another," because they are roughly the same size and thus have equal incentives to interconnect.  The merger, however, "would create an entity with a large enough share that a strategy of ending voluntary interconnection would have a dangerous probability of creating monopoly power in this market."  *Id.*  The 2010 Guidelines find that this changed incentive would be an anticompetitive effect of the merger and that "[t]he interests of rivals and of consumers would be broadly aligned in preventing such a merger."  *Id.*

### (b)  *Increased Ability to Coerce Agreements that Impair Rivals*

The acquisition of market power through purchasing a rival can give the merged firm the ability to demand agreements from third parties that interfere with the plaintiff's ability to compete.  *See Tasty Baking*, 653 F. Supp. at 1273-74.  In *Tasty Baking*, a snack cake company successfully established antitrust injury on this basis at the preliminary injunction stage.  The plaintiff maintained that, through the merger, the combined firm had acquired such a significant share of the snack cake market that it could pressure retailers into removing plaintiff from "desirable shelf space and promotion times," a strategy that would make it unduly costly or difficult for the plaintiff to compete.  *Id.* at 1274.  The court agreed that this threat of non-price predatory acts by the merged firm established antitrust injury.  *Id.*  Moreover, the court recognized that defendants' enhanced power to displace plaintiff from desirable retail space was an anticompetitive effect of the merger, as opposed to legitimate competition, because it was

"attributable mostly to the market power obtained through defendants' illegal acquisition," and not merger efficiencies. *Id.* at 1273-74.

### (c)   *Disruption of Access to Upstream Inputs*

When the acquiring firm consolidates market power downstream, it can increase the ability and incentive of the merged firm to exploit its access to necessary upstream markets and disrupt a non-integrated rival's access to upstream inputs. In *Six West*, an independent theater operator established standing at the motion to dismiss stage to challenge the horizontal consolidation of its two major competitor theater chains that were owned by vertically integrated movie distributors. *See Six West*, 2000 WL 264295, at *22-26. The court concluded that the plaintiff had adequately alleged antitrust injury to challenge the merger's horizontal effects because the complaint alleged that the acquisition enabled defendants to "restrain[] plaintiff's access to quality motion pictures . . . effectively depriving [p]laintiff of its ability to compete for first-run films." *Id.* at *22. This in turn could cause harm to competition and increased prices in the theater market. *Id.* at *24 n.40. Significantly, while the court noted the defendants' positions as leading movie distributors, *id.* at *25, it found that plaintiff had adequately alleged antitrust injury without calculating the amount of foreclosure or the level of availability of movies through other distributors. *Id.* at *25-26.

Similarly, in *Union Carbide*, plaintiff competed through a joint venture in the licensing of a plastics manufacturing process. 944 F. Supp. at 1147-49. Defendant, a competitor in that market, acquired the plaintiff's joint venture partner, thus disrupting plaintiff's access to one of two inputs necessary to provide a complete licensing package and limiting the competitive threat plaintiff posed to the defendant in the licensing market. *Id.* at 1126-28, 1132. The plaintiff sued, alleging that the defendant's acquisition of its joint venture partner violated Section 7 by reducing competition in the market for the input and in the market for the licensing

package.  *Id.* at 1147-49.  The court found that the plaintiff had adequately stated antitrust injury

by alleging harm through the defendant's actions to eliminate the plaintiff as a competitor in the

licensing market, thereby giving the defendant the power to "restrict output, increase prices, [and]

limit [innovation]."  *Id.* at 1148-50.  The court rejected the defendant's argument that the

plaintiff purportedly only stood to benefit from the reduction in competition, holding that "a

competitor . . . has standing as long as it can demonstrate 'that its injury was caused by

anticompetitive or predatory aspects of [defendant's] conduct, not by competition.'"[12]  *Id.*

(citation omitted).

### (d)   *Impairment Through Raising Rivals' Costs*

The horizontal acquisition of market power also can have the effect of giving the

merged firm the ability to increase the plaintiff's costs of competing, which enhances the merged

firm's market power to raise prices.  In *Bon-Ton Stores*, for instance, a department store

company established antitrust injury at the preliminary injunction stage to challenge a

combination of department stores in Rochester, NY, through which the merged firm acquired all

of the available space to place a department store in Rochester's four main malls.  *See Bon-Ton*

*Stores*, 881 F. Supp. at 865-66, 876-78.

---

[12]    Defendants cite a source suggesting the grant of standing in *Union Carbide* was "inappropriate," because the allegation that the merged firm would reduce output and raise prices "would seem to benefit the plaintiff." (Defs.' Sprint Br. at 11 n.6.)  *See* 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 356a n.6 (2d and 3d eds., 2011). Respectfully, this source misses the point.  The plaintiff in *Union Carbide* did not stand to benefit from the reduction in competition in the licensing market, because the acquisition undermined its ability to compete in that market.  By disrupting the plaintiff's access to the input, the merger gave *the defendant* the power to harm competition by raising prices, restricting output, and limiting innovation.  *See* Jonathan M. Jacobson & Tracy Greer, *Twenty-One Years of Antitrust Injury: Down the Alley with* Brunswick v. Pueblo Bowl-O-Mat, 66 Antitrust L.J. 273, 310 (1998) ("It is an accepted principle that conduct that impairs rivals or raises their costs in such a way as to create or facilitate the exercise of market power violates the antitrust laws and inflicts antitrust injury on the aggrieved competitor."); *see also Tasty Baking*, 653 F. Supp. at 1256 (noting that "competitors—with specialized knowledge of their market—may recognize that an acquisition will enable the acquiring company to harm competition by harming the remaining competitors").

The defendants argued that the acquisition did not harm competition, or cause antitrust injury to the plaintiff, because the plaintiff could open a store elsewhere, including in strip malls and stand-alone locations. *Id.* at 865. The evidence indicated, however, that a position in a main mall was critical to competing in the department store market, and that it was difficult to succeed and "not economical" to operate a store from other locations. *Id.* at 876-77. Consequently, the court concluded that the merger undermined the plaintiff's ability to enter the market and compete effectively. *Id.* at 878. Moreover, the court found that it was "not difficult to believe, . . . in the absence of competing department stores," that defendants' prices "would be higher on average, that they would have fewer sales, and that consumers would suffer accordingly." *Id.* at 877-78. Thus, there was a "direct nexus" between the plaintiff's injury—its exclusion from the best mall space—and harm to the market and consumers, justifying antitrust injury to plaintiff. *Id.* at 878.

### (e)      *Other Ways of Impairing Rivals*

Consistent with the Section 7 incipiency standard, the categories above are not exhaustive of the ways in which a horizontal acquisition can give a merged firm the ability to reduce the competitive viability of remaining rivals, causing further injury to consumers. In *Coors Brewing*, for example, Coors was found to have adequately alleged antitrust injury and standing to challenge the merger of competing brewers, Miller and Molson. 889 F. Supp. at 1400-02. Coors had a licensing agreement with Molson's parent company, and the transaction would also give Miller a share of this parent company. *Id.* at 1401-02. Coors alleged antitrust injury for harm to competition in beer markets on the ground that the acquisition gave Miller access to sensitive competitive information about Coors, through the licensing agreement, which "threaten[ed] [Coors'] status as the principal competitor to Miller and Anheuser-Busch . . . which,

given the concentration in that market, weakens domestic competition and promotes a Miller/Anheuser-Busch duopoly." *Id.* at 1398.

The court found these allegations sufficient to establish antitrust injury and standing at the pleading stage. The court noted that the only question at issue at that stage was whether Coors had pled facts that, "if proved, tend to establish an injury that flows from a threatened or actual restraint on competition." *Id.* at 1401. Thus, while defendants argued that any weakening of Coors would only be the result of "tough competition," not anticompetitive conduct, the court concluded that dismissal would be inappropriate until the facts could be evaluated after discovery. *Id.*

\*     \*     \*     \*     \*

Significantly, none of the seven cases rejecting competitor standing since *Cargill* was based on any "categorical" legal rule that a competitor cannot have standing to challenge a horizontal merger of its competitors. Instead, these outcomes stemmed from either the failure of the plaintiffs to establish, *on the evidence*, that the acquisition gave the merged firm market power in the horizontal market sufficient to interfere with the ability of remaining rivals to compete[13] or a failure to claim or articulate how the merged firm could use its market power to

---

[13] In *Pearl Brewing Co. v. Miller Brewing Co.*, No. SA-93-CA-205, 1993 WL 424236 (W.D. Tex. Mar. 31, 1993), for example, the private plaintiffs failed to establish antitrust injury at the preliminary injunction stage, for an acquisition that joined a firm with only a 22-percent market share and a firm with only a 0.08-percent market share, which was insufficient to even suggest a *prima facie* violation of Section 7. *Id.* at \*3. The court found a lack of proof, on the merits, that the merged firm had sufficient market power in the horizontal market to engage in exclusionary conduct towards rivals. *Id.* at \*3 & n.5. Similarly, in *Ansell Inc. v. Schmid Laboratories, Inc.*, 757 F. Supp. 467 (1991), a competitor failed to establish antitrust injury on the merits, because, *inter alia*, the evidence indicated that the merged firm, which had only a 29 percent market share and was significantly smaller than another firm in the market, did not have the market power in the horizontal market to implement non-price exclusionary practices. *Id.* at 483; *see also Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 100 (5th Cir. 1988) (plaintiff failed to establish antitrust injury at the preliminary injunction stage, because it alleged antitrust injury through predatory pricing, but, as in *Cargill*, could not produce evidence suggesting below-cost pricing, and failed to show how the acquisition enhanced the ability or incentive of the vertically integrated acquirer to interfere with the plaintiff's access to an upstream input).

impair the plaintiffs' ability to compete.[14]  In fact, each of those cases involved the application of

*Brunswick* to the particular facts at issue.

### C.   When Assessed Under the Actual Legal Standards and Precedents, the Complaints Clearly Plead Antitrust Injury

In considering the application of the law to Defendants' motions, it is

worth emphasizing that the "antitrust standing" and "antitrust injury" requirements of Section 16

are simply elements of the private cause of action, subject to basic notice pleading principles.

*See Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778, 782-83 (7th Cir. 1994) (Posner,

J.).  This means, as with all elements, that they must be judged on the face of the complaint,

accepting the truth of the facts alleged therein, and drawing all reasonable inferences in the

plaintiff's favor.[15]  Importantly, these principles apply even when the private party bringing suit

is a competitor, and continue to apply after *Twombly*.  *See Palmyra Park Hosp.*, 604 F.3d at

1294-95, 1303.  Accordingly, the only question at issue in these motions is whether Sprint and

Cellular South have alleged facts which, when taken as true and viewed in the light most

favorable to Plaintiffs, suggest the market power resulting from the merger impairs their ability

to compete, thereby furthering harm to consumers.

---

[14]   *See Remington Prods., Inc. v. N. Am. Phillips Corp.*, 717 F. Supp. 36, 44-47 (D. Conn. 1989) (finding a lack of antitrust injury at summary judgment when the plaintiff did not present evidence or even claim that the defendants' market power achieved through the acquisition could be used to engage in any anticompetitive conduct towards rivals), *aff'd on reh'g*, 755 F. Supp. 52, 56-58 (D. Conn. 1991); *Hart Intercivic, Inc. v. Diebold, Inc.*, No. 09-678, 2009 WL 3245466, at *4-5 (D. Del. Sept. 30, 2009) (finding a lack of antitrust injury at the preliminary injunction stage because the plaintiff did not present evidence or describe the source of its injury stemming from the acquisition); *Alberta Gas Chems. Ltd. v. E.I. du Pont de Nemours & Co.*, 826 F.2d 1235, 1239 (3d Cir. 1987) (finding a lack of antitrust injury at the summary judgment stage because plaintiff could not connect its claim of lost business to any anticompetitive effects of the deal).  In the only case to reject antitrust injury on a motion to dismiss, the acquisition simply was not the cause of the defendants' alleged exclusion from the market.  *See Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1107 (6th Cir. 1989) (holding that plaintiff failed to allege antitrust injury, because its exclusion from the market was caused by a patent, not the acquisition at issue).

[15]   *See Hammes*, 33 F.3d at 782-83 (holding that a competitor adequately alleged antitrust injury in a suit alleging price-fixing by its rivals, when, despite two plausible interpretations of the complaint, one interpretation was that the rivals were interfering with the plaintiff's ability to compete, which is an antitrust injury).

The complaints contain detailed facts alleging how both competition and Sprint and Cellular South would be harmed by the proposed merger.  The merger would increase the incentives and ability of AT&T, both by itself and tacitly with Verizon, to reduce competition.[16] To protect their own price increases and stave off competition from Sprint, Cellular South, and others, AT&T and Verizon would be able to use their enhanced market power to impair their rivals' ability to compete.  Thus, Plaintiffs allege precisely that their harm flows from the merger's anticompetitive effects, and this harm is therefore "antitrust injury" in complete alignment with the likely harm to consumers.

### 1.    The Proposed Acquisition Would Impair Plaintiffs' Access to Competitive Handsets

First, as pled, the merger would increase AT&T's and Verizon's ability to coerce handset manufacturers into disadvantaging Sprint, Cellular South, and other wireless providers. (Sprint Compl. ¶¶ 159-69; CS Compl. ¶¶ 50-63.)  AT&T, as well as Verizon, currently enjoy preferential access to many of the top handset manufacturers.  The proposed transaction would increase AT&T's subscriber base by over 33 percent to 129 million, and Verizon would continue to have 104 million subscribers.  (Sprint Compl. ¶¶ 94-95; CS Compl. ¶ 9 (citing similar numbers).)  Sprint, with approximately 50 million subscribers, would be less than half the size of either firm, and Cellular South would be far smaller.  Thus, the increased disparity between the Twin Bells and Sprint and the remaining carriers "would enable both AT&T and Verizon to coerce exclusionary handset deals . . . without AT&T having gained that advantage through

---

[16]    Post-merger, AT&T and Verizon would together control approximately 80 percent of these markets, (Sprint Compl. ¶¶ 2, 159, 196; CS Compl. ¶¶ 74, 79), making coordinated interaction between them highly likely.  *See United States v. UPM-Kymmene Oyj*, No. 03 C 2528, 2003 WL 21781902, at *9 (N.D. Ill. July 25, 2003) ("[W]hen 80% of current production is in the hands of three companies who agree to raise prices, they will be able to do so with little fear that the fringe of other competitors can defeat their attempts at price increases.").  The likelihood of coordination is also supported by a number of market characteristics, including the Twin Bells' common corporate heritage, common set of competitive assets, symmetrical pricing, and price transparency.  (Sprint Compl. ¶¶ 195-96.)

competition on the merits.  With reduced access to the latest handsets post-acquisition, Sprint's offers to its customers would be less attractive and its business would be injured."  (Sprint Compl. ¶ 160; *see* CS Compl. ¶¶ 58-59.)

The transaction would also give AT&T a greater ability to demand handsets that are compatible with only its network, an anticompetitive practice that it already engages in to some extent today.  (Sprint Compl. ¶ 165; CS Compl. ¶¶ 58, 62.)  As Cellular South explains in its complaint, wireless carriers design and build their networks (or ecosystems) for specific spectrum bands.  (CS Compl. ¶ 51.)  "Without T-Mobile's independent demand for devices, device manufacturers will be even less willing to design or build devices for any carrier, like Cellular South, which is operating outside of the ecosystem of one or the other of the Big Two. . . . [T]he merger would allow AT&T and Verizon to develop separate ecosystems even further that will impair competition by depriving other carriers of the ability to deploy high end devices such as smartphones."  (*Id.* ¶ 52; *see also* Sprint Compl. ¶¶ 163-64.)

The merger-enhanced ability and incentive to coerce handset manufacturers into disfavoring Plaintiffs falls clearly within the category of anticompetitive conduct that gave rise to competitor-plaintiff standing in *Tasty Baking*.  It would also create a form of "negative feedback loop" recognized by the court in *Community Publishers*.  Because handsets are a key driver of consumers' choice of a wireless carrier (Sprint Compl. ¶ 79; CS Compl. ¶ 63), inhibited access to the leading handsets would cause Sprint and Cellular South to lose customers to AT&T and Verizon.  As their subscriber bases shrink, they would be even less able to obtain desirable handsets, thereby increasing AT&T's and Verizon's power even further and allowing them to raise prices or otherwise reduce competition while also increasing market share.  (Sprint Compl. ¶ 168.)  In light of the complaints' allegations, including details of AT&T's existing influence

27

over handset manufacturers (Sprint Compl. ¶¶ 85, 165, 167; CS Compl. ¶¶ 50-63), Defendants'

assertion that the complaints do not explain how the transaction will increase AT&T's ability to

coerce more restrictive exclusivity agreements with handset manufacturers is baseless.

Likewise, the Court should reject Defendants' attempt to discredit Plaintiffs'

handset allegations by analogizing them to Sherman Act cases involving run-of-the-mill

exclusive distributorship arrangements.  (Defs.' Sprint Br. at 20; Defs.' CS Br. at 6-7.)  Only in

AT&T's imagined complaint can it cast itself as a mere handset distributor; Plaintiffs'

complaints certainly do not treat it as such.  Further, even Defendants acknowledge that

exclusivity arrangements can be anticompetitive when they "allow[] one buyer of goods

unreasonably to deprive other buyers of a needed source of supply."  (Defs.' Sprint Br. at 21

(alteration in original) (citation and internal quotations omitted).)  Plaintiffs are not bringing a

Sherman Act claim challenging a particular handset arrangement.  Rather, Plaintiffs claim that

the merger would create an undue increase in market power that would enable "increased periods

of market exclusivity . . . [for the purpose of] foreclos[ing] rivals from a critical input necessary

to compete effectively . . . ."  (Sprint Compl. ¶ 162; *see also* CS Compl. ¶ 59.)

AT&T's *enhanced* power to demand exclusive arrangements would not be

beneficial to competition because AT&T would be using its exclusivity to protect and enhance

market power resulting from an anticompetitive merger.  (Sprint Compl. ¶ 168; *see* CS Compl.

¶ 63.).  Moreover, unlike in the past, when Sprint could team with T-Mobile through

collaborations like the OHA to approximate the scale of AT&T or Verizon and provide a

response to their exclusives, the acquisition prevents this from ever happening again.  (*See infra*

II.C.2.)  Defendants' arguments to the contrary, at best, raise a factual dispute for trial as to the

transaction's likely effect on access to handsets.

### 2.    The Proposed Acquisition Would Impair Innovation by Disrupting Sprint's Historical Collaboration with T-Mobile

Second, the complaints allege that the transaction would take away the ability of Sprint and other independent competitors to ally with T-Mobile to create substantial scale for the development of new handsets to compete with the Twin Bells.  For example, T-Mobile and Sprint partnered together in the OHA to help develop the Android mobile device platform to compete with AT&T's iPhone.  (*Id.* ¶¶ 88-90.)  Smartphones running on the Android operating system are now the key competitors to the iPhone and account for 34 percent of smartphones in the United States.  (*Id.* ¶ 90.)  The acquisition of T-Mobile would remove a key innovator from the marketplace and stifle collaborative efforts like the OHA in the future.  The removal of T-Mobile as an important collaborative partner for Sprint and others implicates the same concerns that led the *Community Publishers* court to find standing.  *See Cmty. Publishers*, 892 F. Supp. at 1166 ("A second source of antitrust injury concerns the possible termination of a news and advertising sharing agreement that is currently in effect between [plaintiff and acquired firm].")

### 3.    The Merger Would Increase the Ability and Incentive of AT&T and Verizon to Inhibit Plaintiffs' Access to Roaming and Backhaul

Third, the merger would enhance the ability and incentive of AT&T, as well as Verizon in tacit coordination with AT&T, to exploit their vertically-integrated status to disrupt Plaintiffs' access to roaming and backhaul, inputs critical to the provision of mobile wireless services.  The proposed transaction would combine the only two nationwide GSM networks, giving AT&T a *monopoly* on GSM roaming, and would likely result in higher prices to AT&T's and T-Mobile's roaming customers, including Cellular South.  (Sprint Compl. ¶ 184; *see* CS Compl. ¶¶ 27, 66-68, 72.)  Corr Wireless, in particular, would be directly injured since its available roaming partners would decrease from two to one as a result of the merger, and thereby injure its business.  (CS Compl. ¶¶ 67-88.)  This problem is even more profound, because AT&T

historically has refused or delayed entering into roaming agreements with smaller carriers, such as Corr Wireless, on reasonable terms.  (*Id.*)

By raising its rivals' roaming costs, AT&T would be able to coerce other wireless firms to go along with increases in retail wireless rates, enabling AT&T to raise its wireless rates without losing customers and while increasing market share.  (Sprint Compl. ¶¶ 185-86.)  With AT&T setting higher prices, Verizon would have the incentive to increase its retail prices and also to raise its roaming rates to CDMA carriers, including Sprint.  (*Id.*; *see* CS Compl. ¶¶ 74-76.) *See JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 778-79 (7th Cir. 1999) (Posner, J.) (competitors colluding to raise the costs of a rival maverick firm that refused to go along with their market-allocation scheme).  Similar effects would be felt with respect to LTE roaming as AT&T and Verizon continue to roll out those networks.  (CS Compl. ¶ 71.)

Defendants raise four challenges to Plaintiffs' roaming claims.  First, Defendants argue that Sprint and Cellular South (except as noted below) do not have standing for their roaming claims because they are not GSM carriers, and therefore cannot purchase roaming from AT&T.  (Defs.' Sprint Br. 18; Defs.' CS Br. 8-9.)  But as detailed in the complaints and explained above (*see supra*, note 16), the transaction would facilitate tacit coordination between AT&T and Verizon, which does provide CDMA roaming.  This coordination would likely extend to roaming because "[w]ith AT&T setting higher [wireless and roaming] prices, Verizon would have an incentive to increase its retail prices and also to raise its roaming fees to CDMA carriers, including Sprint."  (Sprint Compl. ¶ 185; *see* CS Compl. ¶¶ 74-76.)  Second, Defendants argue that less than 3 percent of Cellular South's customers use GSM roaming, although it is not clear whether this is meant to be a standing argument or just an observation about the size of the harm to Cellular South.  (Defs.' CS Br. 9.)  In either event, just because Cellular South's

approximately 25,000 GSM subscribers may not seem like much to AT&T, that is no reason to dismiss Cellular South's claims. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972) ("[T]he freedom guaranteed each and every business, no matter how small, is the freedom to compete . . . .") (citing *Philadelphia Nat'l Bank*, 374 U.S. at 371).  Third, Defendants argue that there is no reason to believe Cellular South will be cut off from roaming post-merger.  (Defs.' CS Br. 9.)  But this is irrelevant because the higher roaming rates likely to result from the merger would nonetheless make it more difficult for Cellular South to compete.

Finally, Defendants argue that Plaintiffs' roaming claims are implausible because the FCC's roaming regulations require all mobile wireless carriers to offer roaming on reasonable terms.  (Defs.' Sprint Br. 19; Defs.' CS Br. 9-10.)  But Defendants do not, nor could they, argue that the FCC regulations would prevent AT&T and Verizon from raising roaming rates post-merger, and indeed many carriers claim they are unable to obtain roaming on reasonable terms today.  (*See, e.g.*, Sprint Compl. ¶ 108 (Leap Wireless explaining that industry "consolidation has contributed significantly to some carriers' control over the terms and conditions of wholesale roaming services."); CS Compl. ¶ 67 (alleging that AT&T does not offer roaming on reasonable terms).)  The FCC's roaming regulations are therefore no bar to Plaintiffs' claims. *See Downs v. Insight Commc'ns Co.*, No. 3:09-CV-00093, 2011 WL 1100456, at *5 (W.D. Ky. Mar. 22, 2011) (holding that *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 406 (2004), does not apply when "claims are grounded in established antitrust standards and would exist regardless of the regulations"); *accord In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*, No. 09-ML-2048-C, 2010 WL 5136047, at *4-5 (W.D. Okla. Jan. 19, 2010).

31

Both Sprint and independent wireless providers will also face impaired access to backhaul at competitive prices. As a result of the vast wireline networks inherited from the old Bell System, AT&T and Verizon are the predominant providers of backhaul, yet rarely compete due to the lack of overlap in their wireline networks. (Sprint Compl. ¶¶ 59, 177.) In many of its inherited territories, AT&T has monopoly power in the provision of backhaul. (*Id.* ¶ 151.) In some areas, AT&T and Verizon face competition from independent backhaul providers, but only where there is sufficient demand to support these additional firms. (*Id.* ¶ 59.) T-Mobile and Sprint are the two key customers of alternative backhaul providers because AT&T and Verizon, as inheritors of the wireline monopoly, typically purchase backhaul from each other and have a shared incentive to stifle independent backhaul providers. (*See id.* ¶ 177-79.) Therefore, T-Mobile, as the second largest independent wireless carrier, has been critical to the viability of independent backhaul providers. (*Id.* ¶ 180 (the backhaul demand from T-Mobile "helps to fuel the growth of alternative special access, leading to greater competition for ILECs and lower prices for carriers and their customers").)

As alleged, the loss of T-Mobile as a key customer of alternative backhaul providers would seriously diminish the demand for these firms' services. (Sprint Compl. ¶¶ 178-82.) At best, this loss of available demand would raise the per unit cost for alternative backhaul and place upward pressure on price; at worst, demand would drop below a level of minimum viable scale, forcing other providers to exit the market or limit overall supply. (Sprint Compl. ¶ 181 (industry association discussing concerns about the loss of T-Mobile as a customer).) It would also take away the incentives for new firms to enter to compete with AT&T and Verizon. (*Id.* ¶ 179.) This reduction in competition will leave backhaul customers like Sprint and Cellular

South with fewer choices and higher backhaul rates, thereby enabling AT&T and Verizon to raise their retail wireless rates without losing business to other carriers.  (*Id.* ¶ 182.)

The merger-enhanced ability of AT&T and Verizon to use their vertically-integrated status to disadvantage rivals through higher backhaul and roaming rates is precisely the competitive concern that constituted antitrust injury in *Six West*.  *See Six West*, 2000 WL 264295, at *22 (finding competitor standing where "Plaintiff alleges that the merger causes antitrust injury by restraining Plaintiff's access to quality motion pictures and, effectively, depriving Plaintiff of its ability to compete for first-run films").  The roaming concerns also fit squarely within the 2010 Guidelines' example of a merger creating an incentive for the merged firm to stop interconnecting with rivals.  *See* 2010 Guidelines § 2.2.3, ex. 2.  As the wireless industry has become more consolidated, it has become harder and harder for smaller carriers to obtain roaming on favorable terms because AT&T and Verizon have become less dependent on roaming and have less need for reciprocal agreements with smaller carriers.  (Sprint Compl. ¶¶ 56, 108.)  The merger would consolidate more of the industry in the hands of AT&T and Verizon, further reducing their incentives to offer roaming to smaller carriers on competitive terms. (Sprint Compl. ¶¶ 184-86; CS Compl. ¶¶ 71-72, 74-76.)

### 4.     The Transaction Would Shift Network Development Costs to AT&T's Rivals

Fourth, the proposed transaction would increase Sprint's and all other independent carriers' costs of developing networks and spectrum for new services, including fourth generation (4G) service for voice and data.  Absent the acquisition of T-Mobile and its spectrum, the national carriers, with the possible exception of Verizon, would have to develop the network infrastructure and handsets required to work in new spectrum bands where competitors have spectrum holdings.  (Sprint Compl. ¶ 171; *see* CS Compl. ¶ 57.)  By acquiring

developed spectrum through the T-Mobile acquisition, AT&T would effectively and improperly shift the costs of network, device, and spectrum development to other carriers, further weakening their ability to compete.  (Sprint Compl. ¶ 171.)  Moreover, the ability of AT&T to avoid investing in spectrum is not an efficiency, because it is not a cost savings; instead, the cost is simply shifted to other carriers.  (*Id.* ¶ 174.)  A competitor has standing to challenge a merger that would raise its costs in this manner.  *See Bon-Ton Stores*, 881 F. Supp. at 865 (competitor had standing to challenge merger that raised its costs by consolidating all department-store retail space in a single firm).

### 5.   The Merger Would Make AT&T and Verizon the Gatekeepers of Mobile Wireless Services

Finally, the merger would allow AT&T and Verizon to control access to upstream products and services, further disadvantaging their rivals.  Developers of mobile operating applications and content, and other businesses, rely on wireless access to deliver their products and services, and consumers rely on the same wireless access to buy products and otherwise interact with upstream firms through their wireless devices.  (Sprint Compl. ¶ 187.)  Post-merger, AT&T and Verizon would be able to use their increased market power to control access to mobile wireless customers, to exclude upstream firms that are unwilling to accede to their business terms, and to raise access costs to those firms that do remain.  (*Id.* ¶ 188.)  Increased costs to upstream companies would harm those companies, independent wireless carriers, and ultimately to consumers who would suffer from higher costs and reduced innovation.  (*Id.*; *see* CS Compl. ¶ 76.)

### 6.   The Merger Would Irrevocably Drive the Wireless Service Industry Back Toward Duopoly

In the aggregate, viewing all the effects of the merger together, the ultimate effect would be to drive the U.S. wireless industry back to a duopoly controlled by AT&T and Verizon.

(Sprint Compl. ¶¶ 195-98.)  Through the acquisition, AT&T would obtain the ability and

incentive to impair competition from smaller rivals, including by interfering with critical inputs,

desirable handsets, content, and services that they need to remain viable, and by raising their

costs for backhaul and roaming access.  (Sprint Compl. ¶ 195.)  Collectively, these effects would

raise Sprint's and Cellular South's costs of providing service and undermine their ability to offer

the products and services necessary to attract and retain customers.  (*Id.* ¶ 198; CS Compl. ¶¶ 74-

76.)  As alleged, this initial damage and loss of customers would feedback in a continuous

loop—further enhancing the market power of the Twin Bells and the harm to consumers

resulting from the merger.  *See Cmty. Publishers*, 892 F. Supp. at 1164-66.

> ### D.      Defendants' Motions Are Directed at Strawmen and Apply Inapplicable Legal Standards

   In sharp contrast to the actual law, Defendants' motions are based on attacking

allegations that are not in the complaints and invoking legal standards that do not apply.

   *First*, Defendants' briefs primarily tear down strawman allegations that are

nowhere in the complaints.  The first factual strawman, noted above, is that Sprint and Cellular

South fear that the transaction will make the wireless market *more* competitive, purportedly

because of efficiencies that numerous government antitrust authorities found do not exist.  As

established above, however, the complaints' plausible allegations of a Section 7 violation, and

the specific allegations of how Defendants' claimed efficiencies are unfounded, precludes this

tactic.  The second factual strawman is the assertion, that "all of the ways in which [Sprint]

claims that competition will be curtailed in wireless services would clear the way for Sprint to

raise its prices and *earn higher profits*."  (Defs.' Sprint Br. at 10 (quoting Sprint Compl. ¶ 158))

(emphasis added).  This quote flatly misstates Sprint's complaint, which does *not* allege that

Sprint would earn higher profits.  The complaints spell out in detail how the acquisition gives

AT&T enhanced market power, which it in turn can use to diminish the competitive vigor of

Sprint and Cellular South by, among other things, raising their costs for backhaul and roaming,

and denying them access to desirable handsets.  AT&T and Verizon benefit from these effects;

Sprint, Cellular South, and consumers unequivocally do not.  (*See* Sprint Compl. ¶¶ 168, 174,

182, 186; CS Compl. ¶ 76.) [17]

> *Second*, without a single citation to a Section 7 case, and ignoring the antitrust

injury precedents since *Cargill*, Defendants attempt to persuade the Court effectively to create a

new legal rule:  that the only way a competitor can have standing to challenge an acquisition is if

it alleges either (1) the likelihood of independent Sherman Act violations, or (2) that any

potential impairment of access to inputs would rise to the level of an independent Section 7

violation (for which a plaintiff would have consumer standing in that market).  (Defs.' Sprint Br.

at 13-14 (applying Sherman Act standards to Sprint's backhaul claims); *id.* at 20-21 (applying

Sherman Act standard to handset claims); Defs.' CS Br. at 6-7 (same).)

> As a threshold matter, there is no legal basis for grafting Sherman Act

requirements onto Section 7 of the Clayton Act to assess the alleged injury to competition or a

competitor stemming from a merger.  As the Supreme Court has recognized, "Section 7 of the

Clayton Act was intended to arrest the anticompetitive effects of market power in their

incipiency," meaning it is designed to arrest the acquisition of market power *before* violations of

the Sherman Act materialize.  *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967)

(citations omitted); *see also United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 589

(1957) ("[Section 7] is violated whether or not actual restraints or monopolies, or the substantial

---

[17]   The cases relied on by Defendants, *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990), and *O.K. Sand & Gravel, Inc. v. Martin Marietta Technologies, Inc.*, 36 F.3d 565 (7th Cir. 1994), are irrelevant, as in each of these cases, the court found that the conduct challenged did not harm competition.  However, Sprint is

lessening of competition, have occurred or are intended."); *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 180 (D.D.C. 2001) ("All that is necessary is that the merger create an *appreciable danger* of such [anticompetitive] consequences in the future.") (emphasis added; citation omitted).[18]  Defendants' attempt to supplement Section 7 with Sherman Act requirements would thus do violence to the very statutory intent behind a Section 7 claim.

There is nothing in *Brunswick* or *Cargill*, or their progeny, suggesting that a competitor can establish standing to challenge a horizontal acquisition only if it alleges the prospect of an independent antitrust violation, including in any related input markets. *Community Publishers*, *Coors Brewing*, *Tasty Baking*, *Bon-Ton Stores*, and *Six West* all found standing for horizontal mergers without requiring any allegations that the rival's impairment would rise to the level of an independent Sherman Act violation, and none called for claims of independent Section 7 violations in related input markets or market definition allegations.[19]

*Tasty Baking*, for example, which found antitrust injury based on the merged firm's ability to coerce exclusionary agreements from third-party retail stores, did not attempt to define a "market for retail distribution."  Instead, the court looked at the defendants' position in the *horizontal market*, and assessed whether, through the market power acquired in that market

---

not complaining of higher prices, but rather that the proposed transaction will enable AT&T to use its enhanced market power, through exclusionary conduct, to the detriment of Sprint and Cellular South, and consumers.

[18]   In assessing the competitive effects of a proposed transaction, it is not enough to examine individual competitive effects piecemeal as Defendants attempt to do.  Rather the court must assess the aggregated effect of all the transaction's potential competitive consequences.  *See FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1223 (11th Cir. 1991) (recognizing the need to consider "the acquisition's total competitive effect"); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) ("The Supreme Court has adopted a totality-of-the-circumstances approach to [Section 7], weighing a variety of factors to determine the effects of particular transaction on competition."); *accord Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("'[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'") (alteration in original) (quoting *Am. Tobacco Co. v. United States*, 147 F.2d 93, 106 (6th Cir. 1944)).

[19]   Defendants' invocation of *Twombly* on market definition or "foreclosure" is thus legally irrelevant.  (Defs.' Sprint Br. at 11, 17, 20.)

by the merger, the defendant obtained enhanced power to coerce retailers into disfavoring the plaintiff.  Even in *Six West*, where the plaintiff was both a competitor in the horizontal market and a customer in a related input market, the plaintiff's standing as a competitor was not dependent on simultaneously alleging a distinct Section 7 violation as a customer in the input market.  The court did not attempt to define the upstream movie distribution market or assess the extent to which movies were available from other sources.  Instead, it recognized that the plaintiff's claimed injury as a non-integrated rival—that the acquisition would increase the ability and incentive of the merged firm to disrupt its access to movies—was precisely the type of threat to competition that is presented by a horizontal merger involving a vertically integrated firm.  AT&T's proposed acquisition of T-Mobile is no different.[20]

## III.   SPRINT HAS STANDING TO CHALLENGE THE MERGER BASED ON HARM TO COMPETITION IN THE BACKHAUL MARKETS

In addition to its horizontal claims in the wireless markets, Sprint brings a separate vertical claim for harm to competition in local backhaul markets.  As explained above, the loss of T-Mobile as a critical backhaul customer would cause competitive backhaul providers to exit the relevant markets and decrease the likelihood of new entry.  *Supra* Section II.C.3.  This loss of competition would lead to higher backhaul rates for Sprint and other wireless carriers.  Defendants' challenge to Sprint's standing here is easily dispatched.  Sprint is a direct customer in these markets, the request is only for injunctive relief (hence, there is no issue of potential duplicative recovery or speculative damages), and the allegations as to how the proposed merger

---

[20]   Much like Sprint does here with respect to backhaul, in *Union Carbide*, the plaintiff alleged that the acquisition violated Section 7 by reducing competition in the market for the input and in the market in which it competed with the defendant.  944 F. Supp. at 1147-49.  *Union Carbide*, however, does not suggest or imply that a Section 7 violation in an input market is required to find that an acquisition impairs a rival's ability to compete in the horizontal market.

will harm competition are laid out in detail and must be accepted as true.  Under these

circumstances, a challenge to Sprint's standing must be rejected.

**A.      Firms That Are Both Competitors and Customers
         Have Standing to Challenge Vertical Aspects of Mergers**

After arguing vociferously that a horizontal competitor "is categorically without

standing" to challenge a merger of rivals (Defs.' Sprint Br. at 6), Defendants then pull an about-

face and argue that only AT&T's backhaul *competitors* have standing to challenge the merger's

effects in those markets.  (Defs.' Sprint Br. at 16.)  Invoking *Associated General Contractors of*

*California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 539 (1983) ("*AGC*"),

Defendants assert that Sprint lacks standing because its injury is derivative of the injury to

competitive backhaul providers, thus placing the backhaul suppliers in a better position to bring a

backhaul claim.  (Defs.' Sprint Br. at 16.)  This argument suffers from at least two flaws.

First, it cannot seriously be disputed that competitors who are also customers of

one of the merging parties have antitrust standing to challenge those transactions as customers.

*See AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 576 n.4 (7th Cir. 1999) ("[The

competitor-plaintiff] has demonstrated a sufficient likelihood of establishing standing as a

consumer of landing gear . . . ."); *Lucas Automotive Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,

140 F.3d 1228, 1236-37 (9th Cir. 1998) (finding that a firm that was both a competitor in the

distribution of vintage tires and a purchaser of vintage tires had antitrust standing to challenge a

vertical merger where the merged firm had market power in the upstream market for inputs).

Indeed, the Plaintiff in *AGC* was denied standing precisely because it was *not* a customer or

competitor.  *See* 459 U.S. at 539.  Here, the effects in the backhaul markets would directly harm

Sprint and other independent wireless carriers through the higher prices they would have to pay

as consumers of backhaul.  *See* Michael H. Riordan & Steven C. Salop, *Evaluating Vertical*

*Mergers:  A Post-Chicago Approach*, 63 Antitrust L.J. 513, 557 (1995) ("Reducing or eliminating competition from certain unintegrated input suppliers can facilitate input market foreclosure against the remaining unintegrated output producers that compete."). This is precisely the type of injury "the antitrust laws were intended to prevent and that flows from that which makes [the proposed transaction] unlawful." *Brunswick*, 429 U.S. at 489.

Second, Defendants' argument overlooks the fact that Sprint is bringing only a claim for injunctive relief under Section 16 of the Clayton Act, not an action for damages under Section 4.  The additional standing considerations articulated in *AGC*, such as the availability of other parties to sue and the risk of duplicative recovery, simply do not apply to an injunctive relief claim, as *Cargill* itself recognized.  *See Cargill*, 479 U.S. at 111 n.6; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d 29, 41-43 (D.D.C. 2008) (noting that the additional "'efficient enforcement factors' identified in *AGC* do not apply to claims for injunctive relief" and denying motion to dismiss claim for injunctive relief) (citing *Cargill*, 479 U.S. at 110-11, nn.5-6)).

### B.   Sprint Plainly Pleads Facts Showing That It Will Suffer Antitrust Injury Through a Reduction in Competition in the Backhaul Markets

#### 1.   Sprint's Claim Is Based on a Well-Recognized Theory of Customer Foreclosure

Defendants challenge the merits of Sprint's vertical backhaul claims on the basis that the merger removes a customer for backhaul, rather than a competitor, from the markets. For some unidentified reason, they claim that this "makes Sprint's burden correspondingly heavier."  (Defs.' Sprint Br. at 12.)  Such *ipse dixit* has no foundation in antitrust merger law or economics.  Sprint's backhaul claims are simply customer foreclosure claims.  *See* Riordan & Salop, *supra*, at 551 ("Customer foreclosure refers to exclusionary conduct by the downstream division of an integrated firm with the purpose and effect of excluding rival input suppliers from

access to a sufficient customer base."); 11 Phillip E. Areeda et al., *Antitrust Law* ¶ 1802c (2d and 3d eds., 2011) (when a firm forecloses a rival's access to customers, "[c]onsumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.").

The Supreme Court recognized customer foreclosure as a competitive concern in the merger context in *Ford Motor Co. v. United States*, 405 U.S. 562 (1972).  In that case, the United States challenged Ford's acquisition of Electric Autolite Co., an independent spark plug manufacturer.  The Supreme Court found the acquisition anticompetitive because it "marked 'the foreclosure of Ford as a purchaser of about ten percent of total industry output.'" *Id.* at 568 (citation omitted).  The Court also reiterated *Brown Shoe*'s cautionary language about vertical mergers:  "The primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a 'clog on competition . . . .'" *Id.* at 570 (quoting *Brown Shoe*, 370 U.S. at 323-24).

More recently, AT&T's predecessor company, AT&T Corp., raised concerns with the FCC over customer foreclosure in the related markets for special access.  As explained by AT&T's economist, Robert Willig:

> [T]he RBOCs [now the new AT&T and Verizon] have the ability to engage in pricing practices [for special access] that make the technology-driven barriers [sic] to entry even more effective in working against new entrants.  The RBOCs can ward off the threat of competitive entry by 'locking up' large customers by offering them volume or term discounts below entrants' costs—thereby deterring prospective entrants, for whom service to large customers may have been the inducement necessary to invest in the necessary sunk facilities."[21]

---

[21]  Declaration of Janusz Ordover and Robert Willig, ¶ 63, attached to AT&T Corp. Petition for Proposed Rulemaking to Reform Regulation of Independent Local Exchange Carrier Rates for Interstate Special Access, RM-10593 (F.C.C. filed Oct. 15, 2002), *available at* http://ecfsdocs.fcc.gov/filings/2002/10/15/5508448142.html.

Here, Sprint alleges that AT&T is "locking up" one of the largest alternative backhaul customers not by offering discounted prices—which arguably have procompetitive benefits—but by acquiring that customer outright. As explained above, T-Mobile's backhaul has been critical to stimulating new entry, and the loss of T-Mobile would likely lead to exit by some firms and higher prices by the remaining firms. It would also reduce the likelihood of new entry in the future. *Supra* Section II.C.3. This is precisely the type of "clog on competition" the Supreme Court was concerned about in *Ford Motor*. *See* 405 U.S. at 570-71 (holding that an acquisition may lead to a substantial lessening of competition where it removes a significant purchaser from the market).

### 2.    Defendants' Objections to Sprint's Customer Foreclosure Claim Are Unavailing

Defendants assert a number of merits objections to Sprint's vertical backhaul claims. These arguments are unavailing because they rely on inapposite case law and attempt to raise factual issues at the motion-to-dismiss stage.

First, Defendants claim that Sprint's complaint contains nothing about the scope of the alleged markets or amount of foreclosure. But this merits argument relies on inapposite case law and ignores the well-pled allegations in the complaint. Defendants' legal position is based on cases involving Sherman Act claims where plaintiffs have to demonstrate an actual harm to competition based on past conduct rather than an "appreciable danger" that competition may be reduced in the future as a result of a transaction.[22] And even in the Sherman Act context, the precision demanded by Defendants is not required at the pleading stage. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 452 n.12 (4th Cir. 2011) ("While Kolon did

---

[22]    *See generally Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111 (10th Cir. 2008) (exclusive dealing claims brought under Sherman Act Sections 1 and 2); *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002)

not allege a specific percentage of market foreclosure in its Counterclaim, it would be problematic to reject its Counterclaim, with its extensive factual allegations, solely on that basis at the pre-discovery, motion-to-dismiss stage[.]").

Further, Defendants' position ignores the well-pled allegations in the complaint. Sprint alleges that the relevant markets for backhaul are no larger than metropolitan-based local markets, and could be smaller, due to "the need to connect each individual cell site to the carrier's network." (Sprint Compl. ¶ 133.) As explained above, AT&T has market or even monopoly power in many relevant local markets that are within AT&T's service territories, where it controls the wireline assets. (*Supra* Section II.C.3; *see also* Sprint Compl. ¶¶ 134, 149, 151.) T-Mobile is the second largest independent wireless carrier and uses competitive backhaul providers for 20 percent of its cell sites. (Sprint Compl. ¶¶ 94-97, 181.) The loss of T-Mobile would clearly affect a substantial share of the relevant local markets.

Second, Defendants suggest that Sprint has no reason to fear a decrease in backhaul competition due to FCC regulations. Again, Defendants turn a blind eye to the complaint's allegations. As Sprint alleged in its complaint, the FCC's regulation of backhaul has been widely regarded as ineffective, in part because the MSA-wide screen the FCC uses to assess competition does not necessarily correspond to actual local market conditions. (*Id.* ¶¶ 60-62.) The identified harm to the backhaul markets is therefore likely to result notwithstanding the FCC's oversight in this area. *See supra* Section II.C.3.

Third, relying on *Alberta Gas*, Defendants argue that Sprint's backhaul claim "simply reflects 'the efficiency effects of a vertical merger.'" (Defs.' Sprint Br. at 14.) But, as the Supreme Court recognized in *Ford*, customer foreclosure can result in a "clog on

---

(same); *Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, No. C 08-01035 JSW, 2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) (exclusive dealing claims under § 2).

competition" actionable under Section 7.  Whether any efficiency effects might outweigh the

anticompetitive harm is a factual issue to be resolved later.  Even in *Alberta Gas*, the

competitor's claim was permitted to proceed past the motion-to-dismiss stage based on an

allegation that the merger foreclosed only three percent of the market.  826 F.2d at 1244.

Fourth, Defendants argue that Sprint's backhaul claims are not plausible because

the loss of T-Mobile demand would actually lead to lower prices.  (Defs.' Sprint Br. at 15.)  But

as the complaint explains, the loss of T-Mobile would reduce demand to such an extent that

competitive backhaul providers in certain markets would no longer be able to achieve minimum

viable scale.  These competitors would thus exit the markets, leading to higher prices.

Finally, Defendants assert that the backhaul claims are speculative because

competitive harm would only result if alternative providers actually withdrew from the market

and the remaining providers would have market power.  Defendants' arguments again ignore the

fact that Section 7 is intended to deal with "with probabilities, not with certainties" and is

intended to arrest potential harm to competition in its incipiency.  *Procter & Gamble*, 386 U.S. at

577 (citations omitted).[23]  Sprint alleges that the elimination of a leading purchaser of alternative

backhaul will result in fewer alternative access vendors in backhaul markets, making Sprint more

reliant on AT&T (and Verizon) for backhaul and facilitating the ability of AT&T and (Verizon)

to raise backhaul rates.  While AT&T is free to try to disprove Sprint's allegations at trial, there

is nothing speculative about the detailed allegations in its complaint.

---

[23]   Defendants' reliance on *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007), is misplaced.  (*See* Defs' Sprint Br. at 17.)  In *Broadcom*, the plaintiff claimed that it would be harmed because it *may* have eventually required a license to future technologies based on standards that were "not yet fully developed" for which the defendant *might* have gained monopoly power *in the event that* standards determining organizations adopted standards that utilized defendant's components as essential elements.  501 F.3d at 322.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the complaints of

Sprint, Cellular South, and Corr Wireless should be denied.

Dated:  October 7, 2011

Respectfully submitted,

*/s/ Chong S. Park*
Chong S. Park (D.C. Bar No. 463050)
Kenneth P. Ewing (D.C. Bar No. 439685)
Matthew Kepniss (D.C. Bar No. 490856)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036-1795
Tel: (202) 429-3000
cpark@steptoe.com

Alan W. Perry (*pro hac vice*)
Daniel J. Mulholland (*pro hac vice*)
Walter H. Boone (*pro hac vice*)
FORMAN PERRY WATKINS KRUTZ &
    TARDY LLP
City Centre, Suite 100
200 South Lamar Street
Jackson, Mississippi 39201-4099
Tel: (601) 969-7833
aperry@fpwk.com

Charles L. McBride, Jr. (*pro hac vice*)
Joseph A. Sclafani (*pro hac vice*)
Brian C. Kimball (*pro hac vice*)
BRUNINI, GRANTHAM, GROWER &
    HEWES, PLLC
The Pinnacle Building, Suite 100
190 East Capitol Street
Jackson, Mississippi 39201
Tel: (601) 960-6891
cmcbride@brunini.com

*Counsel for Plaintiffs Cellular South, Inc. and
    Corr Wireless Communications, L.L.C.*

*/s/ Steven C. Sunshine*
Steven C. Sunshine (D.C. Bar No. 450078)
Gregory B. Craig (D.C. Bar No. 164640)
Tara L. Reinhart (D.C. Bar No. 462106)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Tel: (202) 371-7000
Steven.Sunshine@skadden.com
Gregory.Craig@skadden.com
Tara.Reinhart@skadden.com

James A. Keyte (*pro hac vice*)
Matthew P. Hendrickson (*pro hac vice*)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036-6522
Tel: (212) 735-3000
James.Keyte@skadden.com
Matthew.Hendrickson@skadden.com

*Counsel for Sprint Nextel Corporation*

45

## CERTIFICATE OF SERVICE

I hereby certify that, on October 7, 2011, I caused the foregoing Joint Opposition to Defendants' Motions to Dismiss the Complaints of Sprint and Cellular South to be filed using the Court's CM/ECF system.  I also caused the foregoing documents or papers to be mailed via electronic mail to counsel for the Defendants listed below:

Michael K. Kellogg
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, DC  20036
202-326-7902
mkellogg@khhte.com

*Counsel for AT&T, Inc. and AT&T Mobility LLC*

Mark W. Nelson
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington DC  20006
202-974-1622
mnelson@cgsh.com

*Counsel for Defendants T-Mobile USA, Inc., and Deutsche Telekom AG*

*/s/ Tara L. Reinhart*
Tara L. Reinhart (D.C. Bar No. 462106)
*Counsel for Sprint Nextel Corporation*